```
 1                         SACRAMENTO, CALIFORNIA

 2                    MONDAY, MAY 4, 2009; 1:00 P.M.

 3                            ---O0O---

 4

 5                         (Whereupon, the following proceedings

 6                         were held in open court outside the

 7                         presence of the jury panel:)

 8            THE CLERK:  Calling criminal case 06-0058, United

 9   States versus Jagprit Singh Sekhon.

10            This is on for jury trial.

11            THE COURT:  The Court is convened outside the presence

12   of the jury.

13            The Court has received several submissions in the

14   nature of motions on behalf of all the defendants to exclude

15   evidence of asylum narrative charts, also a supplemental

16   brief filed by Mr. Zindel I received this morning.

17            Counsel, anything you want to add to what has already

18   been submitted?

19            MR. ZINDEL:  No, Your Honor.

20            THE COURT:  Government wish to respond to the motions?

21            MR. REARDON:  I'll -- just to notify the Court, I had

22   submitted something at 12:59, which obviously you did not

23   receive, notice of an additional case the government found.

24   It's the case of Walker, which is 191 F.3d, 326.  It's a

25   Second Circuit opinion.
```

1          THE COURT:  What does it say?

2          MR. REARDON:  The case is the prosecution of an

3    attorney and interpreter in an asylum fraud case with facts

4    similar to what the government believes are at issue here.

5    The case goes on to say that they reject the defendant's

6    claim, that the summary provided by the INS official was

7    improper expert testimony because it offered legal

8    conclusions.

9          They say the immigration official's testimony simply

10   summarized and commented upon the contents of the

11   applications without opining on the truth or falsity of those

12   accounts or whether the defendant had committed the crime;

13   moreover, the applications themselves were before the jury

14   and available to the defense for purposes of cross-examining

15   the official.

16         Then it just says they review the admission for an

17   abusive discretion and it was well within the des cretion of

18   the Court to admit that evidence pursuant to Federal Rule of

19   Evidence 1006.

20         THE COURT:  Thank you, counsel.

21         Give me a moment to review.  I have not seen the

22   response to the defendants' joint supplemental motion.

23         I have reviewed the response.  Mr. Blackmon provided a

24   further reply to the response.

25         MR. BLACKMON:  It's additional information the Court

1   would want to have, but I've gone over these exhibits that

2   are in issue here with my client and I have information as to

3   which ones of the various narratives and all of those

4   exhibits she would have had some connection with.

5        It certainly is not all of the narratives in all of

6   the exhibits.  I think that is information that goes to the

7   argument that Mr. Gohel has placed before the Court having to

8   do with a foundation as to whether or not there's evidence

9   that each of the individual defendants had knowledge of these

10  particular narratives.

11       If the Court thinks that would be helpful to it, I

12  could quickly --

13       THE COURT:  It would not be helpful.  I appreciate the

14  opportunity to review that, but I'm ready to rule.

15       MR. WAGNER:  If I could make one comment.  The one

16  thing that was indicated in Mr. Zindel's motion that I

17  thought was well taken is with respect to Exhibit 75.2, which

18  is a chart which comprises entirely of Indian applicants.

19       All of the other charts are either exclusively

20  Romanian or predominantly Romanian, but that chart is

21  exclusively Indian.  I think the point that he made in his

22  motion is if the Court is inclined to allow testimony on

23  that, that the Court give a limiting instruction with respect

24  to Mr. Caza and Ms. Harmath as to that chart.

25       The government would agree to that.  That's 75.2, Your

1    Honor.

2        THE COURT:  All right.  What about the information

3    regarding Ms. Harmath with respect to her husband?  It seems

4    to me that is fairly prejudicial unless there's some

5    indication she was aware of the falsity of that application.

6        MR. WAGNER:  Well, she's listed on the application

7    itself.  Her photograph on that application itself.  She's a

8    derivative beneficiary of that application.  I think there

9    would certainly be circumstantial evidence that she would be

10   aware of its contents.  She did not sign it, but it contains

11   her photograph.

12       THE COURT:  This is 75.5, PB?

13       MR. WAGNER:  Yes.  That is her husband.

14       THE COURT:  Is this a false application that the

15   government is going to present evidence it is false?

16       MR. WAGNER:  We believe it is because as indicated on

17   that chart, there are similarities between that narrative and

18   so many others.  That's in a list of about 45.

19       THE COURT:  But getting down to the issue of

20   whether -- what about the evidence that PB is, in fact, her

21   husband?  Is that necessary?  That doesn't go to the basis

22   upon which this would be admitted, at least based on what

23   you've argued?

24       MR. WAGNER:  No.  It's a separate issue from the chart

25   as a whole.  Those are two separate issues.

1          THE COURT:  The question here is not whether it's

2     false or true.  The question now we're dealing with is

3     whether or not the fact this is her husband is admissible and

4     what is the relevance of that; that she knew it was his

5     application and is caught up in these similar narratives that

6     have been submitted?

7          MR. WAGNER:  Yes.

8          THE COURT:  I'm not inclined to allow that evidence,

9     but go ahead.

10         MR. GOHEL:  You are?

11         THE COURT:  I'm not.

12         MR. GOHEL:  I'm not going to say anything then.

13         THE COURT:  That's a good position to take, Mr. Gohel.

14         MR. GOHEL:  I just wanted to talk generally about the

15    narratives.  It seems to me that the government, and I

16    appreciate Mr. Wagner's candor in the sense that that chart

17    with the Sikh -- I think 75.2 should have a limiting

18    instruction.  It seems to me the argument, perhaps not as

19    forcibly could be made, for any of the charts that have Sikhs

20    in them.

21         For example, I think there's another one that has

22    several Sikhs that certainly Mr. Caza and Ms. Harmath would

23    not have been involved in.  I don't think there's any

24    evidence they were involved in those in any way, shape, or

25    form.

1          THE COURT:  How do I make the distinction here, Mr.

2    Wagner?  If all Sikh applications or narratives would not

3    apply to Ms. Harmath, where do we draw the line?  It seems to

4    me logically that should be the limiting instruction.

5          MR. WAGNER:  I wouldn't object to that, Your Honor.

6          THE COURT:  All right.  Can you identify the exhibits

7    that that would affect?

8          MR. WAGNER:  Yes.  I think that may take me a moment.

9          THE COURT:  Check that out while we're listing to the

10   balance of this argument.

11         Mr. Dratman?

12         MR. DRATMAN:  75.7 deals with the Gheorghe Jianu,

13   Daniel Chisca narrative.  That is a separate conspiracy

14   charged in this Indictment that my client is not charged in.

15   I had not given separate consideration to that until just

16   now.

17         The fact is, there is no evidence at all that my

18   client was involved -- he's not charged with the Gheorghe

19   Jianu matter.  It really does strike at the heart of these

20   charts as well.  The fact is that the government is going to

21   argue that all of these applications contained in these

22   charts are false by virtue of circumstantial evidence when

23   none of the applications have been vetted.

24         My client isn't charged at all in connection with

25   75.7, period.  He's got no involvement at all.  There's no

1    evidence that the government's going to present that he had

2    anything to do with the other narratives.

3         THE COURT:  Mr. Wagner -- there's 11 other narratives

4    referred to there.  You're saying we should parse the

5    narratives?  This is the heart of the argument here.  Is that

6    what you're suggesting?  Where do you come down to it?

7         Let's talk about 75.7.  You're saying your client was

8    not charged?  Is there a conspiracy -- no, it's everybody.

9         MR. DRATMAN:  Yes, a separate conspiracy count.

10        THE COURT:  Mr. Wagner, what do you say to that?

11        MR. WAGNER:  Gheorghe Jianu appears on that list with

12   12 Romanians that a person on that list.  All of those

13   Romanians were part of the same fraud factory.  As it

14   happens, Mr. Jianu or Mr. Chisca, his undercover name never

15   made it to San Francisco and an asylum hearing, but many of

16   the others on this list did.

17        So I think it's Count One, the entire conspiracy, not

18   limited to just the undercover and it relates to the overall

19   activity.

20        THE COURT:  Okay.

21        Mr. Stepanian.

22        MR. STEPANIAN:  Yes, Your Honor.

23        Mr. Wagner states that the inference of the similarity

24   of the charts and the language in the charts would go to the

25   truth of the charts.  This is what -- that inference is going

1    to be before the Court because the language is the same;

2    therefore, they are true; therefore, they are false.  This is

3    basically what we're talking about.  The problem is the

4    questions of the witnesses who will present these charts.

5          I'm assuming the Court will admit some of these

6    charts.  If that is to be the case, her testimony is

7    important on how the question is framed as to what she did

8    with the charts.  The inferences raised by her presenting the

9    charts to the jury and that inference, therefore, shows that

10   the charts, the 589s are false.

11         This is a very, very difficult position only because

12   the question is:  Where is the line?  Where is the line that

13   when she testifies, is she testifying as an expert?

14         No, because she hasn't been designated an expert.

15         Is she testifying as a lay person?

16         Well, she's an agent.

17         So the question I have is the same sort of question,

18   not the same, but when we admitted hearsay statements

19   concerning the documents.  We can't cross-examine in some

20   respects the idea that, well, what are the basic substance of

21   the charts.  So I think the questioning of her, I think the

22   position she takes has to be decided now.

23         If, in front of the jury there is questioning

24   concerning the veracity of these charts based on your

25   introducing the charts over our objection, they we're in a

 1    very, very precarious position as to the substantive aspect

 2    of the charts.

 3              THE COURT:  What are you asking of the Court?

 4              MR. STEPANIAN:  I think the safest way to go would be

 5    to have her testify out of the presence of the jury as to

 6    what she's going to say about these charts.  I don't think

 7    that we -- I don't think that she's in a position to say,

 8    "these charts."  "I'm showing you these charts."  "These

 9    charts are similar in language."  "There scenarios are

10    similar; therefore, they're fraudulent."

11              THE COURT:  No.  We're not going to get to that

12    conclusion.  That's not what this is about.  We're not

13    seeking her opinion on whether this is fraudulent, whether

14    these are fraudulent narratives or not.  It's improper.

15              MR. STEPANIAN:  I understand that.

16              THE COURT:  You're seeking some type of examination

17    outside the presence of the jury?

18              MR. STEPANIAN:  Yes.  To find out how this evidence is

19    being presented.  It's extremely prejudicial.  It is based

20    on, frankly, the charts themselves.  These references in the

21    charts create a situation where they are very, very

22    prejudicial.  And how it's presented, I think, is a concrete

23    problem.

24              THE COURT:  Let's take one step at a time here.  Let's

25    deal with -- the actual narratives or exhibits, do you have

1    those laid out?  Which ones are Sikh and which ones are --

2           MR. WAGNER:  I think 75.2 is --

3           THE COURT:  All Sikh?

4           MR. WAGNER:  Yes.  All Indian; 75.7 is all Romanian.

5           75.6 consists of -- I believe it is seven pairs of

6    applicants of which four pairs are Romanian, two pairs are

7    Nepalese and one pair is Fijian.

8           THE COURT:  The last one is Fijian?

9           MR. WAGNER:  Yes.

10          THE COURT:  What do I do with that Nepalese and

11   Fijian?

12          MR. WAGNER:  We can have a limiting instruct as to

13   those two.

14          THE COURT:  Would not be Mr. Caza or Ms. Harmath?

15          MR. WAGNER:  Yes.

16          THE COURT:  Those would be limiting?

17          MR. WAGNER:  Yes.  The remaining ones, which are

18   75.3, .4 and .5 are mostly Romanian.  I was just going

19   through -- there are a few Sikh applications, I believe, in

20   each of those, and we can --

21          THE COURT:  Let's do this.  For purposes of this

22   ruling, all those narratives that are being compared that the

23   source is Romanian.  There will be no limiting instruction.

24          As to 75.2, 75.6, the non-Romanian narratives will be

25   limited by the Court's instruction as to whom they apply and

1    the same would apply to 75.3, 75.4 and 75.5.  You'll have to

2    help the Court.

3              MR. WAGNER:  Absolutely.

4              THE COURT:  I'm going to grant the motion with respect

5    to DB.  I'm not going to permit evidence as to the

6    relationship between Ms. Harmath and her husband; otherwise,

7    I'm prepared to rule on the issue itself.

8              Now let me ask you this, counsel.  Mr. Wagner, Mr.

9    Stepanian, I'm not satisfied that this is necessary, but this

10   is your case.  How do you feel about the testimony coming in

11   on -- are you talking about all of the testimony or a

12   preliminary examination as to how the witness put together

13   these charts?

14             MR. STEPANIAN:  The charts and the testimony of the

15   charts is what I'm talking about.

16             THE COURT:  I'm still trying to understand.  I want to

17   make sure this comes in without any taint of error.  I'm

18   trying to understand what it is that you're concerned about

19   as such.

20             You gave an example that the witness would conclude

21   that these are fraudulent applications.  That's obviously not

22   going to come in.

23             MR. STEPANIAN:  I'm saying you cautioned the

24   government on the way in which the investigators on the

25   doctor testified.  You cautioned the government not to get

1   into to particular areas.  I think that caution was

2   worthwhile ultimately, but I believe that in this particular

3   case, since we're dealing with hearsay statements, hearsay

4   documents, having her testimony as to similarities or showing

5   similarities, this is wrought with danger, in a sense.

6         THE COURT:  Isn't the -- your prerogative and probably

7   what is going to happen, you're going to demonstrate that

8   these narratives consisted of numerous paragraphs, none of

9   which have any similarity.  That would seem to me the heart

10  at least part of this cross-examination.  We're dealing with

11  a very small segment of these narratives.

12        MR. STEPANIAN:  That's right.

13        THE COURT:  Cross-examination it seems to me in this

14  case can be fairly extensive, unlike the issue with these

15  documents from India.

16        MR. STEPANIAN:  It's a balance, because on one hand,

17  to be thorough, I would have to go through all of the -- yes,

18  I know, all of them, but on the other hand, examples would

19  suffice.  I'll try to choose some examples rather than going

20  over every single chart to show that aspect which you brought

21  up.

22        I have to balance.  They are getting tired.  You are

23  getting upset and I'm losing the jury.

24        THE COURT:  I think you run a very fertile area of

25  cross-examination.  This is not a case where your hands will

1     be tied as far as cross.

2            MR. STEPANIAN:  I understand.

3            MR. BLACKMON:  In terms of cross-examination of Ms.

4     Webster, I'm going to have to go through -- if the issue --

5     and I think it is legitimate, is whether Manjit Rai had

6     knowledge of all these document that are being compared here,

7     then I have to through each one of those as to information

8     the government has that indicates Manjit Rai had some

9     exposure or knowledge of the contents of these documents.

10           Doing a rough calculation, I think there's 115 names

11    plus all these documents and Ms. Rai had access to 22 of

12    those client files.  I think I'm going to have to do that.

13           THE COURT:  It seems to me you probably -- I think --

14    I don't know what the witness is going to testify to in that

15    respect, her knowledge of whose involvement in a specific

16    defendant's involvement.  You can probably streamline that a

17    little bit, but I think that's what I expected to be the

18    course of cross-examination.

19           MR. BLACKMON:  It's going to be tedious.

20           THE COURT:  It could be, but doesn't have to be

21    entirely.  There's a way to short circuit this.  Look.  I'm

22    talking to a very experienced lawyer.  I think you know ways

23    of dealing with that more efficiently than I can dream of.

24           Ready to roll on the ruling?

25           MR. STEPANIAN:  Yes.  On a technical, I have requested

1    the government to allows us to use their good services which

2    will make things a lot faster if they put the pairs up as an

3    example or put the documents up, and that we be able to have

4    the use of their ability and this machine so that we can move

5    through it quickly.

6         THE COURT:  I suspect Mr. Wagner and Ms. Skipper and

7    Mr. Reardon have no objection to that, within reason?

8         MR. WAGNER:  I will say it makes our paralegal

9    uncomfortable presenting the case for them.  They have the

10   technological ability to do this.

11        THE COURT:  I heard Mr. Blackmon.  We're going to be

12   here for a while.  I expect to be here for a couple of days

13   of cross.  I suspect we will be.  What can we do in the way

14   of any joint presentation that would be helpful?  I don't

15   mean that you present the case on behalf of the defendants.

16   I'm not suggesting that.

17        MR. WAGNER:  I think they have the same technology.

18   We provided the disk, so they could scan it and do the same

19   thing.

20        THE COURT:  This is going to take two to tango.  If

21   the government is not prepared do that, I'll not order them

22   to do it.

23        I think it's best if I kind of read through my notes

24   in this order so the record is clear.  Defendants assert that

25   the government has not established that each defendant had

1   knowledge of the similarity of narratives within the chart

2   and thus the narratives and the chart are relevant to certain

3   defendants.

4        I indicated previously that I will limit, provide

5   limiting instruction with respect to those charts are that

6   reflect an analysis of the non-Romanian clients.  They would

7   be -- the jury would be advised they would not consider that

8   evidence as to Ms. Harmath or Mr. Caza.  I will provide a

9   limiting instruction in that regard at the appropriate time.

10       I'll request the government to give me some notice

11  when we're into those particular charts that are non-Romanian

12  clients and give that limiting instruction.

13       And, also, as I indicated, I'm going to grant

14  Defendant Harmath's motion to exclude evidence regarding the

15  applicant DB with respect to the relationship of Ms. Harmath

16  with PD, who is her husband.  That motion is granted.

17       The relevance of the evidence with respect to these

18  narratives and the summaries is not contingent upon each

19  defendant's knowledge of the similarity of the narratives.

20  This evidence is relevant to the falsity of the applications,

21  which is another element of the offense.  The jury could

22  infer based on similarities between the narratives in the

23  aggregate, some of these applications were fraudulent.

24       Because relevance is not contingent upon each

25  defendant's knowledge, the defendant's argument as to these

1    specific -- with the understanding that a certain number of

2    these exhibits would be excluded or this clear evidence that

3    some defendants had no knowledge or involvement with those

4    particular narratives; but, nevertheless, as to the balance,

5    I believe the defendant's argument is without merit regarding

6    those particular exhibits.

7         So it seems also in addition to the evidence of

8    falsity, which is clearly relevant, there's also conspiracy

9    charges involved and obviously in a conspiracy you do not

10   know every aspect of a plan.  Defendant asserts that the

11   government has not established the falsity of more than one

12   applicant in each asylum narrative chart, and thus the

13   narratives on the charts are irrelevant.

14        Again, the jury could infer based on the similarities

15   between the narratives in the aggregate some of these

16   applications were fraudulent.  The narratives are not being

17   offered for the truth or falsity of the matters contained

18   therein.

19        Agent Webster would not have the personal knowledge to

20   testify as to those matters, at least that's my assumption.

21   Rather the similarities between the applications are

22   circumstantial evidence that some of the narratives may be

23   fraudulent.  Defendants' argument goes to the weight of the

24   evidence and certainly goes to cross-examination of Webster

25   at great length to demonstrate she had no personal knowledge

1        of the truth or falsity of any of these narratives.

2            Defendants also contend that the charts, if they are

3        admitted, they will be forced to present extensive comparison

4        evidence through cross-examination.  The argument is this may

5        be misleading or confusing to the jury.

6            The narratives and charts are relevant to the

7        government's proof regarding falsity.  It's also likely

8        relevant to the number of false applications filed, which

9        would be evidence of the extent of the alleged fraudulent

10       scheme.  This type of evidence is not cumulative.  It's

11       highly relevant.

12           Again, there's going to be vigorous cross-examination

13       and I think that will certainly affect how the jury perceives

14       this evidence and the quality of this evidence.  And, again,

15       that goes to the weight not to the admissibility.

16           Does that cover all the issues the defendants have

17       raised, Mr. Dratman?  I think it does.  Maybe it doesn't.

18           MR. DRATMAN:  Cross-examination of Ms. Webster on her

19       personal knowledge or her examination of A files or her

20       examination of these particular applications presents a very

21       difficult problem because any answer that is given by Ms.

22       Webster that purports to be a review of the entire file or

23       these applications will, of necessity, will by application

24       become an expert opinion or an opinion for the witness for

25       which there is no foundation.

1          Carol Webster is not an expert on these applications.

2          THE COURT:  Help me here.  When you say her lack of

3     knowledge somehow has something to do with her expertise?

4     Either she knows or she does not know.

5          MR. DRATMAN:  Let's say, for example, we're examining

6     about applicant A who is listed on the chart with Gheorghe

7     Jianu, the first one on the list.

8          Have you, Ms. Webster, examined the file or

9     application of the applicant A in its entirety?

10         Yes.

11         Have you examined the A file?

12         Yes, I have.

13         Who worked on that?  And the questions may come and

14    then we're asking Ms. Webster on something that she had

15    nothing to do with.  She was not an asylum officer.  She was

16    not an immigration judge.  She had nothing to with the

17    processing, yet we will be examining her to knock out the

18    foundations of this chart.

19         If she has no knowledge of it, ok.  That may be one

20    thing, but I doubt that.  I think that what we're going to be

21    doing in front of this jury is taking a tremendous risk

22    asking questions when we could get hammered in response.

23    That's not right.  That's why we've been fighting so

24    vigorously against the charts.

25         It's very difficult to examine a witness where these

1    summary things have been done in terms of the underpinnings

2    when we actually don't have the A files for all these people.

3    We just have the applications.

4         THE COURT:  Give me an example?  What kind of question

5    would you ask her?  She said, "I did not work on this.  I

6    have no direct knowledge.  I looked at the language.  I found

7    these similarities."

8         Now, what's the next question?

9         MR. DRATMAN:  She's here in court.

10        THE COURT:  She is in court.  I'm not going to exclude

11   her, but the bottom line is:  I'm not sure I follow your

12   argument.  Help me.

13        MR. DRATMAN:  Let's say we start examining about

14   applicant A. What do you know about applicant A?  And we

15   start going into the knowledge, which may be based on a

16   review of the A file, which we don't have.

17        THE COURT:  Are you talking about Mr. Chisca?  That's

18   a different issue.

19        MR. DRATMAN:  A different issue.

20        THE COURT:  I assume she knows nothing about any of

21   these applicants unless -- in the sense of about their

22   applications?

23        MR. DRATMAN:  Yes.  We have evidence and there's

24   evidence before this Court that Ms. Webster had held up all

25   of the A files relating to this law firm.  That she had them

1    segregated at the immigration office.

2         At least I heard that evidence.  I think it was

3    through Barbara Morihara and through other witnesses who had

4    to journey to Sacramento to see the status of their A file

5    was.  So assuming she had all of these A files that underlie

6    all of these particular -- all of the applications that are

7    reviewed in this chart -- we don't have all of these A files.

8         Quite frankly, to review 122 A files at this point

9    would be a very heavy task, and none of us for the defense

10   have done that.  And, quite frankly, I was hoping that I

11   wouldn't even have to request it, let alone do it.

12        But the fact is if Ms. Webster who has had, I presume,

13   all of the A files has, in fact, reviewed them, it's going to

14   be impossible to examine her.

15        THE COURT:  Isn't her testimony limited to the

16   similarities not the narratives?  That's all we're really

17   talking about here.  The involvement of the defendants with

18   those particular clients is one thing, but whether Ms.

19   Webster has read these A files, I'm not even sure that's

20   relevant.

21        All we're talking about is her testimony with respect

22   to a small portion of each of the narratives that seems to be

23   close to identical.  Period.  That's all we're dealing with.

24        MR. DRATMAN:  From our standpoint, the similarity of

25   language is something that Asylum Officer Garnett and Asylum

1    Officer Temple spoke about as being something that is looked

2    for in terms of these applications.

3              THE COURT:  That goes to the weight.  That goes to

4    cross-examination.  Maybe they aren't similar.  I don't know.

5    But the bottom line is they appear to be similar.  That's

6    what the summaries indicate.  As to whether she knows the A

7    files or not, I'm not sure that's particularly relevant to

8    the cross-examination at all.

9              MR. DRATMAN:  Well, that is how we get as to how these

10   files are dissimilar and these applications dissimilar.

11             THE COURT:  The narratives are dissimilar.  That

12   appears to be the case.  You're only dealing with a small

13   portion of those narratives.

14             MR. DRATMAN:  But when we limit it to just dealing

15   with those narratives when, in fact, this witness we have may

16   have reviewed the A files and may have knowledge that may

17   exculpate our clients or inculpate, I don't know.  We're

18   running into area that we don't know about because we have

19   not seen the A files.

20             THE COURT:  I've made my ruling.  I think we're

21   dealing with a much narrower issue than you're presenting.  I

22   think it's much narrower then what you're looking at.  I've

23   made my ruling.  I'm not so certain that the A file is all

24   that relevant to what Ms. Webster is going to testify to the

25   small portion of the narratives that appear to be the same.

1          MR. DRATMAN:  If it turns out Ms. Webster has reviewed

2     these A files and we know that she's reviewed some of them

3     and some are named people and there's exhibits in front of

4     the Court that have portions of the A files in them, to the

5     extent we haven't received those A files and in their

6     entirety, I suppose I'm asking the Court to order production

7     of all 122 --

8          THE COURT:  If that becomes necessary, I'll do

9     whatever becomes necessary to serve justice.  We're not close

10    to being at that point in my view.  I don't see that's going

11    to be any part of that testimony.  If it becomes necessary, I

12    will make that order.  I don't think it is at this juncture.

13         MR. DRATMAN:  Thank you, Your Honor.

14         THE COURT:  Ready to proceed?

15                          (Whereupon, the following proceedings

16                          were resumed in open court in the

17                          presence of the jury panel:)

18         THE COURT:  Ready to proceed, Mr. Wagner?

19                     CAROL WEBSTER

20    Recalled as a witness on behalf of the government herein, was

21    previously sworn, examined, and testified as follows:

22         THE COURT:  You may continue at this time.

23              DIRECT EXAMINATION (CONTINUED)

24    BY MR. WAGNER:

25    Q.    When we broke on Thursday, we were about to discuss

1    the return trip by Mr. Chisca to Sacramento in late 2003.

2         Do you recall that?

3    A.    Yes.

4    Q.    That was in order to participate in the undercover

5    operation?

6    A.    Yes.

7    Q.    Did you or other agents with ICE equip him with a body

8    recorder?

9    A.    Yes, a body wire.

10   Q.    Did Mr. Chisca have any control over the on-and-off

11   switch of that device?

12   A.    No.

13   Q.    Did you provide him with some funds with which to make

14   a payment to the law firm?

15   A.    Yes, we provided him with initial payment.

16   Q.    Did he visit the firm?

17   A.    Yes.

18   Q.    What instructions, if any, did you give him about what

19   he was to do during his visit to the firm?

20   A.    He was supposed to go in acting like a tourist from

21   Romania who wanted to stay in the United States.  Those were

22   his instructions.  And he had to remember his information

23   from his passport that we gave him, the name he was using,

24   Gheorghe Jianu, and the information from his passport.

25        We gave him information from where he said he was

1   going to be from Romania.

2   Q.      Did you give him any specific instructions to request

3   that he apply for asylum?

4   A.      No.  But it was mentioned on the phone call.

5   Q.      What did you do during the operation when Mr. Chisca

6   was inside the law firm?

7   A.      I was listening to the -- he had a recorder and a

8   wire, and the wire was being broadcast and I was listening to

9   it.

10  Q.      While the conversation was going on?

11  A.      Yes.

12  Q.      Inside the law firm?

13  A.      Yes.

14  Q.      Who did he meet with for that intake interview?

15  A.      He met with Jagprit Sekhon.

16  Q.      And did he also speak with Ms. Harmath?

17  A.      Yes.  Ms. Harmath was also present.

18  Q.      Was that the recording that was played earlier in the

19  trial?

20  A.      Yes.

21  Q.      Was he compensated for that trip to Sacramento,

22  Mr. Chisca?

23  A.      Yes.

24  Q.      What was the nature of the compensation he received

25  for that?

1    A.      His travel expenses were paid.  We gave him per diem

2    for food and we paid him for his work he performed.

3    Q.      Was an asylum application subsequently filed with

4    Customs and Immigration Services in the name of Gheorghe

5    Jianu?

6    A.      Yes.

7    Q.      Showing you 9.1, is that the application that was

8    filed?

9    A.      Yes, this is.

10   Q.      Is there a received stamp on that document?

11   A.      Yes.

12   Q.      And does it indicate when it was received by the

13   service?

14   A.      November 24, 2003.

15   Q.      Immediately after the undercover investigation in this

16   case, did you commence interviewing some Sekhon and Sekhon

17   asylum clients?

18   A.      Yes.

19   Q.      I think Mr. Kadar testified about an interview.

20           Did you interview him?

21   A.      Yes.

22   Q.      Where was that?

23   A.      At the asylum office in San Francisco.

24   Q.      By the way, with respect to Mr. Kadar, I believe he

25   testified earlier that his interpreter at the hearing was

1    Luciana Harmath.

2            Do you remember that?

3    A.     Yes.

4    Q.     Let me show you 10.6 and ask you what that is?

5    A.     This is the record of interpreter's oath during an

6    interview for Stefan Kadar.

7    Q.     What's the date of the interview?

8    A.     September 2nd, 2003.

9    Q.     And does it indicate who the interpreter is?

10   A.     Yes.

11   Q.     Who is that?

12   A.     Luciana Harmath.

13           MR. WAGNER:  Government move 10.6 into evidence, Your

14   Honor.

15           THE COURT:  It will be admitted.

16                       (Whereupon, Government's Exhibit 10.6

17                       was received into evidence.)

18   BY MR. WAGNER:

19   Q.     Where did you interview Stefan Kadar?

20   A.     At the asylum office.

21   Q.     Is that the same interview that Barbara Morihara

22   testified about earlier?

23   A.     Yes.

24   Q.     Was she present as well?

25   A.     Yes.

1   Q.      Did you travel to other locations to interview clients

2   during this period?

3   A.      Yes, we did.

4   Q.      Where did you travel to?

5   A.      We went to Arizona, Los Angeles, Orange County area

6   and Seattle.

7   Q.      Seattle, Washington?

8   A.      Yes.

9   Q.      Did you interview clients at each of those locations?

10  A.      Yes.

11  Q.      During this timeframe, did you examine asylum

12  applications for purposes of comparing language in different

13  claims that had been filed by the Sekhon law firm?

14  A.      Yes.

15  Q.      I'll ask you more about that in a moment.

16          Was that undertaken initially during this period of

17  late 2003?

18  A.      I'm not sure when I started doing that.

19  Q.      In January 2004, did the undercover operation

20  continue?

21  A.      Yes.

22  Q.      Was a preparation scheduled for the informant,

23  Mr. Chisca?

24  A.      Yes.

25  Q.      Did you arrange for Mr. Chisca to come back to

1    Sacramento?

2    A.      Yes.

3    Q.      How long was he here approximately?

4    A.      In January, like four days, I think.

5    Q.      Were there two days of prep sessions?

6    A.      Yes.

7    Q.      And in -- did he go back to the firm on January 13,

8    2004?

9    A.      Yes, he did.

10   Q.      For purposes of his first preparation session?

11   A.      Yes.

12   Q.      And, again, was he equipped with a recording device?

13   A.      Yes.

14   Q.      And, again, was he able to turn it on or off?

15   A.      No.

16   Q.      And were his conversations that day at the law firm

17   recorded?

18   A.      Yes.

19   Q.      Who did he meet with at the first prep session?

20   A.      He met with Iosif Caza and Jagprit Sekhon.

21   Q.      And was the full tape of that discussion played

22   earlier in the trial?

23   A.      Yes.

24   Q.      There was a second prep session; correct?

25   A.      Correct.

1   Q.      Same location?

2   A.      Yes.

3   Q.      Did you also participate in that undercover operation?

4   A.      Yes.

5   Q.      And, again, was Mr. Chisca wearing a transmitter?

6   A.      Yes, he was.

7   Q.      And, again, did he have any ability to turn it on or

8   off?

9   A.      No.

10   Q.      Was this conversation at the second prep session at

11   the law firm recorded that day?

12   A.      Yes.

13   Q.      Who did he meet with that day?

14   A.      He met with Luciana Harmath and Manjit Rai.

15   Q.      And, again, was the full tape of that discussion

16   played earlier in this trial?

17   A.      Yes.

18   Q.      Did Mr. -- after the conclusion of the second prep

19   session at the law firm, did Mr. Chisca do anything else in

20   connection with this investigation?

21   A.      No, not until right before the trial.

22   Q.      What are you referring to right before the trial?

23   A.      He had to listen to the recordings and read the

24   transcripts and make sure it was accurate.

25   Q.      Other than that preparation for trial, did he do

1    anything else since January 2004 in connection with the

2    investigation?

3    A.      No.

4    Q.      And was some compensation paid to Mr. Chisca in

5    connection with his trip to Sacramento in January 2004?

6    A.      Yes.

7    Q.      What sort of compensation?

8    A.      We paid his travel expenses, his per diem and he was

9    paid for the work he performed.

10   Q.      Approximately how much, if you recall?

11   A.      I think what we paid for his work was about $200.  I'm

12   not sure about the per diem.

13   Q.      And did you assist Mr. Chisca in obtaining parole

14   status in the United States in the course of the

15   investigation?

16   A.      Yes.

17   Q.      Why did do you that?

18   A.      Because we needed him here as a witness at trial.

19   Q.      How was that obtained?  What did he have to do and

20   what did you have to do in order obtain that parole status?

21   A.      His initial parole was done by Agent Harwood, and what

22   I did was apply for an extension of that parole.

23   Q.      In order to obtain parole, does he have to leave the

24   country?

25   A.      Yes, he did.

1    Q.      Did you arrange that?

2    A.      No.  Agent Harwood did.

3    Q.      And your role in extending the parole was what?

4    A.      I had to fill out a form and submit it through my

5    chain of command to our headquarters in Washington, D.C..

6    Q.      In the course of testimony, Agent Harwood testified

7    about Mr. Chisca asking you for a green card.

8            Do you remember that?

9    A.      Yes.

10   Q.      Did Mr. Chisca do that?

11   A.      Yes.

12   Q.      What did you say to him in response?

13   A.      I can't remember.  I think I told him he just started

14   so would he have to discuss any of that with Agent Harwood.

15   Q.      Aside from the extension of the parole that you

16   arranged for him, have you promised Mr. Chisca any

17   immigration benefits in the future because of his work in

18   this case?

19   A.      No.

20   Q.      Let me ask you about Mr. Vorobiov, a witness who

21   testified in this case.

22           The undercover operation that you just talked about

23   concluded in January of 2004; is that correct?

24   A.      Correct.

25   Q.      Let me show you what's been marked and previously

1   admitted as Government's Exhibit 1210 and ask you what that

2   document is.

3   A.      This is a submission to the immigration court by the

4   law offices of Sekhon and Sekhon for Florin Vorobiov.

5   Q.      And when was that submitted to the immigration court?

6   A.      February 9, 2004.

7   Q.      And if you take it out of its sleeve, do you see in

8   there some declarations submitted to the immigration court?

9   A.      Yes.

10  Q.      Is there a declaration from Boris Vorobiov?

11  A.      Yes.

12  Q.      Do you recall the witness, Florin Vorobiov, testifying

13  that was his father?

14  A.      Yes.

15  Q.      Let me show you what's been marked as 67.1.7 and ask

16  you:  Was there some other evidence located in the course of

17  the case relating to this same document?

18  A.      Yes.

19  Q.      What is 67.1.7?

20  A.      A declaration from Boris Vorobiov.

21  Q.      Did that come from the computer registered to Jagprit

22  that I'm showing on the screen now?

23  A.      Yes.

24  Q.      What page of 12.10 does the Boris Vorobiov declaration

25  appear at?

1    A.       Page five.

2    Q.       If you compare the declaration of Boris Vorobiov as it

3    was filed with the immigration court from 12.10 with the text

4    recovered from the computer of Jagprit Sekhon at 67.1.7, what

5    differences, if any, do you see in that text, in those two

6    texts?

7    A.       The computer text seems to have been cut off like

8    two-thirds of the way through.

9    Q.       Is it cut off at about someplace about there?

10   A.       Yes.  Right after the first two words of that

11   sentence.  After the word "United States," yes.

12   Q.       In other words, does 67.1.7, the text from the

13   computer reflect the text of the document as filed except for

14   the end of the declaration, the part below the blue line?

15   A.       Yes.

16   Q.       Does the declaration contain an address that appears

17   to have been added?

18   A.       The one submitted to the Court has an address in

19   Moldova.

20   Q.       Apart from those, this language and the language found

21   on the computer and the language filed with the Court

22   substantially verbatim, is that the same?

23   A.       Yes.

24   Q.       Do you see in 12.10 is there a declaration, a medical

25   certificate from Dr. Gedras?

1   A.      Yes.

2   Q.      And what page of the document is that on?

3   A.      Start on page 15.

4   Q.      The actual signed certificate, is that on page 16?

5           Is that what we're looking at on the screen now?

6   A.      Yes.

7   Q.      Do you recall Mr. Vorobiov testifying about that?

8   A.      Yes.

9   Q.      Is this one of the documents that you sent to

10  Mr. Mates in Romania?

11  A.      Yes, I did.

12  Q.      32.17 is that the stamp and signature of Dr. Gedras

13  that Mr. Mates testified about earlier?

14  A.      Yes.

15  Q.      12.10 was submitted to the immigration court, I take

16  it, and Mr. Vorobiov's case was proceeding at that time?

17  A.      Yes, it was in immigration court.

18  Q.      And about this time, did you ask for a postponement in

19  Mr. Vorobiov's case, the hearing before the immigration

20  court?

21  A.      Yes.

22  Q.      Why did do you that?

23  A.      We were still investigating and we wanted to wait to

24  disclose the investigation.

25  Q.      Who is Kevin Lashus?

1    A.       An ICE attorney that presents immigration cases to the

2    immigration court in San Francisco.

3    Q.       The date on 12.10, when was that submitted to the

4    immigration court?

5    A.       February 9, 2004.

6    Q.       The entry I'm showing you now was previously admitted

7    as 62.6.2.  There is an entry date added a few days later,

8    February 13th of '04.

9            Is there a reference to Kevin Lashus, the ICE attorney

10   there?

11   A.       Yes.

12   Q.       What does that say, if you can read it?

13   A.       (Reading:)

14                   It says:  "2-13-04, Kevin Lashus left

15                   message requesting continuance to run

16                   forensics.  I return call objecting to

17                   continuance."

18   I don't understand that word.

19                   "Number one, that also" --

20   Q.       Would that be the word "stating"?

21   A.       (Reading:)

22                   "Stating that all" --  something "worked

23                   admitted to AO in July 2002."

24   Q.       Could that be:  "All docs were submitted"?

25   A.       (Reading:)

1                          "All docs were submitted.

2                          Number two, client was found credible.

3                          Number three" -- I'm not sure what that

4    says, in something -- "since 10-23-02."

5    Q.     Would that possibly say:  "Case has been in court"

6    something "10-23-02"?

7    A.     Yes.

8    Q.     Do you recall Mr. Vorobiov's earlier testimony that he

9    had a court date that date?

10   A.     Yes.  And number four:  "Request is untimely."

11   Q.     Now, according to this note, the writer apparently was

12   not agreeing to a continuance; correct?

13   A.     Correct.

14   Q.     Let me show you Government's Exhibit 12.11 and ask you

15   what that is?

16   A.     This is a filing to the immigration court from ICE

17   counsel.

18   Q.     And was that filed in the official record of the case?

19   A.     Yes.

20   Q.     Did you obtain that copy from the A file?

21   A.     Yes.

22   Q.     For Mr. Vorobiov?

23   A.     Yes.

24          MR. WAGNER:  Government moves 12.11 into evidence,

25   Your Honor.

```
 1              THE COURT:  It will be admitted.
 2                          (Whereupon, Government's Exhibit 12.11
 3                          was received into evidence.)
 4    BY MR. WAGNER:
 5    Q.    And in that filing, what's the received date on that
 6    document, initial one I think?
 7    A.    February 18, 2004.
 8    Q.    Is that a few days after the entry that we just read?
 9    A.    Yes.
10    Q.    And did Mr. Lashus seek a continuance?
11    A.    Yes, he did.
12    Q.    And did he attach something to his motion?
13    A.    Yes.
14    Q.    What is it that he attached?
15    A.    An e-mail from me to him regarding Florin Vorobiov
16    case.
17    Q.    What did your e-mail to Mr. Lashus say?
18    A.    Dated February 11, 2004.
19                    "Kevin, I talked to you about this file
20                    today to request to postpone the hearing.
21                    Do you need the A file to do that?  Should
22                    I send it to you?  Let me know.  I have the
23                    file number."
24    Q.    Did you expect he would file that in the case?
25    A.    No.
```

1    Q.      Subsequently found in the investigation in this case

2    was there evidence the contents of this e-mail was shared

3    between Jagprit and Jagdip Sekhon?

4    A.      Yes.

5            MR. STEPANIAN:  Objection.  That's leading.

6            THE COURT:  It is, counsel.

7            Rephrase the question.

8            Sustained.

9    BY MR. WAGNER:

10   Q.      Did you -- in the investigation was there subsequent

11   evidence relating to the same e-mail?

12   A.      Yes.

13   Q.      I've shown you what's previously been admitted as

14   67.1.8.  What's the date -- is that an e-mail?

15   A.      Yes, it is.

16   Q.      That was previously admitted in this case?

17   A.      Yes.

18   Q.      I think you indicated that 12.11 was filed in the

19   middle of the February; is that correct?

20   A.      Yes.

21   Q.      What is the date on this e-mail?

22   A.      March 3rd, 2004.

23   Q.      Does it -- who is it from and who is it to?

24   A.      From Jagprit to Jagdip.

25   Q.      And does it describe the e-mail that we just looked at

1    that was filed in Florin Vorobiov case?

2    A.      Yes.

3    Q.      66.23, you indicated what the date of the e-mail was,

4    March 3rd; is that right?

5            Let me ask you this.  67.1.8 what is the date of that

6    e-mail from Jagprit to Jagdip Sekhon concerning your e-mail

7    about the Florin Vorobiov case?

8    A.      March 3rd, 2004.

9    Q.      And now turning to 66.23, which is before you, was

10   that seized from Mr. Caza's house?

11   A.      Yes.

12   Q.      Can you generally describe what that is.

13   A.      It's a letter to, Dear Blank, fill in the blank.  It's

14   about officers from the Department of Homeland Security who

15   have contacted Sekhon clients and what they should do.

16   Q.      Do you recall Barbara Morihara testifying about that

17   same document?

18   A.      Yes.

19   Q.      What is the fax line at the top of that document?

20   A.      It's dated 3-14-04, and from phone number 916, area

21   code, Sekhon and Sekhon.

22   Q.      So how soon after the e-mail roughly was that draft

23   letter faxed?

24   A.      It looks like 11 days.

25   Q.      Now, in the -- that was in March 2004; correct?

1    A.      Correct.

2    Q.      Turning ahead to May 2004, did you participate in a

3    Romanian client of the Sekhon firm of CH?

4    A.      Yes, I did.

5    Q.      Did Ms. Morihara testify about that event as well?

6    A.      Yes.

7    Q.      Was he processed at the offices here in Sacramento?

8    A.      Yes.

9    Q.      And I believe Ms. Morihara testifies about a receipt

10   that was recovered on Mr. CH.

11           Do you recall that?

12   A.      Yes.

13   Q.      Were you also there when that receipt disappeared?

14   A.      Yes.  He took it from my hand and tore it up and ate

15   it.

16   Q.      You saw Jagprit Sekhon in connection with that case?

17   A.      Yes, I did.

18   Q.      Did he make a comment to you about your investigation

19   that day?

20   A.      Yes.

21   Q.      What is your recollection of what he said?

22   A.      He said that he knew I was contacting his clients and

23   he didn't want me to continue to do that.  He said I was

24   making veiled threats of deportation.

25   Q.      Did you also -- that was in May 2004; is that correct?

1   A.      Correct.

2   Q.      Now, in June of 2004 -- let me ask you this first:

3           Did you continue to contact Sekhon and Sekhon clients

4   in the course of your investigation or former clients?

5   A.      Yes.

6   Q.      And in June of 2004, did you interview a client whose

7   initials were VS?

8   A.      Yes, I did.

9   Q.      Where did that interview take place?

10  A.      In the Sacramento ICE office.

11  Q.      Let me show you what's previously been admitted, an

12  e-mail 67.1.9.

13          Do you recall Agent McDonald's testimony about the

14  recovery of this e-mail from the law firm computers?

15  A.      Yes.

16  Q.      Do you see there is a reference in this e-mail

17  addressed to Mr. Jagprit Sekhon to some individuals who were

18  interviewed in the Sacramento BCIS office?

19  A.      Yes.

20  Q.      At the top, do you see there's a reference to the

21  initials of the person?

22  A.      Yes.

23  Q.      Is that the same person that you interviewed?

24  A.      Yes it is.

25          MR. STEPANIAN:  We would object.  This is a hearsay

 1    statement.

 2              THE COURT:  Overruled.

 3    BY MR. WAGNER:

 4    Q.      Were you present at the search of the house of Mr.

 5    Caza?

 6    A.      Yes, I was.

 7    Q.      This e-mail -- do you see this e-mail in which

 8    Mr. Jagprit Sekhon was responding to Kushminder Singh about

 9    the investigation?

10    A.      Yes.

11    Q.      What is the date of that response?

12    A.      September 9, 2004.

13    Q.      When was the search warrant executed at the law firm

14    and the house of Mr. Caza?

15    A.      The following day, September 10, 2004.

16    Q.      And were you present when the search was executed at

17    Mr. Caza's house?

18    A.      Yes.

19    Q.      Were you -- what was your role?

20    A.      Well, I was the team leader, but I was kind of

21    overseeing all three search locations.  Barbara was the lead

22    team leader at that location and I was helping her.

23    Q.      Did you also participate in the search at the Caza

24    residence?

25    A.      Yes.

1    Q.      Let me present to you what has previously been

2    admitted as 65.24.

3            Do you recall this photograph and do you recall this

4    location?

5    A.      Yes.

6    Q.      Could you just remind the jury what this depicts.

7    A.      This is a desk that was in the front bedroom of Iosif

8    Caza's house.  It's a computer with a color ink jet printer

9    and floppy disks on the top shelf.

10   Q.      Let me ask you about the floppy disks on the top

11   shelf.  Were they in the boxes I just marked with the blue

12   line there?

13   A.      Yes.

14   Q.      Do you recall approximately how many there were?

15   A.      There were a lot, like over a hundred.

16   Q.      Were those seized that day?

17   A.      Yes.

18   Q.      What did you do with those?

19   A.      I put them in the evidence room or, actually, they

20   were turned over to the magistrate and were held for a long

21   time.  When the evidence was released, I sent them to Melissa

22   McDonald, the computer person in Reno.

23   Q.      She testified earlier in this case?

24   A.      Yes.

25   Q.      Is that where the floppy disks came from that she

1    analyzed?

2    A.      Yes.

3    Q.      That computer was seized?

4    A.      The computer, I guess, is under the desk.

5    Q.      And what about the printer on the right side of that

6    picture?  Was that seized?

7    A.      Yes.

8    Q.      Is that an ink jet printer?

9    A.      Yes.

10   Q.      Color or black and white?

11   A.      Color.

12   Q.      Were there any other printers, computers and printers

13   located in the Caza residence at the time of the search?

14   A.      Yes.

15   Q.      Was there another printer?

16   A.      Yes.  It had a scanner printer combo.

17   Q.      Was that printer also seized?

18   A.      Yes.

19   Q.      Do you recall Mr. -- during the testimony of

20   Mr. Sexton, Mr. Zindel asked him about European size paper?

21   A.      Yes.

22   Q.      Which is slightly longer and narrower than the

23   standard in U.S.

24           Do you recall that?

25   A.      Yes.

1    Q.      Did you find some paper in Mr. Caza's house?

2    A.      Yes, we did.

3    Q.      66.25, let me ask you what that is.

4    A.      This is blank paper and the European size, A4.

5    Q.      Is it blank or is it marked on in some way?

6    A.      It's blank.

7    Q.      Is it more than one sheet?

8    A.      Yes.  Stack.

9            MR. WAGNER:  Government would move Exhibit 66.25 into

10   evidence, Your Honor.

11           THE COURT:  It will be admitted.

12                      (Whereupon, Government's Exhibit 66.25

13                      was received into evidence.)

14   BY MR. WAGNER:

15   Q.      Now, did you also seize some calendars and ledger

16   books during the course of the search?

17   A.      Yes.

18   Q.      What type of documents were those?

19   A.      There were several spiral notebooks and it looked like

20   ledgers and datebooks also being used as ledgers.

21   Q.      Datebooks meaning what?  Can you describe what those

22   were?

23   A.      Pocket calendar or maybe a larger size calendar book.

24   Q.      Let me show you Government's Exhibit 76.5 and ask you

25   what that is.

1    A.       2003 weekly diary.

2    Q.       Was that seized in the course of the search?

3    A.       Yes, it was.

4    Q.       In the course of the search of Mr. Caza's house?

5    A.       Yes.

6    Q.       Let me ask you this --

7             MR. ZINDEL:   Objection.   May I be heard at sidebar

8    about this?

9             THE COURT:   Sidebar?

10            MR. ZINDEL:   Yes.

11            THE COURT:   All right.

12            MR. ZINDEL:   Let me talk to Mr. Wagner.   We can talk

13   at the break.

14   BY MR. WAGNER:

15   Q.    Ms. Webster, having a technological issue.   Put that

16   to the side and we'll get back to that in a moment.

17   A.       Okay.

18   Q.       Let me show you what was previously admitted as

19   66.2.1 -- 62.21, some documents seized in the law firm in the

20   Indian language.

21            Do you see that?

22   A.       Yes.

23   Q.       That was a documents that was seized in the course of

24   the search of the law firm?

25   A.       Yes.

1    Q.      Do you see in there there's some documents in an

2    Indian language?

3    A.      Yes.

4    Q.      Did you submit that document for translation?

5    A.      Yes, I did.

6    Q.      Who did you submit it to?

7    A.      Translator at the FBI in Sacramento.

8    Q.      Did he translate that document?

9    A.      Yes.

10   Q.      Let me provide 62.2.1A and ask you with that is?

11   A.      This is the translation of 62.2.1.

12   Q.      Did you receive that from the FBI translator?

13   A.      Yes.  I believe that he sent it to Mr. Reardon.

14           MR. WAGNER:  Government would move Exhibit 62.2.1A

15   into evidence.

16           THE COURT:  It will be admitted.

17                         (Whereupon, Government's

18                         Exhibit 62.2.1A was received into

19                         evidence.)

20   BY MR. WAGNER:

21   Q.      I don't think we need to publish this document, but

22   can you describe what that is, the translation, from the

23   translation?

24   A.      It has information about the India Sikh Federation and

25   about the Khalistan Movement and it's kind of a history of

1    both things.

2    Q.      A history relating to Sikh group?

3    A.      Yes.  And then there's looks like some religious

4    information also.

5    Q.      About the Sikh religion?

6    A.      Yes.

7    Q.      Let me turn to something else.

8            Following the search warrant that you -- the execution

9    of the search warrant you described, did you analyze the

10   records that were seized?

11   A.      Yes.

12   Q.      And did you send any more documents to India for

13   review?

14   A.      Yes, they were sent by Special Agent Morihara.

15   Q.      Did you conduct more interviews of clients?

16   A.      Yes.

17   Q.      Mr. Vorobiov testified about meeting you in Chicago.

18           Do you recall that?

19   A.      Yes.

20   Q.      When did you travel to Chicago to meet with him?

21   A.      That was December 2004.

22   Q.      That in was late 2004, early 2005?

23   A.      Yes.

24   Q.      At some point did you participate in an interview with

25   Manjit Rai?

1    A.        Yes.

2    Q.        Approximately when was that, if you recall?

3    A.        I think it was 2005.

4    Q.        Where did that take place?

5    A.        At the U.S. Attorney's Office here in Sacramento in

6    this building.

7    Q.        Was she represented by an attorney?

8    A.        Yes.

9    Q.        Who else was present at that interview?

10   A.        Barbara Morihara and Ms. Skipper for the first part of

11   the interview.

12   Q.        How long was the interview?

13   A.        I think it was over two hours.

14   Q.        And did you ask her whether she was aware of false

15   asylum applications being filed by the Sekhon firm?

16   A.        Yes.

17   Q.        How did she respond to that?

18   A.        She said she was not aware of any false asylum claims,

19   and the first she found out about this whole thing was by

20   reading the search warrant affidavit.

21   Q.        Did you ask her if she was aware whether some of the

22   Sekhon and Sekhon asylum clients resided outside of

23   California?

24   A.        Yes.

25   Q.        How did she respond to that?

1    A.       She was not aware that any lived outside the

2    jurisdiction.

3    Q.       Was she asked whether or not she had ever rescheduled

4    asylum interviews when there was a discrepancy between the

5    asylum application and oral statements?

6    A.       Yes.

7    Q.       What did she say to that?

8    A.       She never rescheduled based on a discrepancy.  The

9    only time she would reschedule someone is if they were

10   physically sick from having to retell the traumatizing event

11   in their asylum claim.

12   Q.       In the course of your investigation, did you collect A

13   files of various Sekhon and Sekhon asylum clients?

14   A.       Yes.  It was part of my investigation because the

15   asylum claim was in the A file.

16   Q.       Why did you want to collect the asylum claim and why

17   did you collect the whole A file?

18   A.       The A file of most of the asylum claims contained

19   everything that was in there basically related to the asylum

20   claim.

21   Q.       And when did you start collecting A files?

22   A.       From the beginning of the investigation.  That's how

23   it started.  The more evidence we found, the more files we

24   requested to see if there was more.

25   Q.       Once you received the A file, did you keep the A file

1   here in California for the most part?

2   A.      Yes.

3   Q.      Why did do you that?

4   A.      They were kept kind of on hold because the

5   underlying -- if they had any subsequent applications, a lot

6   of time it's based on the underlying application, which was

7   the asylum claim which appeared to have some problems in it,

8   fraud documents and things like that.

9           MR. STEPANIAN:  This calls for a conclusion.

10          THE COURT:  The jury will disregard the latter part of

11  the answer with respect to the word "fraud" and "problems."

12  Disregard that part of the answer.

13          Proceed.

14  BY MR. WAGNER:

15  Q.      Did you have any concern about losing control over the

16  A file if you release it back to another part of the agency?

17          MR. DRATMAN:  Suggesting an answer.  Leading.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes.  I was investigating the case and

20  so if another office requested the file and I sent it out,

21  then there goes my investigation because it would be really

22  hard to get that file back.

23  BY MR. WAGNER:

24  Q.      Back in 2004, how long did you anticipate this

25  investigation would last?

1    A.       One year.

2    Q.       And the A files that you collected, did those include

3    both cooperators and non-cooperators?

4    A.       Yes.

5    Q.       By collecting the A file, what effect, if any, did

6    that have on any other pending proceedings that that client

7    may have, immigration-related proceedings?

8    A.       Yes.  Most proceedings can't take place without the A

9    file.  Usually that's like lawful permanent resident

10   application.  They need the A file for that.

11   Q.       Now, in the course of the investigation, did some of

12   the former clients of Sekhon and Sekhon begin cooperating?

13   A.       Yes.

14   Q.       And have some of those individuals testified here in

15   this trial?

16   A.       Yes.

17   Q.       And did you attempt to keep track of their location

18   and status?

19   A.       Yes.  I had to make sure that they were going to be

20   available when the case goes to trial.

21   Q.       If one of the -- if an applicant leaves the country

22   and relocates to another country, do you have any authority

23   to serve a subpoena on that person?

24   A.       No.

25   Q.       Do you have any ability to compel their attendance at

1    trial?

2    A.      No.

3    Q.      You recall Rhanbir Khera?

4    A.      Yes.

5    Q.      Did he testify earlier in this case?

6    A.      Yes.

7    Q.      What is this?

8    A.      This is a letter from Sekhon and Sekhon for Rhanbir

9    Khera.

10   Q.      Is -- what sort of a letter?

11   A.      It appears that it was attached to the original filing

12   of the asylum application.

13           MR. WAGNER:   The government move Exhibit 6.1 into

14   evidence.

15           THE COURT:   It will be admitted.

16                        (Whereupon, Government's Exhibit 6.1

17                        was received into evidence.)

18           THE COURT:   You may publish.

19   BY MR. WAGNER:

20   Q.      What is the date of that letter?

21   A.      August 14th, 2000.

22   Q.      How is it you met Rhanbir Khera?

23   A.      He came into our office with his wife acquiring about

24   the status of his green card.

25   Q.      Was his A file one of the ones that you had collected

1    in the course of your investigation?

2    A.      Yes.  I believe another agent in my office had it that

3    was helping me with the investigation.

4    Q.      Did he come in by himself?

5    A.      No, he was with his wife.

6    Q.      How long had he been married at that time?

7    A.      I think about two years.  I'm not sure of the time.

8    Q.      In the course of your work as Special Agent, have you

9    investigated cases involving sham marriages?

10   A.      Yes.

11   Q.      In your experience, how long do these marriages

12   typically last?

13          MR. DRATMAN:  Objection.  Calls for an opinion without

14   foundation.

15          THE COURT:  Sustained.

16          Provide a foundation for that question, counsel.

17   BY MR. WAGNER:

18   Q.      How many sham marriage cases have you investigated in

19   the course of your work as a Special Agent?

20   A.      Over fifty.

21   Q.      Have you interviewed people who have participated in

22   sham marriages?

23   A.      Yes.

24   Q.      And in the course of your work investigating sham

25   marriages, do they typically last days, weeks, months, years?

1          MR. DRATMAN:  Same objection, Your Honor.

2          THE COURT:  You can do better on the foundation.

3          I'll sustain the objection.

4    BY MR. WAGNER:

5    Q.     At the time that Mr. Khera and his spouse visited your

6    office, did they have a petition pending to adjust status on

7    the grounds of marriage?

8    A.     Yes.

9    Q.     Do you know how long that had been pending?

10   A.     About two years.

11   Q.     Where was that pending, that application?

12   A.     It had been pending in San Francisco, but our office

13   requested the file.

14   Q.     And was it at some point pending in the Fresno area?

15   A.     What happened was the jurisdiction for his place of

16   residence during that time moved to Fresno, so I guess it

17   was.

18   Q.     And did you or do you have any authority to grant his

19   petition to adjust his status?

20   A.     No.

21   Q.     Was Mr. Khera interested in having his application

22   adjudicated?

23   A.     Yes, he was.

24   Q.     And what did you tell him about that?

25   A.     When he first came in with his wife, I explained that

1    we were doing an investigation and that it would probably

2    take some time.  When we were finished, then I would send his

3    file and it would proceed with his original application.  I

4    told him it would probably be about a year that he would have

5    to wait.

6    Q.      Did you promise any immigration benefits to Mr. Khera?

7    A.      No.

8    Q.      Did he call from time to time to check on the status

9    of it?

10   A.      Yes.

11   Q.      Ultimately, did you take any action to release his

12   file so that his petition could be adjudicated?

13   A.      Yes.  Three years after I originally talked to him, I

14   sent the file down to Fresno.

15   Q.      Why did do you do that?

16   A.      I kind of felt bad for holding it up for so long.

17   Q.      Did you promise anything to Mr. Khera in connection

18   with that action?

19   A.      No.

20   Q.      Did you communicate with the Fresno office about your

21   interest in the file?

22   A.      Yes.

23   Q.      Why did do you that?

24   A.      Because it had the evidence for the investigation in

25   it and I didn't want to lose it and I also wanted to make

1    sure that I kept track of where Mr. Khera was.

2    Q.      Did you know the CIS official that adjudicated his

3    petition?

4    A.      No.

5    Q.      Did you make any recommendation to him about how he

6    should adjudicate that petition?

7    A.      No.

8    Q.      Did you participate in any way in his decision

9    regarding that adjudication?

10   A.      No.

11   Q.      Was the petition granted?

12   A.      Yes.

13   Q.      Did you receive the file back?

14   A.      Yes.

15   Q.      And did Mr. Khera -- was Mr. Khera ever promised

16   anything by you in connection with his cooperation or his

17   testimony in this case?

18   A.      No.

19   Q.      Do you recall Davinder Singh who testified in this

20   case?

21   A.      Yes.

22   Q.      When did you first meet him, if you recall?

23   A.      I think it was 2007.

24   Q.      Was that in your Sacramento office?

25   A.      Yes.

1    Q.      What were the circumstances under which you met him?

2    A.      He also came in to check on the status of his

3    application.  He had married a U.S. citizen similar to the

4    inquiry made by Mr. Khera.

5    Q.      Did you speak with him?

6    A.      Yes.

7    Q.      In English?

8    A.      Yes.

9    Q.      Did you ask him about his asylum claim?

10   A.      Yes.

11   Q.      And at that initial interview, did you consider the

12   information he provided truthful?

13   A.      No.

14           MR. DRATMAN:  Objection.  Calls for a conclusion.

15           THE COURT:  Sustained.

16           Disregard the answer of the witness.

17   BY MR. WAGNER:

18   Q.      Did you end that interview?

19   A.      Yes.

20   Q.      Did you ever threaten him with deportation?

21   A.      No.

22   Q.      Did he ask about the status of his petition?

23   A.      Yes, he did.

24   Q.      What did you tell him about that?

25   A.      Well, I told him his asylum application was under

1    investigation and his file was in Sacramento as part of that

2    and so his adjustment couldn't go through without the file.

3    Q.      Why did you tell him that?

4    A.      That's what the situation was.

5    Q.      Did you tell him anything about how long it would

6    take?

7    A.      Yes.  I told him that after the trial is over, we

8    would most likely send his file to the asylum office to be

9    reopened.  And after that, I think at the point in '07 I told

10   him it what be about a year before that took place.

11   Q.      When you say, "to be reopened," what does that mean?

12   A.      They want to reopen the cases and look at the asylum

13   claim again.

14   Q.      Did he --

15           MR. STEPANIAN:  Excuse me.  I would pose an objection.

16   It's not an answer to the question.

17           THE COURT:  No.

18           Overruled.

19           MR. BLACKMON:  Grounds of hearsay also.

20           THE COURT:  Overruled.

21           Proceed.

22   BY MR. WAGNER:

23   Q.      Did he later arrange for an attorney to meet with you?

24   A.      Yes.

25   Q.      And have you promised Davinder Singh any immigration

1   benefits as a result of his subsequent cooperation or

2   testimony in this case?

3   A.      No.

4   Q.      Do you recall Cosmin Iacob who testified in this case?

5   A.      Yes.

6   Q.      Do you recall approximately when you met him?

7   A.      I don't recall the date.  If it was '07 or '08.

8   Q.      Was that in the Sacramento office?

9   A.      Yes.

10  Q.      And, again, how did that occur?

11  A.      It was similar to Rhanbir Khera and Davinder Singh.

12  He came in with his wife and inquired about the adjustment of

13  status based on his marriage to a U.S. citizen.

14  Q.      Do you recall his testimony that there was a telephone

15  call preceding the meeting?

16  A.      Yes.

17  Q.      Did you call him?

18  A.      Yes, I did.

19  Q.      And did he show up at a subsequent meeting?

20  A.      Yes.

21  Q.      Did you discuss with him the status of his petition?

22  A.      Yes.

23  Q.      Did he seek to have that adjudicated?

24  A.      Yes.

25  Q.      And how long had that been pending, if you know?

1    A.       I think it was over two years.

2    Q.       And did you promise any immigration benefits to Mr.

3    Cosmin Iacob?

4    A.       No.

5    Q.       Did you ultimately take any action to send the file to

6    Phoenix for adjudication?

7    A.       Yes.

8    Q.       Why did you do that?

9    A.       Well, in my view he qualified for the benefit and I

10   wanted to make sure he was around in case we needed him for

11   trial.

12   Q.       Did you know the CIS official who adjudicated his

13   petition?

14   A.       No.

15   Q.       Did you participate in the adjudication decision on

16   his petition at all?

17   A.       No.

18   Q.       Did you have any contact with the Phoenix CIS office

19   about how they should decide his adjustment of status

20   petition?

21   A.       No.

22   Q.       Was that petition granted?

23   A.       No.

24   Q.       Have you promised Cosmin Iacob any benefits in

25   connection with his cooperation or testimony in this case?

1   A.      No.

2   Q.      Do you recall Radu Vlad who testified in this case?

3   A.      Yes.

4   Q.      Did you assist Radu Vlad with what's called a waiver

5   of inadmissibility?

6   A.      Yes.

7   Q.      What is that?

8   A.      The applicants who marry U.S. citizens, they only

9   qualify for the green card if they are approved a waiver.  If

10  they have fraud previous -- previous immigration fraud, they

11  qualify for the green card but have to file a waiver in order

12  to get that.

13  Q.      Why did you help him in connection -- what assistance

14  did you provide him in connection with that filing of the

15  waiver of inadmissibility?

16  A.      Our office sent a letter to the Chicago CIS office

17  recommending that they grant it based on his assistance or

18  based on him being a witness and assistance in the case.

19  Q.      We talked a little bit about parole earlier.

20          What is parole?

21  A.      It's kind of a quasi status where someone would be

22  given a parole if they don't qualify for any other type of

23  visa, but they need to come to the United States.

24  Q.      There's been some references in the trial to something

25  called, "significant public benefit parole"?

1    A.        Yes.

2    Q.        Is that the same thing?

3    A.        Yes.

4    Q.        As humanitarian parole?

5    A.        Yes.  It's almost the same thing.  I think they

6    changed the name.

7    Q.        And what is parole used for?  What types of situations

8    would someone be recommended for parole?

9    A.        It's for medical emergencies.  It's for witnesses,

10   informants, defendants, defense witnesses, any time somebody

11   needs to come to the U.S. and they don't qualify for a visa.

12   Q.        And do you yourself have the authority to grant parole

13   to anyone?

14   A.        No.

15   Q.        How do you go about applying for parole?

16   A.        For me, the first step is filling out an application

17   for parole and sending it to my supervisor.

18   Q.        And does your supervisor have the authority to make

19   that decision?

20   A.        No.

21   Q.        Who does?  Where does it go after that?

22   A.        The person making the decision is in Washington, D.C.

23   Q.        How long is parole good for?

24   A.        The initial parole is usually 90 days to six months

25   and then it can be renewed in one year increments.

1    Q.      Did you apply for parole for some witnesses in this

2    case?

3    A.      Yes.

4    Q.      Who would those be?  We discussed Mr. Chisca already,

5    the extension on his parole; right?

6    A.      Yes.  Mr. Vlad.

7    Q.      How about Mr. Kadar?

8    A.      Yes.

9    Q.      How about Mr. Vorobiov?

10   A.      Yes.

11   Q.      And why did you apply for parole for those four

12   individuals?

13   A.      So they could be present at the trial to testify.

14   Q.      Did they get work permits as part of their parole?

15   A.      Yes.

16   Q.      Why is that?

17   A.      As immigration, we're not allowed to ask someone to

18   stay here and work illegally, so we have to give them a work

19   permit.

20   Q.      And is that something that is typically done in parole

21   cases?

22   A.      Yes.

23   Q.      And once the trial testimony or the other purpose for

24   their parole is accomplished, what happened to the parole?

25   A.      Then it's no longer able to be extended.

1    Q.      Do you recall Mr. Vorobiov was asked about a problem

2    he had at the Canada border?

3           Do you recall that?

4    A.      Yes.

5    Q.      Were you contacted at the time that that occurred?

6    A.      Yes.

7    Q.      What was the nature of the problem that he had there?

8    A.      What happened, the Canadians would not allow him in

9    with his Moldova passport.  I'm not sure why.

10   Q.      Was he arrested or detained by U.S. authorities in

11   connection with that incident?

12   A.      No.

13   Q.      There's been some discussion in the case of an S visa.

14   Let me ask you what that is?

15   A.      An S visa -- I refer to it as a Witness visa.

16   Q.      Do you have the power to grant an S visa?

17   A.      No.

18   Q.      Does your boss have the power to grant an S visa?

19   A.      No.

20   Q.      Does your boss' boss have the power to grant an S

21   visa?

22   A.      No.

23   Q.      Tell me what the process is to apply for an S visa.

24   A.      It's very lengthy, but it goes through my office, the

25   regional office.  It has to be approved by the U.S. Attorney,

 1      then it goes to Washington, D.C. to the Department of Justice

 2      Criminal Division where it goes to several people.

 3              If it's approved there, it goes back to ICE

 4      headquarters.  It's reviewed by several people including ICE

 5      attorneys, and if it's approved preliminarily, it will go to

 6      the assistant section of the Department of Homeland Security

 7      and if it's approved there, then it goes to Citizenship and

 8      Immigration Services, and I think it goes to several people

 9      there and that's when the ultimately approved.

10      Q.    And how long is an S visa good for?

11      A.    There's two types.  One is non-immigrant and it's good

12      for three years.

13      Q.    And did you apply for S visas for some individuals who

14      have testified in this case?

15      A.    Yes.

16      Q.    And what type of S visa?

17      A.    Non-immigrant.

18      Q.    And did you apply on behalf of Alina Contis?

19      A.    Yes.

20      Q.    Did you apply on behalf of her sister, Ana Maria

21      Contis?

22      A.    Yes.

23      Q.    How about Mr. Radu Vlad?

24      A.    No.

25      Q.    What about Stefan Kadar?

1    A.      Yes.

2    Q.      What about Florin Vorobiov?

3    A.      Yes.

4    Q.      Anyone else who testified in this case that you can

5    recall?

6    A.      I think that's it.

7    Q.      How long ago did you apply for those?

8    A.      2007.

9    Q.      Are you still awaiting approval?

10   A.      Yes.  They're still pending.

11   Q.      Why did you apply for S visas for those witnesses?

12   A.      I wanted to guarantee their presence at this trial

13   because it was taking a long time and everybody was going

14   their own separate ways.

15   Q.      Does the -- under the terms of your application for

16   the S visa, does the receipt of the S visa depend in any way

17   on the outcome of this case?

18   A.      No.

19   Q.      Let me ask you about deportation, because there's been

20   some discussion about that in the course of the case.

21           Do you have the authority to deport anyone?

22   A.      No.

23   Q.      If an individual were found to have committed fraud in

24   connection with their asylum application, what steps, if any,

25   can you take to initiate the removal of that person from the

1   United States?

2   A.      There's not much.  The only thing I could do would be

3   to write a memo to the asylum office requesting that they

4   terminate, which means that they would allow -- they would

5   send the person a letter and have them come in for an

6   interview and try to resolve any problems and see if they

7   still qualify for asylum.

8   Q.      When you say "terminate," does that mean terminate

9   their asylum status?

10  A.      Yes.

11  Q.      That presume they are still in asylum status and

12  haven't adjusted; correct?

13  A.      Correct.

14  Q.      At an interview to terminate, would that be an

15  interview similar to the asylum officer interviews that have

16  been discussed in this case?

17  A.      Yes.  I'm pretty sure it's the same, but they would

18  find out about the reasons for the request for termination.

19  Q.      And would the person have a right to counsel in that

20  hearing?

21  A.      Yes.

22  Q.      And if they don't get satisfied, that is, if it's

23  terminated, would the matter proceed onto immigration court?

24  A.      Yes.

25  Q.      Would they have a right to counsel at the immigration

1    court?

2    A.      Yes.

3    Q.      If the immigration court rules against them, do they

4    have a right to appeal that?

5    A.      Yes.

6    Q.      To whom?

7    A.      The Board of Immigration Appeals.

8    Q.      If the Board of Immigration Appeals rules against

9    them, do they have the right of further appeal?

10   A.      Yes.

11   Q.      To whom?

12   A.      The Ninth Circuit Federal Court.

13   Q.      You reviewed a number of A files in the course of your

14   investigation?

15   A.      Yes.

16   Q.      Let me show you 30.1, 30.2 and .3 and ask you what

17   those are.

18   A.      This looks like an asylum application and a narrative

19   and a G-28 which is a notice of appearance of attorney.

20   Q.      Starting with 30.1, that's the G-28?

21   A.      Yes.

22   Q.      Is that on behalf of an individual by initials DPB?

23   A.      Yes.

24   Q.      What nationality is he?

25   A.      Romanian.

1    Q.      Who is -- was he an asylum client at the Sekhon law

2    firm?

3    A.      Yes.

4    Q.      According to that G-28, who was representing him as an

5    attorney?

6    A.      Jagprit Sekhon.

7            MR. WAGNER:  Government move Exhibit 30.1 into

8    evidence, Your Honor.

9            THE COURT:  Admitted.

10                            (Whereupon, Government's Exhibit 30.1

11                             was received into evidence.)

12           MR. STEPANIAN:  Objection.  Hearsay.

13           THE COURT:  Overruled.

14   BY MR. WAGNER:

15   Q.      What about 30.2, what is that?

16   A.      That is a form 589 application for asylum.

17   Q.      Is that for the same client?

18   A.      Yes.

19   Q.      Is that the same type of I-589 form that we've seen

20   for other clients in this case?

21   A.      Yes.

22   Q.      Is there a "received" stamp there?

23   A.      Yes.

24   Q.      What's the date that that was received?

25   A.      October 22, 2001.

1          MR. WAGNER:  Government would move Exhibit 30.2 into

2    evidence.

3          THE COURT:  It will be admitted.

4                         (Whereupon, Government's Exhibit 30.2

5                         was received into evidence.)

6    BY MR. WAGNER:

7    Q.    30.3, what is that?

8    A.    This is the narrative which describes the asylum

9    claim.

10   Q.    Let me -- does that relate to the same I-589 and the

11   same client you just referred to?

12   A.    Yes.

13         MR. WAGNER:  Government would move Exhibit 30.3 into

14   evidence.

15         THE COURT:  It will be admitted.

16                         (Whereupon, Government's Exhibit 30.3

17                         was received into evidence.)

18   BY MR. WAGNER:

19   Q.    I've shown you 30.7, what is that?

20   A.    This is cover letter that goes with the asylum

21   application.

22   Q.    And who is it addressed to and who is it from?

23   A.    Addressed to Immigration and Naturalization Service,

24   Nebraska Service Center and it's from Sekhon and Sekhon in

25   Sacramento.

1    Q.     Signed by whom?

2    A.     Jagprit Singh Sekhon.

3    Q.     Does it refer to some of the documents that you just

4    looked at?

5    A.     Yes.

6           MR. WAGNER:  Government would move 30.7 into evidence.

7           THE COURT:  It is admitted.

8                         (Whereupon, Government's Exhibit 30.7

9                          was received into evidence.)

10   BY MR. WAGNER:

11   Q.     Look at the second page of that document.

12          Is that a copy of the envelope in which those

13   materials were mailed?

14   A.     Yes.

15   Q.     When is that postmarked?

16   A.     October 16th, 2001.

17          THE COURT:  Want to break now, counsel?

18          MR. WAGNER:  Yes.

19          THE COURT:  We will take our mid-afternoon break,

20   ladies and gentlemen.

21                         (Whereupon, a break was taken at

22                          3:04 p.m.)

23                         (Whereupon, the following proceedings

24                          were resumed in open court in the

25                          presence of the jury panel:)

1    BY MR. WAGNER:

2    Q.      I'm going to return briefly to 76.5.

3            Do you recall this I showed you earlier?

4    A.      Yes.

5    Q.      It's labeled:  Weekly Diary for 2003.

6            Was that seized at Mr. Caza's house during the search?

7    A.      Yes.

8            MR. WAGNER:  Government would move 76.5 into evidence.

9            I've discussed this with Mr. Zindel, and I only intend

10   to publish three pages of it to the jury.  What we've agreed

11   to do is produce a copy of those three pages and submit those

12   as evidence as a substitute for the booklet which is now

13   76.5.

14           Is that properly stated?

15           MR. ZINDEL:  Yes.  That's fine.

16           THE COURT:  They will be admitted.

17                        (Whereupon, Government's Exhibit 76.5

18                         was received into evidence.)

19   BY MR. WAGNER:

20   Q.      This is the booklet, 76.5?

21   A.      Yes.

22   Q.      Were there indications in the booklet relating to what

23   appear to be transactions and documents?

24   A.      Yes, there were.

25   Q.      And let me direct your attention to -- does some of

1    the writing appear to be in Romanian?

2    A.      Yes.

3    Q.      Are there references to what appear to be clients?

4    A.      Yes.

5    Q.      What does it appear to indicate on this line and the

6    next line, if you can read that?

7    A.      (Reading:)

8                    "$500 for documents, $400 for translator."

9    Q.      And turning to the next page, is there another

10   reference to what appears to be documents?

11   A.      Yes.

12   Q.      And then, finally, turning to the next page, there are

13   a number of entries next to this client; correct?

14   A.      I can't see them.

15   Q.      Do you see below Florida Badar, are there some entries

16   there?

17   A.      Yes.  I think there's another name there, Daniella and

18   then it says:

19                   "1,000 for docs, 400 second department

20                   translator, 200 address, 100 transport SF."

21   Q.      Do you recall that there was some testimony by Mr.

22   Vorobiov and Mr. Kadar about being charged about a hundred

23   dollars to go to San Francisco?

24   A.      Yes.

25   Q.      When we broke, we were talking about a client with the

```
 1    initials DPB.

 2              Do you recall that?

 3    A.        Yes.

 4    Q.        You had looked at Government's Exhibit 30.7, the cover

 5    letter and envelope which, I believe, you indicated was

 6    postmarked October 16, 2001; is that right?

 7    A.        Yes, that's correct.

 8    Q.        The received stamp on the I-589 form was shortly after

 9    that; is that right?

10    A.        Yes, October 22, 2001.

11    Q.        If you look at the first paragraph of the asylum

12    narrative, which is 30.3, can you just indicate very briefly

13    what type of a claim that is?

14    A.        Pentecostal Christian.

15    Q.        And, again, Mr. DPB is a Romanian?

16    A.        Yes.

17    Q.        61.7 was previously admitted, and does it indicate

18    let -- me show you the original of 61.7.

19              THE COURT:  Counsel, the clerk advises me 61.7 has not

20    been admitted.

21              MR. WAGNER:  We show it admitted on April 30th.

22              THE COURT:  Go ahead.

23              MR. WAGNER:  Thank you, Your Honor.

24              MR. BLACKMON:  Before you question, may I see the

25    original of that exhibit?  The bottom part is cut off of the
```

1     copy.

2     BY MR. WAGNER:

3     Q.     Do you see on the screen there is an indication for

4     prep day one on the original that you have?

5     A.     Yes.

6     Q.     What's the date of that?

7     A.     November 21st, 2001.

8     Q.     And then there's a second prep day; is that correct?

9     A.     Yes.

10    Q.     Let me show you what's been marked as 30.4 and ask you

11    what that document is?

12    A.     This is a record of interpreter's oath during an

13    interview for DPB.

14    Q.     And so does it indicate that there was an asylum

15    interview for that individual?

16    A.     Yes.

17    Q.     And does it list who the interpreter is?

18    A.     Yes, Iosif Caza.

19          MR. WAGNER:  Government would move Exhibit 30.4 into

20    evidence, Your Honor.

21          THE COURT:  It will be admitted.

22                         (Whereupon, Government's Exhibit 30.4

23                          was received into evidence.)

24    BY MR. WAGNER:

25    Q.     What's the date of that asylum interview?

1  A.      November 26, 2001.

2  Q.      So would that be a few days after what's listed here

3  as prep day two?

4  A.      Yes.

5  Q.      Further down, there's a reference where I'm now

6  indicating, a reference to MH and to IJ.

7          What would that refer to?

8  A.      What do the initials refer to?

9  Q.      Yes.

10  A.      MH is master hearing.

11  Q.      Is that in the immigration court?

12  A.      Yes.

13  Q.      What is IJ?

14  A.      Immigration judge.

15  Q.      Would that indicate proceedings similar to the asylum

16  interview in the immigration court?

17  A.      Yes.

18  Q.      Can you see the entry for March 6, 2002?

19  A.      Yes.

20  Q.      What does that indicate?

21  A.      (Reading:)

22               "March 6, 2002, file received.  Iosif

23               preparing.  Told Carmen that docs need to

24               be prepared by March 11th or 12.  Waiver

25               completed."

1    Q.      Let me show you 30.6 and ask you what that is.

2    A.      This is a submission to the immigration court by the

3    Sekhon and Sekhon law office.

4    Q.      And is that in the case of DPB, the individual we've

5    been discussing?

6    A.      Yes.

7            MR. WAGNER:  Government would move Exhibit 30.6 into

8    evidence.

9            THE COURT:  It will be admitted.

10                        (Whereupon, Government's Exhibit 30.6

11                        was received into evidence.)

12   BY MR. WAGNER:

13   Q.      In the note we just looked at on the file notes it

14   says that the docs need to be prepared by March 11th or 12,

15   '02?

16   A.      Yes.

17   Q.      What is the date, the "received" stamp -- what is the

18   date that this was submitted next to the signature of the

19   attorney?

20   A.      March 12, 2002.

21   Q.      Who is the attorney whose signature is appearing on

22   this document?

23   A.      Manjit Kaur Kang.

24   Q.      The received date is that also March 12th?

25   A.      Yes.

1    Q.      What are the documents attached to this filing that

2    are part of Government's Exhibit 30.6?

3    A.      Identity documents and declarations and a certificate

4    from a church.

5    Q.      Were some of these documents submitted to the forensic

6    laboratory for review, for examination?

7    A.      Yes.

8    Q.      Do you recall which certificate was submitted?

9    A.      Let me check here.  It's the one labeled attachment

10   E -- sorry.  That's the wrong one.  It's on page seven and

11   eight.

12   Q.      And is that what's been previously admitted as 63.3.1?

13   A.      Yes.

14   Q.      I think Thursday when you testified you indicated that

15   you had located a number of documents that purported to be

16   original certificates in the A file and sent them onto the

17   forensic lab; is that right?

18   A.      That's right.

19   Q.      Is 63.3.1 one of those documents?

20   A.      Yes.

21   Q.      Was it found in the A file for DPB?

22   A.      Yes, it was.

23   Q.      And is there a stamp on that declaration?

24   A.      Yes.

25   Q.      And is that the stamp that I'm enlarging there now?

1  A.       Yes.

2  Q.       And what sort of a stamp does that appear to be?

3  A.       A notary stamp from Romania.

4  Q.       Does it have the name of the notary on it?

5  A.       Yes.

6  Q.       What is that?

7  A.       Elisabetha Chis.

8  Q.       Let me show you what's been previously admitted as

9  67.2.1.

10          What is that?

11 A.       A three-page document with stamps from doctors and

12 notaries and church stamps from Romania.

13 Q.       Is that the compilation of stamps from the floppy

14 disks that Agent McDonald testified about earlier?

15 A.       Yes.

16 Q.       Do you see what appears to be the same stamp on that

17 first collection, first page, second row?

18 A.       Yes.

19 Q.       Is it a notary stamp for the same individual?

20 A.       Yes, it is.

21 Q.       Let me ask you about a second individual.  I'll show

22 you Government's Exhibit 15.1 and 15.2 and ask you what those

23 are.

24 A.       15.1 is a G-28, notice of appearance of attorney.

25          15.2 is a submission to the immigration court from

1    Sekhon and Sekhon.

2    Q.      And were those both found in the A file for a client

3    of Sekhon and Sekhon?

4    A.      Yes.

5    Q.      What are the initials of this individual?

6    A.      DMB.

7    Q.      Is that a male?

8    A.      Yes.

9    Q.      What is his nationality?

10   A.      Romanian.

11   Q.      Starting with the 15.1, what is the date on that

12   document and what attorney signed that document?

13   A.      It's dated August 21st, 2001.  It's signed by Jagprit

14   Singh Sekhon.

15          MR. WAGNER:  The government would move Exhibit 15.1

16   into evidence.

17          THE COURT:  It will be admitted.

18                      (Whereupon, Government's Exhibit 15.1

19                      was received into evidence.)

20   BY MR. WAGNER:

21   Q.      Turning to 15.2, what is that?

22   A.      It's a submission to the immigration court, on behalf

23   of the same individual, DMB.

24   Q.      And what is the date next to the signature of that

25   document?

1    A.       February 11, 2002.

2    Q.       What attorney submitted that?

3    A.       Manjit Kaur Kang.

4    Q.       Was that submitted to the immigration court in the

5    same asylum proceedings for this same client?

6    A.       Yes.

7             MR. WAGNER:  Government would submit Exhibit 15.2 into

8    evidence, Your Honor.

9             THE COURT:  It will be admitted.

10                          (Whereupon, Government's Exhibit 15.2

11                          was received into evidence.)

12   BY MR. WAGNER:

13   Q.       15.2, did that document submit a number of notarized

14   Romanian documents and other similar documents to the

15   immigration court?

16   A.       Yes.

17   Q.       Let me -- directing your attention to the seventh page

18   of the exhibit, do you see there's a stamp in the upper

19   right-hand corner there?

20   A.       Yes.

21   Q.       Go to page eight, is that the same stamp that also

22   appears on the bottom the eighth page?

23   A.       Yes, it's the same.

24   Q.       Does that appear to be another notary stamp of some

25   sort?

```
1    A.      Yes.

2    Q.      Does it have the individual's name on there?

3    A.      Yes.

4    Q.      67.2.1, go to page three, please.

5            If you look at the screen at 76.2.1 -- I'll put the

6    original in front of you -- do you see on the third page in

7    the fifth row there's some notary stamps?

8    A.      Yes.

9    Q.      The one on the left of what I've highlighted, do you

10   see that?

11   A.      The one on the left?

12   Q.      Do you see the three on 67.2.1 the analysis of the

13   floppy disks?

14   A.      Yes.

15   Q.      The one on the left, is there a name of that notary?

16   A.      The one on the far left?

17   Q.      Yes.

18   A.      Buta Anton.

19   Q.      What is the name on the -- of the notary whose stamp

20   is affixed to 15.2?

21   A.      Buta Anton.

22   Q.      15.2, the 11th page, do you see there's a separate

23   declaration there?

24   A.      Yes.

25   Q.      Is there a notary whose stamp appears there?
```

1    A.       Yes.

2    Q.       And what is the name of that notary?

3    A.       I don't know if I can pronounce this --

4    Q.       Is the name on the stamp also the name that appears to

5    the right there on the blue line?

6    A.       Yes.

7    Q.       If you look at 67.2.1 the compilation of floppy disk

8    from the Mr. Caza's house, the one I'm circling on the right,

9    can you see that?

10   A.       Yes.

11   Q.       Is that the same person?

12   A.       Yes, it is.

13            MR. STEPANIAN:   I object to that as characterizing

14   this as the same person or the same name.

15            THE COURT:   Same name.

16            MR. WAGNER:   I will rephrase that, Your Honor.

17   Q.       Is that the same name that appears on both stamps?

18   A.       Yes.

19   Q.       Turn to the 21st page of 15.2, do you see the page on

20   the screen now?

21   A.       Yes.

22   Q.       Does there appear to be a Pentecostal stamp of some

23   sort there?

24   A.       Yes.

25   Q.       And on 67.2.1, could you go to the first page.

1         Does the stamp in 15.2 on the 21st page reference the

2  city of Bistria?

3  A.     Yes.

4  Q.     And is there a similar stamp that has those same

5  references in a document that comes from the floppy disks

6  from Mr. Caza's house?

7  A.     Yes, it's the same.

8  Q.     Is that what I'm showing on the screen there?

9  A.     Yes.

10  Q.     Finally, if you turn on 15.2 to page 24, is there a

11  doctor's stamp there?

12  A.     Yes.

13  Q.     What's the name of that doctor or the name of the

14  stamp I should say.

15  A.     Boca Marius.

16  Q.     In the document 67.2.1, do you see the stamp that I've

17  highlighted from the third page of that document?

18  A.     Yes.

19  Q.     Does that appear to be a stamp bearing the same name

20  and the same information?

21  A.     Yes, it does.

22  Q.     Agent Webster, earlier this afternoon I asked you

23  whether in the course of your investigation you attempted to

24  analyze some of the text of the asylum applications that were

25  filed by Sekhon and Sekhon that you were investigating.

1          Do you recall that?

2     A.     Yes.

3     Q.     And I think you indicated at some point you did

4     collect and attempt to analyze that information.

5          Tell me in general terms what you did to analyze --

6     starting with Romanian applicants, what you did to analyze

7     those -- the text of the applications?

8     A.     Well, what I first did was read through several

9     narratives and I noticed that all of the applicants go

10    unconscious.  I notice that language in almost all of them.

11    Q.     Did you do something to further investigate the

12    language in the applications?

13    A.     Yes.  After that I took the narratives from the A

14    files and scanned them into Adobe PDF files and I indexed

15    them for text and then I scanned them for repetitive phrases.

16    Q.     What did you do with what you received from that

17    phrase search?

18    A.     I placed them into groups that had similar phrases and

19    scenarios.

20    Q.     Approximately how many claims did you look at in the

21    course of that analysis?

22    A.     About 330.

23    Q.     And approximately how many of those were Romanian

24    applicants?

25    A.     About 200 Romanians.

1   Q.      Those that were not Romanian, what countries were they

2   from?

3   A.      They were from India, Fiji, Nepal and a few others.

4   Q.      Did you attempt to include every claim that had been

5   filed by the Sekhons during the period you were looking at?

6   A.      No.

7   Q.      Did you compile some charts with the information that

8   you uncovered through your searches that you've just

9   described?

10   A.      Yes, I did.

11   Q.      Showing you 75.2, let me ask you what this is.

12   A.      This is a chart and it relates to a group that had the

13   same wording regarding a large number of police who raided

14   their home in the middle of the night, threw the applicant or

15   his or her relative in a Jeep, took him to the police station

16   and presented him before an officer.

17   Q.      Now, approximately how many claims are listed on

18   Government's Exhibit 75.2?

19   A.      12.

20   Q.      Are all 12 of those claims Indian applicants?

21   A.      Yes.

22   Q.      Have you collected all of the 12 asylum applications

23   that are reflected on that chart?

24   A.      Yes.

25   Q.      Let me show you 75.2A and ask you what that is?

1    A.      These are all the narratives that relate to the

2    initials on this chart.

3    Q.      Were those narratives all filed in connection with

4    asylum claims?

5    A.      Yes.

6    Q.      Were they all represented by Sekhon and Sekhon?

7    A.      Yes, they were.

8    Q.      Where did you get those narratives?

9    A.      From the alien files.

10          MR. WAGNER:  The government would move 75.2 and 75.2A

11   into evidence.  Since they are all Indian, we would request a

12   limiting instruction with respect to Mr. Caza and Ms.

13   Harmath.

14          THE COURT:  Ladies and gentlemen, these documents

15   identified as 75.2 and 75.2A relate to Indian applicants.

16   I'm going give you an instruction.  I'm going to order you

17   not to consider this evidence as to the defendants Iosif Caza

18   or Luciana Harmath.  It applies only to the other defendants.

19   These exhibits only apply in turn to clients of the firm

20   apparently from India.

21          The jury understand my limited instruction?

22          You're all nodding "yes."

23          The exhibits will be admitted with that limitation.

24                        (Whereupon, Government's Exhibits 75.2

25                        and 75.2A were received into

```
 1                          evidence.)

 2            MR. WAGNER:  Thank you, Your Honor.

 3   Q.     Now, is one of the applicants listed by his initials

 4   BSS?

 5   A.     Yes.

 6   Q.     Let me show you Government's Exhibit 37.1 and 37.2 and

 7   ask you what those are?

 8   A.     This is an asylum application and a G-28 notice of

 9   appearance of attorney for that same applicant, BSS.

10   Q.     And was that G-28 and asylum application, were they

11   filed with Customs and Immigration Service in connection with

12   the asylum application of client BSS?

13   A.     Yes.

14            MR. WAGNER:  Government would move Exhibit 37.1 and .2

15   into evidence, Your Honor.

16            THE COURT:  Admitted.

17                          (Whereupon, Government's Exhibits 37.1

18                          and 37.2 were received into evidence.)

19   BY MR. WAGNER:

20   Q.     Turning first to 37.1, who is the attorney who signed

21   that representation form?

22   A.     Jagdip Sekhon.

23   Q.     And turning to 37.2, same question:  Who is the person

24   that signed that on the signature form?

25   A.     Also Jagdip Sekhon.
```

1   Q.      If you can turn to 37.2, does that have the asylum

2   application attached to it?

3   A.      The narrative, yes.

4   Q.      Can you turn to page three of that narrative, and it's

5   going to be about page 11.  Do you see there's two

6   paragraphs -- 37.2 is this one the narratives you included on

7   your chart there?

8   A.      Yes, it is.

9   Q.      And the language that describes the scenario that is

10  the commonality reflected in your chart, is that on this page

11  three?

12  A.      Yes.

13  Q.      And let me direct your attention to the two paragraphs

14  that I have highlighted in that narrative.

15          Can you just indicate -- taking the first paragraph

16  first, can you generally indicate what that states that's

17  relevant to your chart.

18  A.      A large number of policemen raided the home in the

19  middle of the night and threw the applicant in a Jeep.

20  Q.      Then in the second paragraph.

21  A.      He was taken -- at the police station taken and

22  presented before the station house officer.

23  Q.      And is that the scenario that is reflected in the

24  various 12 applications that you have included in this chart?

25  A.      Yes.

1   Q.      And does the language vary from case to case or is it

2   always the exact same language?

3   A.      It varies.

4   Q.      Showing you 37.3 and ask you what that is?

5   A.      This is a submission to the immigration court for the

6   same applicant, BSS.

7   Q.      The same applicant that we just discussed?

8   A.      Yes.

9   Q.      Is that submitted to the immigration court in the

10  course of the asylum claim by that individual?

11  A.      Yes.

12  Q.      Does that attach supporting evidence?

13  A.      Yes, it does.

14          MR. WAGNER:  Government would move Exhibit 37.3 into

15  evidence, Your Honor.

16          THE COURT:  It will be admitted.

17                          (Whereupon, Government's Exhibit 37.3

18                          was received into evidence.)

19  BY MR. WAGNER:

20  Q.      Who is that signed by?

21  A.      The submission is signed by Jagprit Singh Sekhon.

22  Q.      Is there a -- in that document, is there a certificate

23  from a doctor?

24  A.      Yes.

25  Q.      What page is that on?

1              May I publish, Your Honor?

2              THE COURT:  You may.

3              THE WITNESS:  Page numbers are not -- I think the

4    fourth page.

5    BY MR. WAGNER:

6    Q.     Is that the document we're looking at that says Singh

7    Hospital?

8    A.     Yes.

9    Q.     Was there recovered in the course of this case, a

10   document that relates to that submission?  And I'm showing

11   you what's previously been admitted as 61.1.4.

12   A.     Yes.

13   Q.     Was 61.1.4 a document that was seized in the course of

14   the search as previously testified to in this case?

15   A.     Yes, seized at the storage unit.

16   Q.     Was that one of the documents discussed by Agent Cruz?

17   A.     Yes.

18   Q.     If you compare the language from the template -- the

19   template has no doctor's name; correct?

20   A.     Correct.

21   Q.     Is there language in it which reflects injuries to

22   this client, BSS?

23   A.     Yes.

24   Q.     Can you compare that to the language in the affidavit

25   as submitted to the immigration court?

1    A.       It looks like the same language.

2    Q.       One of the other clients listed on your chart is JSS;

3    is that correct?

4    A.       Yes.

5    Q.       Let me show you 46.3 and ask you what that is.

6    A.       This is a submission of documents to the asylum office

7    from Sekhon and Sekhon.

8    Q.       Is that submitted in the case of JSS?

9    A.       Yes.

10   Q.       And was that submitted to the asylum office in the

11   course of the asylum claim by JSS?

12   A.       To the asylum office, yes.

13   Q.       Where did you recover that document?

14   A.       This was from the A file of JSS.

15             MR. WAGNER:   Government moves Exhibit 46.3 into

16   evidence.

17             THE COURT:   Admitted.

18                         (Whereupon, Government's Exhibit 46.3

19                          was received into evidence.)

20   BY MR. WAGNER:

21   Q.       Did that pleading submit to the asylum office another

22   doctor's affidavit?

23   A.       Yes, it did.

24   Q.       What's the name of the doctor whose affidavit is

25   submitted?

 1   A.        B.L. Sharma.

 2   Q.        50.5.2 that was previously admitted, second page.

 3            Was that document -- did you find a purported original

 4   version of that document in the A file which was submitted to

 5   the agents in India?

 6   A.        No.  We submitted a copy.

 7   Q.        I'm sorry.  Did you submit a copy of that document to

 8   the agents that were assisting your investigation in India?

 9   A.        Yes, but I think we found the original in the client

10   file.

11   Q.        50.5.2, is that the signature for that doctor that was

12   obtained by Mr. Sharma that he referred to in his testimony

13   earlier in the trial?

14   A.        Yes.

15   Q.        Is that, again, submitted in connection with the claim

16   of JSS?

17   A.        Yes.

18   Q.        I take it that was not the only chart you prepared?

19   A.        No, there's more.

20   Q.        The jury probably guessed there was more.

21            Let me show you Government's Exhibit 75.3 and ask you

22   what that is.

23   A.        This is a chart I prepared, a compilation of asylum

24   narratives with the language regarding an officer and two or

25   three policemen who approached the applicant and the officer

1    slapped the applicant across the face.

2    Q.    Approximately how many narratives are there on this

3    chart?

4    A.    21.

5    Q.    Let me show you what's been marked as 75.3A and ask

6    you what those are.

7    A.    These are all the narratives that correspond to these

8    initials from the asylum applications.

9    Q.    Did you review these asylum applications in connection

10   with creating the chart, 75.3?

11   A.    Yes.

12   Q.    And I take it that this -- does this chart contain

13   some Romanians and some Indians?

14   A.    Yes, it does.

15         MR. WAGNER:  Your Honor, I would note that

16   applicant -- of the 21 individuals listed on the chart 75.3,

17   two of them with the initials KS and PS are Indian.  The rest

18   are Romanian.

19         We would ask to admit Government's Exhibit 75.3 and

20   75.3A with the limiting instruction as to those two entries

21   KS and PS on the chart.

22         THE COURT:  They will be admitted.

23                        (Whereupon, Government's Exhibits 75.3

24                         and 75.3A were received into

25                         evidence.)

1          THE COURT:  Ladies and gentlemen, I will again

2    instruct you you should not consider the applications of KS

3    and PS which are both Indian applicants; that you not

4    consider that evidence as to defendant Iosif Caza or Luciana

5    Harmath.

6          MR. WAGNER:  May I publish the chart?

7          THE COURT:  You may.

8    BY MR. WAGNER:

9    Q.    Now, the first individual listed on this chart is an

10   entry for a person with the initials AE.

11         Do you see that?

12   A.    Yes.

13   Q.    Let me show you what's been previously marked as

14   Government's Exhibit 25.3 and ask you what that is.

15   A.    This is an asylum application for AE.

16   Q.    Is he a Romanian individual?

17   A.    Yes.

18   Q.    A male?

19   A.    Yes.

20   Q.    Where did you locate that document?

21   A.    From the alien file.

22   Q.    And does that include both the I-589 form and the

23   asylum attachment?

24   A.    Yes.

25         MR. WAGNER:  Government would move Exhibit 25.3 into

1    evidence, Your Honor.

2              THE COURT:  It will be admitted.

3                        (Whereupon, Government's Exhibit 25.3

4                        was received into evidence.)

5    BY MR. WAGNER:

6    Q.    Who is the -- looking first at the I-589 form, who is

7    the attorney that signed this document?

8    A.    Jagprit Singh Sekhon.

9    Q.    On the first page is there a received stamp indicating

10   when it was received by CIS?

11   A.    Yes, October 28, 2002.

12   Q.    Could you pull up 25.3, Ms. Kenny.

13         To the 13th page of the exhibit, please.

14         You indicated that the chart relates to the scenario

15   in which an officer or two or three policemen approach the

16   applicants and the officer slaps the applicant across the

17   face.

18         Is that reflected on the bottom of page five and the

19   top of page six of the asylum application beginning with the

20   language that I've bracketed on the screen?

21   A.    Yes.

22   Q.    What does the first paragraph say that's relevant to

23   your comparison of these asylum applications?

24   A.    That three policemen came to his home, took him to the

25   police station, and he objected and was slapped across the

1    face.

2    Q.      Turning to the top of the next page, what does that

3    say relative to your comparison?

4    A.      At the police station he was thrown into a cell, and

5    within minutes, policemen returned with the officer and he

6    was slapped across the face.  They said some things to him.

7    Q.      Do you still have the chart in front of you?

8    A.      Yes.

9    Q.      About eight from the bottom, there is an individual

10   with the initials CS?

11   A.      Yes.

12   Q.      Was CS also a Romanian client of Sekhon and Sekhon?

13   A.      Yes, he was.

14   Q.      Showing you Government's Exhibit 20.3, let me ask you

15   what that is.

16   A.      This is the asylum application for CS.

17   Q.      Is there an attorney who signed that document?

18   A.      Yes.  Jagprit Singh Sekhon.

19   Q.      Is there a received stamp date?

20   A.      Yes.  It's dated June 6, 2002.

21   Q.      Does this document include both the I-589 and the

22   asylum narrative?

23   A.      Yes, it does.

24   Q.      Where did you locate this document?

25   A.      In the alien file.

1              MR. WAGNER:  Government would move Exhibit 20.3 into

2      evidence, Your Honor.

3              THE COURT:  It will be admitted.

4                          (Whereupon, Government's Exhibit 20.3

5                          was received into evidence.)

6              MR. WAGNER:  May I publish?

7              THE COURT:  You may.

8      BY MR. WAGNER:

9      Q.      Turning to pages nine and ten of the exhibit, which

10     are pages three and four of the document, of the attachment,

11     do you see the language that starts at the beginning at the

12     police station:  "I was placed in a cell"?

13     A.      Yes.

14     Q.      Is that the beginning of the language that you found

15     was the reason you included it on this chart?

16     A.      Yes.

17     Q.      Next page.

18             What do the first three paragraphs of the next page

19     say that were relevant to your analysis?

20     A.      That has an officer and some policemen in it.

21     Q.      And in the third paragraph, does it indicate that the

22     applicant was slapped across the face?

23     A.      Yes.

24     Q.      And then, finally, the chart, one of the two Indian

25     applicants is PS, is that correct, on your chart?

1    A.      Yes.

2    Q.      Was that individual also a client of Sekhon and

3    Sekhon?

4    A.      Yes, he was.

5    Q.      I will show you 44.2 and ask you what that is?

6    A.      This is an asylum application for PS.

7    Q.      And was that -- where did you obtain that document?

8    A.      From the alien file.

9    Q.      Is that signed by PS and by an attorney?

10   A.      Yes.

11   Q.      Who is the attorney?

12   A.      Jagprit Sekhon.

13           MR. WAGNER:  Government would move Exhibit 44.2 into

14   evidence, Your Honor.

15           THE COURT:  It will be admitted.

16                          (Whereupon, Government's Exhibit 44.2

17                          was received into evidence.)

18   BY MR. WAGNER:

19   Q.      Turning to the 13th page of the exhibit, which is the

20   second to last page of the document, is there some language

21   in there that is relevant to why you included this one on

22   your list of these 21 files?

23   A.      Yes.

24   Q.      What does it say that was relevant to you in compiling

25   this chart.

1    A.       He was at the police station, taken to an

2    interrogation room and within minutes the station house

3    officer flanked by two policemen burst into the room.  The

4    officer screamed some things at the applicant and slapped the

5    applicant.

6    Q.       Turning back to Mr. AE, the first of the three we

7    discussed with respect to this individual, was there some

8    other evidence that was checked in the course of the case

9    that's been discussed already in this case that relates to

10   that applicant AE?

11   A.       Yes.

12   Q.       Let me show you what's been marked Government's

13   Exhibit 25.1, .2, .4, and .5, and ask you what those are.

14   A.       These are documents from the alien file of AE relating

15   to the asylum application.

16   Q.       Where did you locate those documents?

17   A.       From the alien file.

18   Q.       And did they all relate to the asylum application of

19   AE?

20   A.       Yes.

21   Q.       And can you just take them one at a time and tell us

22   what 25.1 is?

23   A.       25.1 is notice of appearance of attorney for AE signed

24   by Jagprit Singh Sekhon.

25            MR. WAGNER:  The government would move Exhibit 25.1

1    into evidence.

2             THE COURT:  Admitted.

3                         (Whereupon, Government's Exhibit 25.1

4                         was received into evidence.)

5    BY MR. WAGNER:

6    Q.     What is 25.2?

7    A.     It is a letter written on Sekhon and Sekhon letterhead

8    to the asylum office regarding applicant AE.

9    Q.     And who is that signed by?

10   A.     Jagprit Singh Sekhon.

11   Q.     Is there a date on that?

12   A.     Yes.  November 21st, 2002.

13            MR. WAGNER:  Move Exhibit 25.2 into evidence.

14            THE COURT:  Admitted.

15                        (Whereupon, Government's Exhibit 25.2

16                        was received into evidence.)

17   BY MR. WAGNER:

18   Q.     You have four and five; is that correct?

19   A.     Yes.

20   Q.     What are those?

21   A.     25.4 is notice of appearance of attorney for AE signed

22   by Manjit K. Rai.

23            MR. WAGNER:  Government would move Exhibit 25.4 into

24   evidence.

25            THE COURT:  Admitted.

```
 1                              (Whereupon, Government's Exhibit 25.4

 2                         was received into evidence.)

 3    BY MR. WAGNER:

 4    Q.     Who is the interpreter that signed that oath?

 5    A.     Iosif Caza.

 6           MR. WAGNER:  The government would move Exhibit 25.5

 7    into evidence.

 8           THE COURT:  It will be admitted.

 9                              (Whereupon, Government's Exhibit 25.2

10                         was received into evidence.)

11    BY MR. WAGNER:

12    Q.     Let me show you 25.7 and ask what you that is.

13    A.     This is a letter from Sekhon and Sekhon to the

14    Nebraska Service Center regarding the asylum application for

15    AE.  It looks like the same cover letter.

16    Q.     Does that appear to be the cover letter submitting the

17    initial asylum documents?

18    A.     Yes.

19    Q.     Who signed that document and what is the date?

20    A.     Jagprit Singh Sekhon dated October 10, 2002.

21           MR. WAGNER:  The government would move Exhibit 25.7

22    into evidence, Your Honor.

23           THE COURT:  It will be admitted.

24                              (Whereupon, Government's Exhibit 25.7

25                         was received into evidence.)
```

1   BY MR. WAGNER:

2   Q.      Turning back to the I-589, is that 25 point -- do I

3   have that?  25.3?  Is there an address in California listed

4   on that I-589?

5   A.      Yes.

6   Q.      What's the address?

7   A.      8840 Central Avenue, Orangevale, California.

8   Q.      Was the intake sheet for this individual one of the

9   documents that was seized during the search and previously

10  admitted during the case?

11  A.      Yes.

12  Q.      Is that document the intake sheet that we're looking

13  at on the screen now?

14  A.      Yes, that's it.

15  Q.      Is the address at the top, is this the one you just

16  saw on the I-589?

17  A.      Yes.

18  Q.      Now, was there some -- in addition to the asylum

19  interview, was there some immigration proceedings involving

20  Mr. AE?

21  A.      Yes.

22  Q.      I've shown you what's been marked as 25.6.

23          Can you indicate what that is?

24  A.      This is a submission to the immigration court from

25  Sekhon and Sekhon on behalf of AE.

1    Q.      And who is it signed by?

2    A.      Signed by Jagprit Singh Sekhon.

3    Q.      And the date?

4    A.      November 19, 2003.

5            MR. WAGNER:   Government would submit 26 point -- 25.6

6    into evidence Your Honor.

7            THE COURT:   It will be admitted.

8                            (Whereupon, Government's Exhibit 25.6

9                            was received into evidence.)

10           MR. WAGNER:   May I publish?

11           THE COURT:   You may.

12   BY MR. WAGNER:

13   Q.      Among the documents submitted to the immigration court

14   that's included in this exhibit, was there some sort of a

15   letter from a Jehovah's Witnesses organization in Romania?

16   A.      Yes.

17   Q.      Turning to the fifth page of the document, is that the

18   document that I am now showing on the screen?

19   A.      Yes.

20   Q.      This letter is signed by an individual or there's a

21   name that appears at the bottom of that; is that correct?

22   A.      Yes.

23   Q.      And did you find -- was there recovered in the course

24   of the search in this case another copy of this or what

25   purports to be the original of that document or similar

```
 1   document?

 2   A.      Yes.

 3   Q.      I'll show you 66.1.  Do you see that document?

 4   A.      Yes.

 5   Q.      And was that document recovered in the course of the

 6   search?

 7   A.      Yes, at Iosif Caza's house.

 8   Q.      And does that appear to be similar -- was that

 9   previously admitted in this case?

10   A.      Yes.

11   Q.      Does -- that one contains no signature; is that

12   correct?

13   A.      Correct.

14   Q.      And the stamp is in a slightly different place; is

15   that correct?

16   A.      Yes.

17   Q.      Other than that, does it appear to be substantially

18   identical to the one that was submitted to the asylum

19   court -- I'm sorry -- the immigration court?

20   A.      Yes.

21   Q.      Put up 67.2.1, please.

22           Is that the compilation of images from the floppy

23   disks that Agent McDonald testified about earlier?

24   A.      Yes.

25   Q.      She referenced that image.
```

1          Is that an image that also appears on the letter

2     submitted to the immigration court?

3     A.     Yes.

4     Q.     Finally, with respect to this letter, let me show you

5     67.2.2 and ask you what that is?

6     A.     This is the text portion of this document.

7     Q.     If you could take down 67.2.1 and put up 2.2, please.

8          When you say, "the text portion of the document," what

9     do you mean by that?

10    A.     No images on it.

11    Q.     Does it otherwise appear to be the text of the

12    document that was submitted to the immigration court in the

13    case of AE?

14    A.     It's similar, but I think this is a computer version

15    so it's not exact.

16    Q.     Let me ask you about one other client who is listed on

17    the chart, which is Mr. PS.  We looked at his asylum

18    narrative earlier.

19         Are do you recall that?

20    A.     Yes.

21    Q.     He is an Indian applicant; is that correct?

22    A.     Correct.

23    Q.     Showing you 44.1 and 44.3 and ask you what those are.

24    A.     44.1 is a G-28 notice of appearance for attorney for

25    PS.

1          44.3 is a cover letter that looks like it goes with

2     the asylum application for PS.

3     Q.      Where did you find those documents?

4     A.      In the A file of PS.

5              MR. WAGNER:  Government would move 44.1 and 44.3 into

6     evidence, Your Honor.

7              THE COURT:  Admitted.

8                          (Whereupon, Government's Exhibits 44.1

9                          and 44.3 were received into evidence.)

10    BY MR. WAGNER:

11    Q.      44.1, did you indicate that was a G-28, one of the

12    attorney appearance forms?

13    A.      Yes.

14    Q.      What attorney signed that?

15    A.      Jagprit Sekhon.

16    Q.      What is 44.3?

17    A.      It is a cover letter that goes with the asylum

18    application.

19    Q.      And who signed that document?

20    A.      Jagprit Sekhon.

21    Q.      Now, was there previously admitted in this case seized

22    in the course of the search some notes from the client file

23    of this individual PS?

24    A.      Yes.

25    Q.      62.5.1, this is the action notes -- the case notes for

1   this individual that were recovered during the course of the

2   search?

3   A.      Yes.

4   Q.      And with respect to this individual, let me show you

5   the original.

6           Do you see there's some references there to some

7   changes and some documents?

8   A.      Yes.

9   Q.      Can you read number three and four?

10   A.      (Reading:)

11                      "Dr. Letter has to be combined and the date

12                      has to be changed to present date."

13                      "Four:  Affidavit and Bhupinder Singh has

14                      to be worded differently than, 'arrow,'

15                      Major Singh's and has Bhupinder's copy

16                      certified if possible."

17   Q.      Were there some immigration proceedings involving

18   client PS in which documents were submitted to the

19   immigration court?

20   A.      Yes.

21   Q.      Showing you 44.4.

22           I'll ask you what that is?

23   A.      A submission of document to the immigration court from

24   the law office of Sekhon and Sekhon.

25   Q.      Where did you get that document?

1    A.        From the A file of BS.

2    Q.        Is it signed?

3    A.        Yes.

4    Q.        By whom?

5    A.        Jagprit Singh Sekhon.

6              MR. WAGNER:  The government would move Exhibit 44.4

7    into evidence.

8              THE COURT:  Admitted.

9                          (Whereupon, Government's Exhibit 44.4

10                         was received into evidence.)

11   BY MR. WAGNER:

12   Q.        Was there a medical certificate admitted together with

13   part of that exhibit to the immigration court?

14   A.        Yes.

15   Q.        Did you submit that document to Mr. Sharma and Agent

16   Golowsky in India for examination or for further

17   investigation?

18   A.        Yes.  Agent Morihara did.

19   Q.        Showing you 50.3.1, is that the document you

20   submitted -- which Agent Morihara submitted to the agents in

21   India for further investigation?

22   A.        Yes.

23   Q.        Is PS the client that appears on 75.3?

24   A.        Yes.

25             MR. WAGNER:  I was going to move onto my next chart.

1          THE COURT:  We will break now.  We'll take our evening

2     recess.

3          Don't form any opinions about the case and don't

4     discuss it until it's submitted to you.

5          We'll recess until tomorrow morning at 9 o'clock.

6                              (Whereupon, a break was taken at

7                              4:31 p.m.)

8                              ---oOo---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           ---oOo---

2           I certify that the foregoing is a correct transcript

3      from the record of proceedings in the above-entitled matter.

4

5

6                    _____

7                    MICHELLE L. BABBITT, CSR 6357

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4        BEFORE THE HONORABLE FRANK C. DAMRELL, JR., JUDGE

5                        ---oOo---

6   UNITED STATES OF AMERICA,        )
                                     )
7            Plaintiff,              )
                                     )
8   vs.                             )   No. Cr. S-06-0058 FCD
                                     )
9   JAGPRIT SINGH SEKHON, et al.,   )
                                     )
10           Defendants.             )
    _____ )

11

12                        ---oOo---

13

14                  REPORTER'S TRANSCRIPT

15                   TRIAL PROCEEDINGS

16

17                     MAY 4, 2009

18

19                        ---oOo---

20

21

22

23

24

25   Reported by:      MICHELLE L. BABBITT, CSR #6357

```
1                              APPEARANCES

2    For the Government:

3
                McGREGOR W. SCOTT
4               UNITED STATES ATTORNEY
                501 I Street
5               Sacramento, California 95814
                BY:  BENJAMIN WAGNER
6                    CAMIL SKIPPER
                     KYLE REARDON
7                    Assistant U.S. Attorneys

8    For Defendant Jagprit Singh Sekhon:
                MICHAEL STEPANIAN
9               RANDY SUE POLLOCK
                     Attorneys at Law
10              819 Eddy Street
                San Francisco, California 94109
11

12   For Defendant Jagdip Singh Sekhon:
                DAVID DRATMAN
13                   Attorney at Law
                1007 7th Street, Suite 305
14              Sacramento, California 95814

15
     For Defendant Manjit Daur Rai:
16              CLYDE BLACKMON
                     Attorney at Law
17              813 6th Street, Suite 450
                Sacramento, California 95814
18

19   For Defendant Iosif Caza:
                FEDERAL DEFENDERS OFFICE
20              801 I Street, 3rd Floor
                Sacramento, California 95814
21              TIM ZINDEL
                     Assistant Federal Defender
22
     For Defendant Luciana Harmath:
23              JAI GOHEL
                     Attorney at Law
24              819 Eddy Street
                San Francisco, California 94109
25
```

1                            INDEX
                            ---oOo--
2

3     Afternoon Session                        Pg. 3465

4

      WITNESSES
5
      CAROL WEBSTER
6     Direct Ex. Continued by Mr. Wagner       Pg. 3486

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            INDEX
                            ---oOo--
 2

 3     EXHIBITS                              ADMITTED

 4     GOVERNMENT
       6.1                                   Pg. 3517
 5     10.6                                  Pg. 3490
       12.11                                 Pg. 3501
 6     15.1                                  Pg. 3545
       15.2                                  Pg. 3546
 7     20.3                                  Pg. 3563
       25.1                                  Pg. 3565
 8     25.2                                  Pg. 3566
       25.3                                  Pg. 3561
 9     25.4                                  Pg. 3567
       25.5                                  Pg. 3566
10     25.6                                  Pg. 3568
       25.7                                  Pg. 3567
11     30.1                                  Pg. 3534
       30.2                                  Pg. 3535
12     30.3                                  Pg. 3535
       30.4                                  Pg. 3540
13     30.6                                  Pg. 3542
       30.7                                  Pg. 3536
14     37.1, 37.2                            Pg. 3553
       37.3                                  Pg. 3555
15     44.1                                  Pg. 3572
       44.2                                  Pg. 3564
16     44.3                                  Pg. 3572
       44.4                                  Pg. 3574
17     46.3                                  Pg. 3557
       62.2.1A                               Pg. 3511
18     66.25                                 Pg. 3509
       75.2, 75.2A                           Pg. 3552
19     75.3, 75.3A                           Pg. 3559
       76.5                                  Pg. 3537
20

21

22

23

24

25
```