1   RAJDEP S. CHIMA (SBN 269677)
    The Law Offices of Raj S. Chima
2   500 Olive Street, Suite 10 and 11
    Marysville, CA 95901
3   Telephone: (530) 749-0749
    Facsimile: (530) 749-0748
4   rchima@rajchimalaw.com
5
6   Attorney for Defendant
    JAGDIP SINGH SEKHON
7

8                    IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10                         SACRAMENTO DIVISION

11

12

13   UNITED STATES OF AMERICA,            Case No.: CR06-00058 JAM

14   Plaintiff,

15   vs.

16   JAGDIP SINGH SEKHON,                 NOTICE OF MOTION AND MOTION TO
                                           VACATE JUDGMENT AND SENTENCE
17   Defendant

18                                        [28 U.S.C. § 2255]

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ................................................................................. viii

3  I.  NOTICE OF MOTION ................................................................................. 1

4  II.  JURISDICTION AND VENUE ...................................................................... 3

5  III. STATEMENT OF FACTS ............................................................................. 3

6       A.   MOVANT JAGDIP SINGH SEKHON ..................................................... 3

7       B.   THE INDICTMENT ................................................................................. 6

8            1.   The Singular Allegation Against Jagdip Under Count 1 ................... 6

9            2.   The Allegations Against the Sacramento Defendants ..................... 7

10      C.   THE PROSECUTION'S THEORY OF ITS CASE THAT THE CONSPIRACY
             WAS NOT JUST LIMITED TO THE SACRAMENTO DEFENDANTS BUT
11           EXTENDED TO JAGDIP IN SAN FRANCISCO. ................................... 8

12           1.   The Overwhelming Evidence of a Sacramento Conspiracy to Advance
                  Fraudulent Romanian Asylum Applications ........................................ 8
13

14           2.   The Prosecution Theory of its Case that the Conspiracy Included Non-
                  Romanian Asylum Applicants and Extended to Jagdip and the San
15                Francisco Office ............................................................................... 10

16                a.   Conspiracy involving Romanian asylum applicants versus a firm-wide
                       conspiracy including non-Romanian applicants. ........................ 10
17

18                b.   The witnesses critical for the prosecution to demonstrate a firm-wide
                       conspiracy including non-Romanian applicants:  Ranbir Khera;
19                     Davinder Singh; and, Case Agent Webster ................................. 11

20                     i.   Ranbir Khera ....................................................................... 11

21                          (a)   Khera's critical testimony that Jagprit fabricated his claim
                                  supporting his asylum application. .............................. 11
22

23                          (b)   Khera's highly suspect immigration history. ................. 12

24                          (c)   Khera's equally suspect testimony regarding his and his
                                  spouse's interactions with Case Agent Webster, and his
25                                decision to cooperate with the prosecution. ................ 14

26                          (d)   Judge Damrell's expressed concerns regarding Khera's
                                  veracity and the truthfulness of the prosecution's
27                                position that he did not receive an immigration benefit
                                  as a result of serving as a prosecution witness ............ 16
28

ii

ii.   Davinder Singh .................................................. 17

    (a)   Background......................................... 17

    (b)   Davinder Singh's testimony that he agreed to file a claim with false details provided by Jagprit. ........................ 18

    (c)   Jagdip's meeting with Davinder Singh........................... 18

    (d)   DHS grants Davinder Singh asylum. ............................. 20

    (e)   As a result of Case Agent Webster's threats, Davinder Singh agrees to serve as a prosecution witness........... 20

    (f)   The government's deliberate misrepresentation to Judge Damrell resulting in the admission of Government Exhibit 61.4.4 and elicitation of false testimony from Davinder Singh. ...................................................... 21

iii.   Case Agent Carol Webster .................................................. 22

    (a)   Background......................................... 22

    (b)   Case Agent Webster's opinion testimony ...................... 24

    (c)   Case Agent Webster's testimony regarding Khera ........ 27

    (d)   Case Agent Webster's testimony regarding Davinder Singh ................................................. 31

D.   THE PROSECUTION'S SUMMATION ................................................. 32

E.   THE VERDICT .................................................................. 35

F.   SENTENCING .................................................................. 35

G.   NINTH CIRCUIT APPEAL ................................................. 36

H.   POST TRIAL INVESTIGATION AND EVIDENCE REGARDING SARBJIT .... 38

   1.   Statement of Sarbjit Kaur that her marriage to Ranbir Khera was a sham and that Sarbjit and Case Agent Webster never met. ...................................... 38

   2.   Khera and Sarbjit's Divorce Proceedings Confirm that their Marriage was a Sham. .................................................. 40

I.   POST TRIAL EVIDENCE CONFIRMING PROSECUTION WITNESS WAZHMA MOJADDIDI LIED DURING HER TESTIMONY........................................... 41

   1.   Mojaddidi's Suspect Trial Testimony........................................... 41

   2.   A Post Trial Investigation Establishes that Mojaddidi's Testimony that Jagdip Introduced his Brother to her Further Evinces her Prevarication. ............ 43

iii

3.   EVIDENCE IN THE § 2255 CASE REGARDING MOJADDIDI'S REPRESENTATION OF HAMID HAYAT CONCLUSIVELY DEMONSTRATED THAT SHE COMMITTED PERJURY AT JAGDIP'S TRIAL. .................................................................. 45

    a.   Hamid Hayat's § 2255 motion challenging his criminal conviction due to Mojaddidi's ineffective assistance............................................. 45

    b.   Mojaddidi's 2014 deposition confirms she committed perjury at Jagdip's trial................................................................... 45

    c.   Previously unavailable evidence regarding Mojaddidi's grave misconduct in *Hayat* makes clear that her testimony at trial was not her commitment to professional ethics, but her appetite for publicity. .................................................. 47

J.   JAGDIP SEKHON'S CURRENT STATUS.................................................. 50

IV. CLAIM #1: THE PROSECUTION KNOWINGLY PRESENTED PERJURED AND FALSE TESTIMONY, AND THEREFORE VIOLATED JAGDIP'S RIGHTS UNDER NAPUE, WARRANTING DISMISSAL OF THE INDICTMENT OR ALTERNATIVELY A NEW TRIAL................................................................................................. 50

A.   *NAPUE* ................................................................................ 50

B.   THE PROSECUTION VIOLATED *NAPUE* BY KNOWINGLY PRESENTING CASE AGENT WEBSTER'S FALSE TESTIMONY. ........................................ 51

1.   Case Agent Webster was a Core Member of the Prosecution Team and Provided Opinion Testimony Resulting in Jagdip's Conviction. .............. 51

2.   Case Agent Webster Testified Falsely, and the Prosecution Knew her Testimony was False........................................................... 52

    a.   Case Agent Webster falsely testified that she determined Khera and Sarbjit had a *bona fide* marriage after meeting the couple; DHS granted Sarbjit's I-130 and Khera's I-485 based on the merits, not based on Khera's status as a prosecution witness; and, the Khera immigration file contained an evidentiary basis for DHS's approval................................................................... 52

    b.   The prosecution knew Case Agent Webster's testimony was false. .. 54

3.   Case Agent Webster's False Testimony was Material. .................................. 55

    a.   The *Napue* violation involving Case Agent Webster's perjury was material because if her perjury was revealed to the jury, it would have irreparably damaged the prosecution's overall credibility and wholly undermined its most important evidence with respect to

iv

Jagdip – her opinion that over 100 asylum applications filed by the law firm were fraudulent............................................................... 55

    b.   The *Napue* violation involving Case Agent Webster's perjury is material because, if her perjury was revealed to the jury, both Count 1 overt acts related to non-Romanian applicants would have imploded. ....................................................................................... 57

    c.   The domino effect of the revelation of Case Agent Webster's testimony would adversely impact every dimension of the prosecution theory of its case against Jagdip, including its reliance on the testimony of Davinder Singh. ........................................... 59

C.   THE PROSECUTION VIOLATED NAPUE BY KNOWINGLY PRESENTING RANBIR KHERA'S FALSE TESTIMONY........................................................ 60

   1.   The Prosecution Suborned Ranbir Khera's Perjury....................................... 60

   2.   Ranbir Khera's False Testimony Was Material. ............................................ 61

D.   THE PROSECUTION VIOLATED NAPUE BY KNOWINGLY PRESENTING FALSE EVIDENCE AND TESTIMONY THROUGH DAVINDER SINGH.... 62

   1.   The Prosecution Knowingly Presented False Evidence and Testimony through Davinder Singh. ............................................................................... 62

    a.   The Prosecution knowingly presented false evidence that Government Exhibit 61.4.4 was presented to Davinder Singh during his preparation. ........................................................................................ 62

    b.   The prosecution knowingly presented false testimony that the dates written in Exhibit 61.4 .4 were in Jagdip's handwriting. .............. 63

   2.   Davinder Singh's False Testimony was Material.......................................... 63

E.   THE PROSECUTION VIOLATED *NAPUE* BY FAILING TO INVESTIGATE AND CORRECT THE FALSE TESTIMONY IT ELICITED FROM MOJADDIDI. .................................................................................................. 64

   1.   The Prosecution Failed to Investigate Mojaddidi's testimony that it Suspected was False. ................................................................................................... 64

    a.   Wazhma Mojaddidi provided testimony that the defendants alleged was perjurious, and the prosecution knew was false. ................... 64

    b.   The prosecution violated *Napue* by failing to investigate whether Mojaddidi's false testimony was perjurious. ................................ 65

   2.   The *Napue* Violation involving the Prosecution's Failure to Investigate and Correct Wazhma Mojaddidi's Suspect Perjury was Material.................. 67

v

F.   THE CUMULATIVE EFFECT OF THE NAPUE VIOLATIONS COMPELS
DISMISSAL OF THE INDICTMENT.................................................. 68

V.  CLAIM #2: THE PROSECUTION FAILED TO REVEAL ITS CONSPIRACY TO
CONCEAL THAT DHS GRANTED KHERA LEGAL PERMANENT RESIDENCY
BECAUSE HE WAS A PROSECUTION WITNESS, AND CONSEQUENTLY VIOLATED
JAGDIP'S DUE PROCESS RIGHTS UNDER BRADY AND GIGLIO, WARRANTING
DISMISSAL OF THE INDICTMENT OR ALTERNATIVELY A NEW TRIAL. ................... 71

A.   *BRADY* ...................................................................... 71

B.   THE PROSECUTION VIOLATED BRADY BY FAILING TO DISCLOSE ITS
CONSPIRACY TO CONCEAL THAT DHS GRANTED KHERA LEGAL
PERMANENT RESIDENCY BASED ON HIS STATUS AS A "KEY" AND
"CRUCIAL" GOVERNMENT WITNESS. ........................................ 72

1.   The Fact that the Prosecution Conspired to Conceal that DHS Granted Khera
Legal Permanent Residency Based on his Status as a Prosecution Witness
was Invaluable Evidence for Impeaching Khera and Case Agent Webster.
.............................................................................. 72

2.   The Prosecution Conspired to Suppress that DHS Granted Khera Legal
Permanent Residency Due to His Status as a Prosecution Witness.......... 73

3.   The Prosecution's Conspiracy to Deliberately Suppress the Unlawful Basis
for DHS Granting Khera Legal Permanent Residency was Material. ...... 74

VI. CLAIM #3:  PETITIONER JAGDIP SEKHON'S SIXTH AMENDMENT RIGHT WAS
VIOLATED BY HIS TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE DUE TO
COUNSEL'S FAILURE TO INVESTIGATE SARBJIT KAUR................................. 75

A.   INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS ...................................... 75

B.   THE FAILURE OF JAGDIP'S COUNSEL TO INVESTIGATE SARBJIT KAUR
FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS. ..... 76

C.   IF JAGDIP'S COUSEL WOULD HAVE INVESTIGATED SARBJIT KAUR IN
ALL LIKELIHOOD THE RESULT OF THE PROCEEDING WOULD BE
DIFFERENT. .................................................................... 77

VII. CLAIM #4: PETITIONER JAGDIP SEKHON'S SIXTH AMENDMENT RIGHT WAS
VIOLATED BY HIS TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE DUE TO
COUNSEL'S FAILURE TO INVESTIGATE THE ALLEGED STATEMENT JAGDIP MADE
TO MOJADDIDI. .................................................................... 78

VIII. CLAIM #5: PETITIONER JAGDIP SEKHON'S RIGHT TO DUE PROCESS WAS
VIOLATED BY HIS COUNSEL'S INEFFECTIVE REPRESENTATION BEFORE THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT. ................................ 82

A.   INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIMS .............. 82

vi

B.   JAGDIP'S APPELLATE COUNSEL'S REPRESENTATION WAS
     PROFESSIONALLY UNREASONABLE............................................................ 82

     1.   Appellate Counsel's Failure to Challenge the Application of the "Abuse of a
          Position of Trust" Enhancement Constituted Ineffective Assistance of
          Counsel. ................................................................................................. 82

     2.   Appellate Counsel's Failure to Challenge the Application of the "Obstruction
          of Justice" Enhancement Constituted Ineffective Assistance of Counsel. 83

C.   JAGDIP WAS PREJUDICED BY HIS APPELLATE COUNSEL'S
     INEFFECTIVENESS. ......................................................................................... 85

IX. CONCLUSION ........................................................................................................ 86

vii

1

**TABLE OF AUTHORITIES**

2

**Cases**

3  *Avila v. Galaza,* 297 F.3d 911 (9th Cir. 2002)..................................................... 76

4  *Belmontes v. Woodford*, 350 F.3d 861 (9th Cir. 2003) ...................................... 55

5  *Benn v. Lambert,* 283 F.3d 1040 (9th Cir. 2002) ............................................... 72

6  *Boyd v. French*, 147 F.3d 319 (4th Cir. 1998) .................................................. 54

7  *Brady v. Maryland*, 373 U.S. 83 (1963) .......................................... 2, 71, 75

8  *Clay v. United States*, 537 U.S. 522 (2003) ....................................................... 3

9  *Evitts v. Lucey*, 469 U.S. 387 (1985) ................................................................. 2

10  *Garringer v. Stewart,* 132 F.3d 463 (9th Cir. 1997) ......................................... 71

11  *Giglio v. United States*, 405 U.S. 150 (1972) .......................................... 2, 54, 71

12  *Harris v. Wood*, 64 F. 3d 1432 (9th Cir. 1995).................................................. 81

13  *Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) ........................................ passim

14  *Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008) ............................ 51, 54, 56, 69

15  *Kyles v. Whitley,* 514 U.S. 419 (1995)............................................................. 76

16  *Matter of Brantigan*, 11 I. & N. Dec. 493 (BIA 1996) .................................... 12

17  *Matter of Casillas*, 22 I. & N. Dec. 154 (BIA 1998) ....................................... 12

18  *Mooney v. Holohan*, 294 U.S. 103 (1935) ....................................................... 51

19  *Moorman v. Ryan,* 628 F.3d 1102 (9th Cir. 2010)................................. 82, 85, 86

20  *Morris v. Ylst*, 447 F.3d 735 (9th Cir. 2006) .............................. 54, 65, 66, 67

21  *Napue v. Illinois*, 360 U.S. 264 (1959) ...................................................... passim

22  *Northern Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001) ............... 67

23  *Silva v. Brown*, 416 F. 3d 980 (9th Cir. 2005) ................................................ 75

24  *Smith v. Robbins,* 528 U.S. 258 (2000)............................................................ 82

25  *Strickland v. Washington*, 466 U.S. 668 (1984) ........................................ 2, 75

26  *United States of America v. Hamid Hayat*, No. CR-S-05-0240........................ 45

27  *United States v. Bagley*, 473 U.S. 667 (1985) ................................... 64, 71, 74

28  *United States v. Barrera-Moreno,* 951 F.2d 1089 (9th Cir. 1991) .................... 70

1   *United States v. Basham*, 789 F.3d 358 (4th Cir. 2015) ................................ 54

2   *United States v. Blanco,* 392 F.3d 382 (9th Cir. 1994) .......................... 71, 72, 75

3   *United States v. Brumel-Alvarez,* 991 F.2d 1452 (9th Cir. 1993) .................... 71, 72

4   *United States v. Castro-Ponce*, 770 F.3d 819 (9th Cir. 2014) ...................... 84, 85

5   *United States v. Chapman,* 524 F.3d 1073 (9th Cir. 2008) ............................ 70

6   *United States v. Garro*, 517 F 3d 1163 (9th Cir. 2008) ............................... 84

7   *United States v. Harmath*, 2014 WL 3766994, ¶ 5 (9th Cir. 2014) ................ passim

8   *United States v. Hayat*, 710 F.3d 875 (9th Cir. 2013) ........................... 47, 48

9   *United States v. Houston*, 648 F.3d 806 (9th Cir. 2011) ............................. 69

10  *United States v. Price*, 566 F.3d 900 (9th Cir. 2009) ............................... 65

11  *United States v. Simpson,* 927 F.2d 1088 (9th Cir. 1991) ............................ 71

12  *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) .......................... 71

13  *United v. Sedaghaty*, 728 F. 3d 885 (9th Cir. 2013) ................................. 75

14  *Wiggins v. Smith*, 539 U.S. 510 (2003) .............................................. 84

15  *Wood v. Georgia*, 450 U.S. 261 (1980) ............................................... 49

16  **Statutes**

17  18 U.S.C. § 1001 ............................................................... 7, 47, 48

18  18 U.S.C. § 1546 .................................................................... 6, 7

19  18 U.S.C. § 2339A ............................................................... 47, 48

20  18 U.S.C. § 3621 (e) ................................................................. 50

21  18 U.S.C. § 371 ................................................................ 1, 6, 35

22  28 U.S.C. § 2255 ................................................................. passim

23  28 U.S.C. § 2255(a) .................................................................. 1

24  28 U.S.C. § 2255(b) .................................................................. 2

25  8 U.S.C. § 1151 ..................................................................... 12

26  8 U.S.C. § 1154 .................................................................. 12, 13

27  8 U.S.C. § 1245 ..................................................................... 12

28

1

**Other Authorities**

2

United States Sentencing Guidelines §3B1.3 ........................................................ 35, 85

3

United States Sentencing Guidelines §3C1.1 ................................................ 35, 83, 84, 85

4

**Rules**

5

Fed. R. Evid. 615(2).............................................................................................. 51

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

x

## I.      NOTICE OF MOTION

PLEASE TAKE NOTICE that defendant and movant JAGDIP SINGH SEKHON ("Jagdip") hereby moves this Court, pursuant § 2255 of Title 28 of the United States Code, to vacate the judgement and sentence in this case; and dismiss the underlying Second Superseding Indictment, or, alternatively grant him a new trial.

Jagdip, through his attorney Rajdep Chima, by this verified motion alleges:

1.      He is in the custody of the Federal Bureau of Prisons at the Federal Correctional Complex in Lompoc, California.

2.      He is imprisoned due to a jury verdict rendered on June 25, 2009, convicting him of one count of conspiracy to violate 18 U.S.C. § 371, in the Unites States District Court for the Eastern District of California, before the Honorable Frank C. Damrell.

3.      Judge Damrell sentenced him to the maximum term of imprisonment of 60 months, and his current release date is June 21, 2016.

4.      His judgement and sentence are illegal and contravene his rights under the Fifth and Sixth Amendments to the Constitution.

5.      As a result, Jagdip is a "prisoner in custody under sentence who has a right to be released upon the ground that [his] sentence was imposed in violation of the Constitution or laws of the United States."  See 28 U.S.C. § 2255(a).

6.      This is so because:

1)      the prosecution violated Jagdip's Fifth Amendment right to due process by:

a)      suborning of perjury of Case Agent Carol Webster and Ranbir Khera; and,

b)      knowingly presenting false testimony by Davinder Singh;

c)      failing to investigate the testimony of its witness Wazhma Mojaddidi after it rightly suspected she may have committed perjury;

d)      failing to correct the aforementioned perjurious and false testimony.

1

1  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

2
3

    2)    the prosecution violated Jagdip's Fifth Amendment right to due process by deliberately failing to disclose that:

4
5

        a)    DHS had unlawfully granted prosecution witness Ranbir Khera legal permanent residency because he was serving as a prosecution witness; and,

6
7

        b)    the prosecution conspired with Mr. Khera to conceal that it had done so.

8  *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

9
10
11

    3)    Jagdip was denied his Sixth Amendment right to legal representation due to his trial counsel's failure to investigate Sarbjit Kaur, who would have readily provided irrefutable evidence that Case Agent Carol Webster and Ranbir Khera had committed perjury.

12  *See Strickland v. Washington*, 466 U.S. 668 (1984).

13
14
15
16

    4)    Jagdip was denied his Sixth Amendment right to legal representation due to his trial counsel's failure to investigate the statement he allegedly made in response to being confronted by an allegation that his brother was engaged in fraudulent practices, which would have provided irrefutable evidence that the alleged exchange never took place.

17  *See Strickland*, id.

18
19
20
21

    5)    Jagdip was denied his Sixth Amendment right to legal representation due to his appellate counsel's failure to raise a meritorious issue on appeal before the United States Court of Appeals for the Ninth Circuit, which denied him his right to resentencing based on a proper calculation under the United States Sentencing Guidelines.

22  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

23      7.    Accordingly, Jagdip respectfully requests that the Court "cause notice thereof to

24  be served upon the United States attorney, grant a prompt hearing thereon, determine the issues

25  and make findings of facts and conclusions of law with respect thereto," and "vacate and set the

26  judgement aside in this case."  Furthermore, Jagdip respectfully requests that the Court order his

27  immediate release, and dismiss the Second Superseding Indictment, or alternately, order a new

28  trial.  28 U.S.C. § 2255(b).

2

## II.      JURISDICTION AND VENUE

8.      The United States Court Appeals for the Ninth Circuit on September 8, 2014, denied Jagdip's petitions filed pursuant to Federal Rules of Appellate Procedure 35 and 40, seeking rehearing of the appellate court's affirmance of the judgement in this case. Exhibit A, Order of the United States Court of Appeals for the Ninth Circuit ("Exh. A.").

9.      Jagdip had 90 days from that date to seek *certiorari* of the Ninth Circuit's decision. *See* Supreme Court Rule 13 (1).

10.      Because Jagdip is filing this motion within one year of the expiration of "the time for filing a certiorari petition expires," his motion is timely under § 2255(f). *See Clay v. United States*, 537 U.S. 522, 527 (2003).

11.      Jagdip has not "previously sought relief arising out of the same matter from this court or any other federal court." See Rule 190 of the United District Court for the Eastern District of California.

12.      Therefore this Court has jurisdiction over Jagdip's timely motion, and the Eastern District is the appropriate venue. 28 U.S.C. § § 2255 (a), (e) and (f).

## III.      STATEMENT OF FACTS

### A.      MOVANT JAGDIP SINGH SEKHON

13.      Movant Jagdip Singh Sekhon ("Jagdip")[1] was born on January 11, 1967, in Seattle, Washington.  (Official Court Reporter Transcript ("RT") (RT 6207).[2]

14.      He was raised in Southern California, where he attended California State University, Long Beach ("CSULB").  (RT 6209).

15.      After completing his undergraduate education at CSULB, Jagdip attended the University of California, Davis, School of Law.  (RT 6211).

---

[1] Movant is identified as Jagdip throughout this document to distinguish him from his brother, and codefendant Jagprit Sekhon.

[2] A complete trial transcript was prepared for defendants' direct appeals and is lodged with the Clerk of the Court. Movant is prepared to file another complete copy or pertinent excerpts of the transcript upon the Court's request.

3

16.     Jagdip graduated from law school in 1993, passed the State Bar of California admissions examination that same year, and was admitted into the practice of law in 1994.  (RT 6213).

17.     While he attended law school, Jagdip became very interested in immigration law and participated in the law school's clinic devoted to the same.  (RT 6212).

18.     A couple of years after he graduated from law school, in the Spring of 1995, Jagdip started his own law practice in San Francisco that focused on immigration law. (RT 6215).

19.     Later in 1995, Jagdip's brother Jagprit Sekhon ("Jagprit") joined the firm.  (RT 3409, 6217, 6427).

20.     Jagprit had also attended the University of California, Davis, School of Law, graduating a year after Jagdip.  (RT 43-44, 6213).

21.     In 1998, the firm expanded by opening a second office in Sacramento. (RT 6436).

22.     From 1998 onwards, Jagdip ran and managed the San Francisco office; and Jagprit ran and managed the Sacramento office.  (RT 32, 652, 1581, 6175-6176, 6362, 6436).

23.     The firm became partnership and in 2000, the firm's entire administration was shifted to Sacramento and placed under the management of Jagprit.  (RT 4096, 6360-6361, 6436, 6720, 6179-6180, 6433).

24.     The firm's files and support staff were thus maintained in Sacramento. (RT 6360-6361).

25.     Jagprit also principally supervised the firm's associate attorneys.  (RT 5688-5689, 6179-6181).

26.     The only files maintained in the firm's San Francisco office were those that were Jagdip's responsibility.  (RT 6360-6361).

27.     Indeed, Jagdip worked exclusively in the San Francisco office, except with respect to his employment at his *alma mater*, where he served as Director of the King Hall Immigration Detention Clinic from 2002 to 2003.  (RT 6365, 6437).

4

28.     It was extremely rare for Jagdip to visit the Sacramento office.  (RT 1321, 1490).

29.     The law firm staff in fact could not recollect Jagdip ever working with Jagprit, or attending a meeting with the firm's other attorneys.  (RT 6175).

30.     Consistent with the firm's infrastructure, the focus of Jagdip's and Jagprit's areas of practices were distinct.  (RT 6175-6177, 6219-6220).

31.     Jagprit's focus was drafting asylum applications and representing applicants at their administrative hearings.  (RT 44, 66-67, 676, 1323-1324, 1333, 1336, 1340, 1516, 1607-1608, 1623-1624, 3143-3144, 4142-4143, 5693, 6179-6180, 6219-6220).

32.     Jagdip's focus over the years increasingly became appellate litigation, both at the administrative and federal level.  (RT 1490, 6175-6176, 6246-6247).

33.     The differences between Jagdip and Jagprit did not end with their division of labor, areas of practice, and location of their respective offices.  (RT 1344-1347, 4345-4346, 6175-6176, 6183-6184).

34.     Unsurprisingly, their personalities have been described as "very different." (RT 6175).

35.     In June 2004, Jagprit left the firm and relocated to Southern California.  (RT 3030, 5695-5696, 6410).

36.     Three months later, in September 2004, the government secured and executed a warrant that resulted in a search of the firm's Sacramento office, and the seizure of hundreds of client files.  (RT 2701, 2817, 2882, 3018, 3748-3749, 4029).

37.     Jagdip closed the Sacramento office after the execution of the warrant.  (RT 2782, 5679-5682).

38.     No warrant was ever executed on the firm's San Francisco office.  (RT 6395-6396).

**B.**    **THE INDICTMENT**

   **1.**    **The Singular Allegation Against Jagdip Under Count 1**

39.    On December 13, 2007, the prosecution filed the Second Superseding Indictment ("SSI") in the United States District Court for the Eastern District of California.[3] Exhibit B, Second Superseding Indictment ("Exh. B.").

40.    The SSI alleged eighteen counts, naming five defendants, including Jagdip. *See* Exh. B.

41.    In addition to Jagdip, the other four defendants were Jagprit; Manjit Kaur Rai ("Manjit"), an associate attorney with the firm; and, two Romanian interpreters who contracted with the firm, Iosif Caza ("Caza") and Luciana Harmath ("Harmath"). *See* Exh. B.

42.    Count 1 charged all five defendants under 18 U.S.C. § 371 with a conspiracy alleged to have two objects:

   1)    The first object charged under the "defraud the United States" prong of § 371, was to impair, impede, obstruct, and defeat the lawful functions of the Bureau of Citizenship and Immigration Services in the fair and objective evaluation of asylum applications, and to do so by deceit, craft, and trickery;

   2)    The second object of the Count 1 conspiracy charged under the "offense against the United States" prong of § 371, was to aid and abet the making of perjured statements in asylum applications and other supporting documents on behalf of clients of the law firm in violation of 18 U.S.C. §§ 1546 and 2.

Exh. B, ¶¶12 a. and b.

43.    Count 1 ultimately alleged thirteen overt acts in connection with the conspiracy, with eleven involving Romanian asylum applicants and two involving non-Romanian asylum applicants:  Jagprit's filing an asylum application on behalf of Ranbir Khera, a Punjabi citizen

---

[3] The original indictment in this case was filed on October 18, 2006, Docket #28.

6

and national of India, on August 14, 2000; and, Jagprit's filing an asylum application on behalf

of M.S., a citizen and national of Fiji, on October 10, 2001.[4]  (RT 7249-7251).

44.     Only one of Count 1's thirteen overt acts involved Jagdip:  on March 19, 2002,

Jagdip accompanied Alina Contis, an asylum applicant represented by the firm, to her asylum

interview.  (RT 7249).[5]

45.     The indictment charged Jagdip only in Count 1. *See* Exh. B.

46.     Significantly, none of the alleged overt acts involving employees of the firm

occurred after Jagprit left the firm in June 2004, and Jagdip assumed control of it.  (RT 5695-

5696).

**2.      The Allegations Against the Sacramento Defendants**

47.     Each of Jagdip's codefendants were charged in multiple counts.  *See* Exh. B.

48.     Jagprit, in addition to Count 1, was charged with:

1)      Eleven substantive counts of submitting false materials and making
        false statement in connection with asylum proceedings in violation
        of 18 U.S.C. §§ 1546 and 1001; and,

2)      Count Seventeen, which alleged that in violation of 18 U.S.C. §§
        371 and 1001, Jagprit, Manjit, Caza, and Harmath were involved in
        a conspiracy to advance a fraudulent asylum claim on behalf of a
        "wired" government confidential informant ("CI"), who was
        posing as a Romanian national.

Exh. B, pp.14-17, 24.

49.     Manjit, in addition to Count 1, was charged with:  three substantive counts of

submitting false materials and making false statements in connection with asylum proceedings in

violation of 18 U.S.C. §§ 1546 and 1001; the Count 17 CI conspiracy; and, Count 18, which

alleged that Manjit, in violation of 18 U.S.C. § 1001, made a false statement to Case Agent Carol

Webster during an interview regarding her practices at the law firm.  Exh. B, pp. 14-20.

---

[4] The SSI that was filed contained additional Count 1 overt acts. However the additional
overt acts were dismissed by the prosecution and not submitted to the jury.

50.     Caza, in addition to Count 1, was charged with:  six substantive counts of submitting false materials and making false statements in connection with asylum proceedings in violation of 18 U.S.C. §§ 1546 and 1001; and the Count 17 CI conspiracy.  Exh. B, pp. 14-19.

51.     Harmath, in addition to Count 1, was charged with:  one substantive count of submitting false materials and making false statements in connection with asylum proceedings in violation of 18 U.S.C. §§ 1546 and 1001; and the Count 17 CI conspiracy. Exh. B, pp. 14-19.

**C.     THE PROSECUTION'S THEORY OF ITS CASE THAT THE CONSPIRACY WAS NOT JUST LIMITED TO THE SACRAMENTO DEFENDANTS BUT EXTENDED TO JAGDIP IN SAN FRANCISCO.**

**1.     The Overwhelming Evidence of a Sacramento Conspiracy to Advance Fraudulent Romanian Asylum Applications**

52.     The prosecution's most devastating piece of evidence was a recording involving the wired Romanian CI.

53.     The recording captured the CI's visit to the law firm's Sacramento office where:

1)     Harmath, speaking to the CI in Romanian, outlined a scheme on the part of the Sacramento defendants to assist the CI in inventing a fictitious Romanian persecution claim to support an asylum application, with Jagprit fabricating the claim and Caza being available to manufacture corroborating documents that the applicant would misrepresent he secured from Romania; Exhibit DD, Government Exhibit 59.23, Transcript of Recording of Meeting of the Confidential Informant with Jagprit and Harmath ("Exh. DD"), pp. 1-12

2)     Jagprit then met with the Romanian CI, interviewed him, and stated to him that Jagprit will complete his asylum application and mail it to him for his review, notwithstanding the fact that the CI stated to Jagprit that he neither suffered or feared persecution in Romania; Exh. DD, pp.12-25

3)     Jagprit and Harmath instructed the CI that he needed to provide a Northern California address to them even though he resided in Georgia; Exh. DD, p. 21

4)     the Romanian CI then received at his Georgia address an application for asylum with an attached narrative containing a persecution claim that was fictitious, completed by Jagprit and

8

mailed from the law firm's Sacramento office; (RT 2420-2422, 2499-2500)

5)   the law firm's Sacramento office thereafter filed the asylum application with DHS on behalf of the Romanian CI, and DHS, in turn scheduled an asylum interview for the Romanian CI; and,

6)   then, over a two-day period, Jagprit, Manjit, Caza, and Harmath reviewed the asylum application with the Romanian CI in preparation of an interview that was eventually cancelled.

54.   The recording confirmed the testimony of five Romanian nationals who filed asylum applications through the law firm's Sacramento office and who served as prosecution witnesses, recounting an experience that was consistent with that of the Romanian CI captured on the recording.  (RT 1208-1209; 1837-1840; 2004-2008; 2847; 3203-3206).

55.   The recording also provided context for the cache of papers and stamps discovered at Caza's home that served as the materials for Caza to manufacture documents that were purportedly secured from Romania; and, forensics evidence that proved that the stamps on some documents filed in support of Romanian asylum applications that purportedly were secured from Romania were actually printed from a computer at Caza's home.  (RT 2709, 2719-2720; 3052-3097; 3149-3164; 3507-3510; Gov't Exh.'s 65.6, 65.7, 65.8, 65.9, 65.10, 65.14, 65.22, 65.23, 66.25, 67.2.1).

56.   Finally, the recording provided context for Exhibit 75.1, which evidenced that Romanian asylum seekers whose applications were filed through the law firm's Sacramento office on occasion provided the same address in order to misrepresent, like the Romanian CI, that they resided in Northern California. Exhibit C, Government Exhibit 75.1 ("Exh. C.").

57.   The recording, however, did not provide evidence that the law firm aided and abetted the fraudulent advancement of non-Romanian asylum applications. *See* Exh. B., pp. 17-19 ¶¶1-3, (RT 7290-7291).

58.   Significantly, two of the participants in what would manifest itself in the SSI as the Count 17 conspiracy, Caza and Harmath, could not have participated in a conspiracy beyond advancing fraudulent Romanian asylum applications because they worked as contract

9

1    interpreters exclusively with Romanian asylum applicants.  (RT 3552, 3560, 3578, 3589, 3623-

2    3624).

3          59.    Nor did the recording implicate Jagdip.

4          60.    Consistent with the law firm's structure and division of labor, Jagdip never

5    appeared on the recording, nor was he even mentioned.

6          61.    Indeed the prosecution presented no evidence and did not allege that Jagdip was

7    involved in the fabricating of asylum applications on behalf of the firm's Romanian applicants.

8    (See, e.g., RT 3781 - 3782).

9          62.    Therefore, he was not charged in the Count 17 conspiracy that revolved around

10   the recording. *See* Exh. B., pp. 17-19 ¶¶1-3, (RT 7290-7291).

11         63.    The prosecution's position has been that Jagdip was not involved in the Count 17

12   CI conspiracy. *See e.g.*, Exh. D, Amended Answering Brief of the United States in *United States*

13   *v. Harmath, et al.* ("Exh. D."), pp. 29, 121.

**2.    The Prosecution Theory of its Case that the Conspiracy Included**
**Non-Romanian Asylum Applicants and Extended to Jagdip and the**
**San Francisco Office**

**a.    Conspiracy involving Romanian asylum applicants versus a**
**firm-wide conspiracy including non-Romanian applicants.**

18         64.    The prosecution's theory of its case with respect to Count 1 was that the recording

19   reflected a *modus operandi* in the law firm that was not limited to the Sacramento defendants'

20   dealings with the Romanian applicants, but extended to the San Francisco office and Jagdip's

21   dealing with non-Romanian applicants.  (See, e.g., RT 6775).

22         65.    The prosecution, however, faced some serious hurdles in proving its allegation of

23   a firm-wide conspiracy to advance fraudulent asylum applications on behalf of both Romanian

24   and non-Romanian applicants.

25         66.    There was no evidence and the prosecution did not allege that non-Romanian

26   applicants submitted corroborating evidence purporting to be from the applicant's home country,

27   but was in actuality manufactured in the United States.

28

10

67.     Furthermore, there was no evidence nor did the prosecution allege that non-Romanian asylum applicants falsified their addresses; or, that non-Romanian applicants falsified their date of entry.

68.     Most importantly, there was no recording involving the law firm employees dealing with a non-Romanian asylum applicant that supported the prosecution's allegation regarding a firm-wide conspiracy to advance fraudulent asylum applications involving non-Romanian applicants.

69.     The upshot is that the prosecution's case to support the theory of its case with respect to Count 1 stands and falls on the credibility of three witnesses:  Ranbir Khera, Davinder Singh, and Case Agent Carol Webster.

70.     Two of the witnesses were former clients of the law firm on whose behalf the Sacramento office applied for asylum:  Ranbir Khera and Davinder Singh.  They were both citizens and nationals of India whose claims were based on a fear of persecution due to the conflict between Sikh nationalists and the Indian government.

71.     The third witness crucial to the government's allegation of firm-wide conspiracy extending to non-Romanian applicants and reaching Jagdip was Case Agent Webster.

> **b.      The witnesses critical for the prosecution to demonstrate a firm-wide conspiracy including non-Romanian applicants: Ranbir Khera; Davinder Singh; and, Case Agent Webster.**
>
> **i.      Ranbir Khera**
>
> **(a)     Khera's critical testimony that Jagprit fabricated his claim supporting his asylum application.**

72.     Ranbir Khera's criticalness for the prosecution was undeniable.  He was the only non-Romanian applicant who testified that his experience with the law firm substantially tracked that of the recording involving the Romanian CI.  Moreover, he was the only non-Romanian applicant serving as a prosecution witness who was the subject of an overt act set forth in Count 1 of the SSI.  Exh. B. p. 12 ¶27.

11

73.     Khera testified he visited Jagprit at the firm's Sacramento office in July or August of 2000 (RT 1637); and, Jagprit fabricated a persecution claim on behalf of Khera, when in fact Khera had no fear of persecution in India or anywhere else.  (RT 1634-1651).

74.     Khera further testified that he chose to abandon his application because it was untrue and he was too honorable to attempt to engage in fraud.  (RT 1649-1651).

75.     For that reason, according to Khera, he broke communication with the law firm.  (RT 1649-1651).

76.     Thereafter, he married a citizen of the United States, Sarbjit Kaur ("Sarbjit").  The couple married on March 17, 2002, in Reno, Nevada, even though at the time, they were both residents of Northern California.  (RT 1720-1723).

77.     Sarbjit, who was born on May 12, 1985, was 16 at the time of the marriage.  (RT 1720-1721).  Khera was 24.  (RT 1727).

**(b)     Khera's highly suspect immigration history.**

78.     Khera proceeded to seek legal permanent residence based on an immigrant petition filed by his citizen spouse, Sarbjit.  (RT 1651-1654).  Sarbjit's immigrant petition sought to classify Khera as an immediate relative spouse, and Khera applied for adjustment of status to a legal permanent resident based on the classification.  See 8 U.S.C. §§ 1151, 1154, 1245; Exhibit E, Immigration File of Ranbir Khera ("Exh. E."), pp. 1-68.

79.     Khera filed his application to adjust his status on Form I-485 concurrently with the immigrant petition filed by Sarbjit on his behalf on Form I-130.  Sarbjit's I-130 petition and Khera's I-485 application were filed with the United States Department of Homeland Security ("DHS") on April 15, 2002.  (RT 1723); Exh. E., pp.1, 61.

80.     Only if Sarbjit, the petitioner, and Khera, the beneficiary, established the *bona fides* of their marriage, could DHS legally approve their petition; and, only if the petition was approved, would Khera be eligible to be granted adjustment to legal permanent resident status. *See Matter of Brantigan*, 11 I. & N. Dec. 493 (BIA 1996); *see also Matter of Casillas*, 22 I. & N. Dec. 154 (BIA 1998).

12

81.   A DHS benefits adjudication officer, Brigido A. Villalon, interviewed Khera and Sarbjit on April 10, 2003, at DHS's San Francisco office, regarding the *bona fides* of their marriage.  (RT 1725-1742; 3801-3805); Exh. E., pp. 169,[6] 189-90, 193.[7]

82.   After interviewing Khera and Sarbjit, Officer Villalon determined that they failed to satisfy their burden of proof for establishing the *bona fides* of their marriage. Exh. E., pp. 169.

83.   In fact, Officer Villalon suspected that the marriage was fraudulent or a "sham." (RT 1725-1742; 3801-3805); Exh. E., pp. 133, 169.

84.   The grounds for Officer Villalon's suspicions were:  the age and cultural disparity between Khera and Sarbjit – Sarbjit was sixteen when the couple married, still a high school student, while Khera was 24;  Khera's marriage and divorce history was atypical – Khera had been in a previous marriage to Maribel Diaz that was a basis of him seeking legal residency, but the marriage was of brief duration and was suspect;[8] at the interview, Khera and  Sarbjit were "very nervous;"  at the interview there was little interaction between the couple;  there was a lack of documentation that normally supports a *bona fide* marriage;  Sarbjit and Khera told wildly divergent stories of how their relationship developed – Sarbjit claimed it was an internet romance, while Khera claimed he was being pressured to marry Sarbjit;  and, there was a suspicion that the couple was actually related through Sarbjit's father. Exh. E., p. 169.

85.   Another concern for Officer Villalon was that Khera's aforementioned previous marriage to Maribel Diaz may have barred him from securing an immigration benefit based on his marriage to Sarbjit.  Khera's immigration file contained no evidence that his short-lived marriage to Diaz was *bona fide*.  If it was not *bona fide*, Khera would be barred under 8 U.S.C. § 1154(c) from securing an immigration benefit based on his marriage to Sarbjit.  Exh. E., p. 169.

86.   For these reasons, on September 2, 2003, Officer Villalon referred Khera's petition to DHS's special operations Anti-Fraud Unit ("AFU") in San Francisco recommending

---

[6]   Page 193 of Exhibit E was admitted at trial as Defense Exhibit JJJ.

[7]   Page 169 of Exhibit E was admitted at trial as Defense Exhibit KKK.

[8] Khera actually contradicted the Case Agent's testimony on this point and denied seeking any assistance with respect to the adjudication of his I-130 and I-485. (RT 1748-1749).

13

1   further investigation as to whether Khera's marriage to Sarbjit was fraudulent, and the *bona fides*

2   of Khera's marriage to Diaz.  (RT 3801-3805); Exh. E., p. 169.

3          87.     During the pendency of the investigation, in 2004, Khera's immigration file was

4   transferred from DHS's San Francisco office to Case Agent Webster.  (RT 3517-3518).

5          88.     DHS transferred the file pursuant to Case Agent Webster's directive as she sought

6   to collect all the immigration files of noncitizens on whose behalf the Sekhon law firm filed

7   asylum applications.  (RT 3517-3518).

8                  **(c)**     **Khera's equally suspect testimony regarding his and his**

                              **spouse's interactions with Case Agent Webster, and his**

9                                 **decision to cooperate with the prosecution.**

10          89.     Khera testified that at some point thereafter, he and Sarbjit sought to check on the

11   status of the I-130 petition and accompanying I-485 application.  (RT 1652-1653).

12          90.     DHS directed him to its Sacramento office.  (RT 1652-1653).

13          91.     According to his testimony, in 2005, at Sacramento's DHS office, Khera and

14   Sarbjit met Case Agent Webster.  (RT 1653).

15          92.     According to the testimony of both Khera and Case Agent Webster, she reviewed

16   the I-130 petition and I-485 adjustment application with the couple, as well as Khera's

17   abandoned asylum application.  She also reviewed with the couple the findings of Officer

18   Villalon who had interviewed them and initiated the investigation into their marriage, and asked

19   questions regarding Khera's previous marriage to Diaz.  (RT 1745-1746; 3806-3807, 3811).

20          93.     As a result of their meeting, Khera ostensibly agreed to serve as a prosecution

21   witness.  (RT 3815-3816).

22          94.     Khera, in turn, requested that Case Agent Webster assist him in securing the

23   adjudication of his petition and adjustment application.  (RT 3519-3520; 3814-3815).[9]

24          95.     Khera and Webster thereafter remained in telephone contact.  (RT 1747-1748;

25   3520).

26

27   _____

28        [9] Khera actually contradicted the Case Agent's testimony on this point and denied seeking any assistance with respect to the adjudication of his I-130 and I-485. (RT 1748-1749).

96.     Following the October 2006 filing of the indictment that included the filing of Khera's asylum application as an overt act, on December 13, 2006, Case Agent Webster released Khera's petition and adjustment application for adjudication, with a memorandum expressing her interest in Khera because he was a "key" prosecution witness "crucial to the indictment of three attorneys in an asylum fraud ring." (RT 1747-1748, 3510, 3814-3816); Exh. E., p. 154.[10]

97.     Although she had received it from the San Francisco DHS office, she released the file to the Fresno DHS office. (RT 3519). Exh. E., p. 154.

98.     As a result, the San Francisco DHS officer never proceeded with any further investigation of Khera's eligibility for an immigration benefit based on his marriage to Sarbjit. (RT 3817-3818); Exh. E, p. 154.

99.     Rather, according to the prosecution, the Fresno DHS officer proceeded to conduct an independent adjudication of Khera's petition and adjustment application based on the merits. (RT 3816-3818).

100.    Fresno DHS approved Sarbjit's I-130 petition on January 30, 2007. And on February 26, 2007, Fresno DHS granted Khera's accompanying I-485 adjustment application. (RT 1701-1702, 1749, 3521, 3816); Exh. E, pp.1, 61.

101.    At trial Khera insisted that his marriage was *bona fide*, and he was entitled to the immigration benefit DHS accorded him, namely DHS granting Sarbjit's petition on his behalf and granting his accompanying application of legal residency. (RT 1692-1700; 1747-1749, 1753).

102.    He testified that he and Sarbjit had been married for "seven, eight years now" (RT 1694); and he repeatedly emphasized his marriage to Sarbjit was a "love marriage" that was the result of a courtship rather than arranged in accordance with Indian custom. (RT 1729, 1732-1733, 1740).

---

[10] Page 154 of Exhibit E was admitted at trial as Defense Exhibit LLL.

1

2

3

        **(d)**     **Judge Damrell's expressed concerns regarding Khera's veracity and the truthfulness of the prosecution's position that he did not receive an immigration benefit as a result of serving as a prosecution witness.**

4

5

6

7

103.     Judge Damrell, presiding over the trial, *sua sponte* expressed suspicions whether DHS granted Khera legal residency based on the merits of his underlying petition and application, as opposed to granting him legal residency because of his status as a prosecution witness.  (RT 1763-1765).

8

9

10

11

104.     Judge Damrell was concerned that the sequence of events was not consistent with the prosecution's position and Khera's testimony that DHS granted him legal permanent residency based on the merits of his petition and adjustment application and not because he was a "key" and "crucial" prosecution witness.  (RT 1764).

12

13

14

15

16

17

105.     Judge Damrell's suspicions were no doubt reinforced by the fact that during his trial testimony Khera could not recollect his date of marriage to Sarbjit – he testified it was sometime in "August 2002," when in fact it was on March 17, 2002; and he could not recollect that Sarbjit was only 16 at the time, testifying that she was 17.  (RT 1720-1722).  Furthermore, Khera's testimony with respect to his marriage with Diaz was similarly dubious.  (RT 1664-1669; 1707-1716).

18

19

20

21

106.     Judge Damrell's concerns resulted in him interrupting Khera's testimony during questioning by Jagdip's trial counsel, articulating his misgivings at sidebar, and directing the prosecution to ascertain the basis of DHS granting Khera legal residency, with instructions to report to the Court.  (RT 1753, 1762-1764).

22

107.     Judge Damrell later reiterated:

23

24

     All the documents seem to point to a problem.  The interview points to questions that the hearing officer had that apparently were not resolved at the hearing.

25

26

27

     That's the take I have of his notes and also the document we have not admitted.  My concern is it is left on the cliff anticipating something beyond that, and the next thing we know, the witness has got a permanent status.

28

16

> I want to know if there's anything that links that hearing and the findings of that officer and the questions he had to the ultimate resolution in favor of the witness.

(RT 1764).

108.    AUSA Wagner responded to Judge Damrell's concerns by assuring that:

> Carol Webster … released the file to the adjudicators so they could take action on it.  Not that she had any influence on the ultimate disposition of the case.

(RT 1765).

109.    Later in the trial, Case Agent Webster would testify and attest to the *bona fides* of Khera's marriage to Sarbjit, confirming Khera's account that DHS did not grant permanent residency to Khera based on his status as a key prosecution witness.  (RT 3517-3521; 3800-3819).

110.    AUSA Wagner eventually replied to Judge Damrell's directive.

111.    On still in the midst of the trial, the AUSA reported to the Court that it had reviewed the basis of DHS granting Khera legal residency, and its findings were consistent with its representations, that Khera did not receive legal permanent residency based on his status as a prosecution witness.  (RT 1700-1703, 1743-1754, 1764-1765).

112.    Based on the Case Agent's testimony and AUSA Wagner's representations to the court, Judge Damrell excluded Khera from the instruction that advised the jury to view the testimony of certain prosecution witnesses with caution because they received a benefit in exchange for their testimony.  (RT 7243).

113.    In other words, as a matter of law, Judge Damrell instructed the jury that Khera's testimony was not to be viewed with caution, because he did not receive an immigration benefit in exchange for his testimony.  (See RT 7443).

### ii.    Davinder Singh

#### (a)    Background

114.    Aside from Khera, Davinder Singh was the only other prosecution witness that was a former client of the law firm who was non-Romanian.

115.    Like Khera, Davinder Singh is a citizen and national of India.  (RT 2134).

17

116.    He is a Sikh, who before fleeing from India, lived in its Punjab province.  (RT 2134-2135; 2183-2184).

117.    Davinder Singh fled from India because he feared persecution at the hands of the Indian government's security forces.  (RT 2136, 2149, 2196, 2235-2239).

118.    In February or March of 2001 he went to the law firm's Sacramento office in order to apply for asylum.  (RT 2136-2138).

119.    Davinder Singh was seeking asylum because he feared persecution in India.  As he testified at trial, he in fact continues to fear persecution in India.  (RT 2135, 2149-2150, 2196, 2235-2249).

120.    Davinder Singh met with Jagprit at the firm's Sacramento office.  (RT 2137-2138).

121.    He explained to Jagprit he wanted to seek asylum and, after a discussion of the asylum procedures, he provided Jagprit the details of his claim.  (RT 2137-2139).

122.    Davinder Singh retained the law firm to prepare and file his asylum application and represent him in the related proceedings.  (RT 2139-2140).

**(b)     Davinder Singh's testimony that he agreed to file a claim with false details provided by Jagprit.**

123.    Davinder Singh testified that in late April 2001 the law firm mailed him a draft of the application that Jagprit prepared on his behalf.  (RT 2140).

124.    According to Davinder Singh, in addition to setting forth the genuine basis of his asylum claim, the application contained persecutory scenarios that were fabricated by Jagprit. (RT 2143-2150).

125.    Davinder Singh, nonetheless, on April 27, 2001, executed the asylum application and it was filed with DHS.  (RT 2140-2142).

**(c)     Jagdip's meeting with Davinder Singh.**

126.    DHS scheduled Davinder Singh's interview for January 15, 2001.  (RT 2150).

127.    Prior to that, he met on consecutive days with Manjit and then with Jagdip at the firm's San Francisco office to prepare for the interview.  (RT 2151-2152).

18

128.    Jagdip and Davinder Singh had a discussion regarding the "type[s] of question[s] [that] will be asked during the asylum interview." (RT 2153).

129.    Jagdip also advised Davinder Singh of the helpfulness of securing affidavits from India corroborating his asylum claim. (RT 2153).

130.    Davinder Singh provided Jagdip a facsimile number where the firm could transmit to his family in India exemplars for affidavits that would be helpful to corroborate Davinder's application. (RT 2153-2154).

131.    Davinder Singh alerted his family in India to expect exemplars at the facsimile number. (RT 2153, 2157-2158, 2287).

132.    Jagdip drafted the exemplars based on Davinder Singh's application and their discussions, and then transmitted the exemplars to the facsimile number Davinder provided. (RT 2156, 2287); Exhibit F, Government Exhibit 61.4.5 ("Exh. F."); Exhibit H, Government Exhibit 61.4.7 ("Exh. H."); Exhibit I, Government Exhibit 61.4.9 ("Exh. I.").

133.    Davinder Singh's family and relations received the exemplars in India, drafted and executed affidavits accordingly, and transmitted them back to Jagdip's office in San Francisco. The affidavits included the head of Davinder's village and neighbor, his aunt, and his mother. (RT 2155, 2164-2167, 2159-2161); *See* Exhibit G, Government Exhibit 61.4.6 ("Exh. G"); Exhibit KK, Government Exhibit 61.4.8 ("Exh. KK"); Exhibit LL, Government Exhibit 61.4.10 ("Exh. LL").

134.    Davinder Singh testified they provided the affidavits knowing the threat of persecution he faced if he was forced to return to India. (RT 2163, 2254-2261).

135.    The affidavits corroborated elements of Davinder Singh's persecution claim that he later testified at trial that Jagprit had fabricated. (RT 2154-2156).

136.    During the time they spent together Davinder Singh never told Jagdip that any element of his asylum claim was untrue. (RT 2243, 2251, 2289, 2292-2293).

137.    Nor did Jagdip ever encourage Davinder to lie or make a misrepresentation to further his asylum claim. (RT 2251, 2254).

19

1

**(d)     DHS grants Davinder Singh asylum.**

2      138.    On January 15, 2002, Manjit accompanied Davinder Singh to his asylum

3 interview before DHS.  (RT 2164).

4      139.    An Asylum Officer interviewed Davinder Singh regarding his claim.  (RT 2164).

5      140.    Davinder Singh testified before the Asylum Officer in accordance with his

6 application.  (RT 2164).

7      141.    Manjit submitted to the Asylum Officer the corroborating affidavits secured from

8 Davinder Singh's family and relations in India.  (RT 2164).

9      142.    The Asylum Officer thereafter granted Davinder Singh asylum.  (RT 2170).

10                    **(e)     As a result of Case Agent Webster's threats, Davinder
11                              Singh agrees to serve as a prosecution witness.**

12      143.    After being granted asylum, Davinder Singh married a citizen, and based on his

13 marriage, applied to adjust his status to a legal permanent resident.  (RT 2172).

14      144.    However, like in Khera's case, the adjudication of Davinder Singh's adjustment

15 application had been suspended as a result of DHS transferring his file to Case Agent Webster.

16 (RT 2172-2173).

17      145.    And like in the case of Khera, when Davinder Singh inquired about the status of

18 his application, he was referred to DHS in Sacramento and confronted by Case Agent Webster.

19 (RT 2173-2174).

20      146.    When they met, Case Agent Webster accused Davinder Singh of filing a

21 fraudulent asylum application.  (RT 2174-2175).

22      147.    Davinder Singh denied Case Agent Webster's allegation, claiming that his asylum

23 application was not fraudulent.  (RT 2174).

24      148.    According to Davinder Singh, Case Agent Webster responded by threatening him

25 with removal to India if he did not cooperate with her.  (RT 2262-2263, 2276-2277).

26      149.    She, on the other hand, promised to assist him to secure legal residency if he did

27 cooperate with her and serve as a prosecution witness against the law firm.  (RT 2262-2263,

28 2276-2277).

150.     As a result of the threats, Davinder Singh admitted elements of his persecution claim were false, and he agreed to cooperate with Case Agent Webster and serve as a prosecution witness.  (RT 2177-2178).

151.     Davinder Singh maintained at trial that he continues to fear persecution in India. (RT 2136, 2149-2150, 2196, 2235-2249).

> **(f)     The government's deliberate misrepresentation to Judge Damrell resulting in the admission of Government Exhibit 61.4.4 and elicitation of false testimony from Davinder Singh.**

152.     During Davinder Singh's direct examination conducted by AUSA Wagner, the AUSA presented him with the law firm's copy of his asylum application drafted by Jagprit.  (RT 2159-2163).

153.     The law firm's copy of the application was marked as Government Exhibit 61.4.4 and the prosecution sought its admission.  (RT 2159-2160).  The prosecution had already secured the admission of Davinder Singh's copy of his asylum application, Government Exhibit 7.3. (RT 2142-2143).

154.     Counsel for the defense aptly objected to 61.4.4's admission due to a lack of proper foundation.  (RT 2160); *See* Exhibit J, Government Exhibit 61.4.4 ("Exh. J.").

155.     Judge Damrell responded by seeking clarification from the AUSA regarding 61.4.4:  "Presumably this was the document presented to the witness [Davinder Singh] at the time of the preparation.  That's what the testimony is."  (RT 2160).

156.     AUSA Wagner responded:  "Yes."  (RT 2160).

157.     Based on AUSA Wagner's response to this inquiry, Judge Damrell admitted 61.4.4.  (RT 2160).

158.     The problem, however, was that the document was not presented to Davinder Singh during his preparation.  Not by Jagdip.  Not by Manjit, or anyone else.  (RT 2249-2250)

159.     In fact, the first time Davinder Singh could recall seeing it was during Jagdip's criminal trial when AUSA Wagner presented it to him.  (RT 2249-2250). *See* Exhibit K, Government Exhibit 7.3 ("Exh. K").

21

1      160.    AUSA Wagner, thus, in his effort to secure the admission of Exhibit 61.4.4

2   deliberately misled Judge Damrell when he affirmed, in response to a direct inquiry, that 61.4.4

3   was "presented to the witness [Davinder Singh] at the time of the preparation."

4      161.    In fact, AUSA Wagner was well aware that the "copy of the asylum narrative,

5   [Government Exhibit] 7.3" was the one in Davinder Singh's possession, not 61.4.4.  (RT 2140-

6   2150).  *See* Exhibit K, Government Exhibit 7.3 ("Exh. K").

7      162.    Exhibit 61.4.4 was not presented to Davinder Singh during his preparation, and

8   AUSA Wagner had no basis for believing otherwise, and his statement to the contrary was a

9   deliberate lie.

10      163.    AUSA Wagner's deception of the court and jury did not end there, but was the

11   beginning of a wider devious stratagem.

12      164.    Over defense counsel's objections, AUSA Wagner asked Davinder Singh

13   questions regarding handwriting that appeared on 61.4.4.

14      165.    AUSA Wagner's particular focus were three dates that the prosecution knew were

15   written on 61.4.4 by Jagdip's codefendant Manjit:  "March '95" (RT 2161); "August 8, 2000"

16   (RT 2162); and, "August 15, 2000."  (RT 2162).

17      166.    AUSA Wagner elicited testimony on direct examination (RT 2162) and allowed

18   Davinder Singh to falsely testify on cross-examination that Jagdip wrote and hence supplied the

19   details of the dates.  (RT 2251-2252).

20      167.    The prosecution knew the handwriting was Manjit's, not Jagdip's.  (RT 4007-

21   4008, 40011).

22      168.    AUSA Wagner thus elicited and allowed to go uncorrected false testimony on the

23   part of Davinder Singh.

24                    **iii.    Case Agent Carol Webster**

25                    **(a)    Background**

26      169.    The architect of the prosecution's case, its principal investigator, and its star

27   witness was Case Agent Carol Webster.  (RT 6679-6680).

28

22

170.    At the time of the trial, Case Agent Webster had been employed with the United States immigration authorities for over nineteen years.  (RT 3420).

171.    At the time she testified, she had approximately twelve years of experience as a case agent.  (RT 3420).

172.    Prior to that, her primary experience was as a benefits adjudicator and immigration inspector with DHS.  (RT 3420-3421; 3787-3788).

173.    As a DHS benefits fraud investigator, Case Agent Webster investigated numerous marriages that were the basis of a petition filed by a petitioner seeking to accord legal immigrant status to an immediate relative.  (RT 3518-3519).

174.    Many of Case Agent Webster's investigations involved marriages that DHS determined the petitioner and beneficiary failed to establish was *bona fide*, and suspected that the marriage may, in fact, be fraudulent or a "sham."  (RT 3519).

175.    At the time of her trial testimony, she had investigated over 50 sham marriages, including "interview[ing] people who participated in sham marriages."  (RT 3519).

176.    Case Agent Webster's investigation in this case included reviewing files of asylum applicants represented by the law firm; interviewing and managing potential prosecution witnesses; and, assisting them in procuring immigration benefits from DHS based on their status as prosecution witnesses.  (RT 6779-6680).

177.    In some cases, Case Agent Webster sought out witnesses she believed would be helpful to the prosecution and ones that could be coaxed into testifying on the prosecution's behalf.  (RT 3491).

178.    An additional means employed by Case Agent Webster to secure prosecution witnesses involved suspending the adjudication of the benefits sought by asylum applicants whose claim were filed by the law firm.  (RT 3517-3520, 3521-3524, 3524-3525).

179.    As part of her investigation, Case Agent Webster collected the DHS files related to asylum applicants whose claims were filed by the law firm.  (RT 6679-6680).

180.    She reviewed these files as well as those seized from the law firm's Sacramento office for evidence to support the prosecution's theory of its case.   (RT 6679-6680).

23

181.    One effect of Case Agent Webster's collection of the files was that DHS's adjudications of any benefit the applicant was seeking was suspended unless she released the file.  (RT 3517-3518, 3521-3524, 3524-3525).

182.    On a number of occasions, applicants whose files the Case Agent was holding would inquire with DHS as to the status of their case, and DHS would refer them to the Sacramento office because, as a consequence of the hold, that was where their file was located. (RT 3517-3518, 3521-3524, 3524-3525).

183.    Often, when the applicant would inquire about the status of his or her case at DHS's Sacramento office, Case Agent Webster would confront them, allege that their asylum application was fraudulent, and try to persuade them to serve as a prosecution witness.  (RT 3517-3518, 3521-3524, 3524-3525).

184.    Case Agent Webster coordinated extending benefits to asylum applicants who agreed to testify on behalf of the prosecution.  (RT 3517-3521, 3521-3524, 3524-3525).

**(b)    Case Agent Webster's opinion testimony**

185.    At trial, Case Agent Webster's most significant role was that of a "lay opinion" witness under Federal Rule of Evidence 701.  (RT 3479-3480, 3550-3665).

186.    As a "lay opinion" witness, Case Agent Webster was permitted to offer her opinion that over 100 asylum applications filed by the law firm carried an indicia of fraud based on similarities she perceived in the narratives supporting the applications.  (RT 3550-3665).

187.    Case Agent Webster's opinion was presented through summary charts she created, entered into evidence at trial as Exhibits 75.2 through 75.7 pursuant to Federal Rule of Evidence 1006.  (RT 3479-3480, 3550-3665); Exhibit L, Government Exhibit 75.2 ("Exh. L"); Exhibit N, Government Exhibit 75.3 ("Exh. N"); Exhibit P, Government Exhibit 75.4 ("Exh. P"); Exhibit R, Government Exhibit 75.5 ("Exh. R"); Exhibit T, Government Exhibit 75.6 ("Exh. T"); Exhibit V, Government Exhibit 75.7 ("Exh. V").

188.    Case Agent Webster testified she reviewed asylum narratives of over 330 applicants represented by the law firm.  (RT 3550).

24

189.    Each asylum narrative presented the persecution claim of an individual applicant that had been filed as an attachment to his or her asylum application.  Exh. L, and Exhibit M, Government Exhibit 75.2A ("Exh. M"); Exh. N and Exhibit O, Government Exhibit 75.2A ("Exh. O"); Exh. P and Exhibit Q, Government Exhibit 75.4A ("Exh. Q"); Exh. R and Exh. S, Government Exhibit 75.5A (Exh. S"); Exh. T and Exhibit U, Government Exhibit 75.6A ("Exh. U"); Exh. V and Exhibit W, Government Exhibit 75.7A ("Exh. W").

190.    Case Agent Webster testified that she scanned the narratives into a searchable file. (RT 3778).

191.    Then, according to Case Agent Webster, she searched the file for "similarities," specifically perceived common scenarios or common wording.  (RT 3778).

192.    She then grouped the narratives, 105 of the 330, based on the particular commonality she perceived.  (RT 3778).

193.    She created six charts based on her groupings that were introduced and ultimately admitted at trial as 75.2 through 75.7.  Exh. L; Exh. N; Exh. P; Exh. R; Exh. T; Exh. V.

194.    Each chart listed all the narratives within a given group grouping, and had a caption as its heading that set forth the commonality Case Agent Webster claimed to find in the listed narratives.  Exh. L; Exh. N; Exh. P; Exh. R; Exh. T; Exh. V.

195.    The only information provided on the individual charts with respect to the listed narrative were the initials and the last three digits of the applicant's alien number who filed the narrative in support of his or her asylum application.  Exh. L; Exh. N; Exh. P; Exh. R; Exh. T; Exh. V.

196.    As a consequence, the factual basis – the allegedly similar passage from the asylum application that resulted in the Case Agent placing the narrative on the chart – was not identified.  Exh. L; Exh. N; Exh. P; Exh. R; Exh. T; Exh. V.

197.    And, although the charts were supplemented with an exhibit containing all the listed narratives, there was no way for the jury to locate within the supplement the specific passage that resulted in the Case Agent listing the narrative in the chart in question.  The prosecution, in fact, resisted Judge Damrell's suggestion to highlight the passages in question.

25

1   (Transcript for Motions in Limine ("MLT") 41-42); Exh. L and Exh. M; Exh. N and Exh. O;

2   Exh. P and Exh. Q; Exh. R and Exh. S; Exh. T and Exh. U; Exh. V and Exh W.

3       198.   Of the 105 listed narratives, seventy-four (74) belonged to Romanian applicants,

4   and thirty-one (31) belonged to non-Romanian applicants.  *See* Exh. L; Exh. N; Exh. P; Exh. R;

5   Exh. T; Exh. V.

6       199.   Over the defendants' objections, the trial court admitted Exhibits 75.2 through

7   75.7 and Case Agent Webster's related testimony on the grounds that:  "The narratives and

8   charts are relevant to the government's proof regarding falsity.  It's also likely relevant to the

9   number of false applications filed, which would be evidence of the extent of the alleged

10  fraudulent scheme."  This type of evidence is not cumulative.  It is highly relevant.  (RT 3481).

11      200.   Case Agent Webster's testimony was the catalyzing evidence for the prosecution,

12  consisting of nearly 500 pages.  (RT 3419-3550).

13      201.   And the centerpiece of her testimony was her opinion represented in Exhibits 75.2

14  through 75.7, consuming over half of her direct examination of 229 transcribed pages. (RT 3549-

15  3665).

16      202.   An emphasis of Case Agent Webster's opinion testimony regarding the charts was

17  her analysis of four Nepalese asylum claims involving Jagdip.  (RT 3645-3659).

18      203.   Jagdip was involved in the preparation of the asylum applications for the four

19  Nepalese.  (RT 3645-3659).

20      204.   According to Case Agent Webster's testimony, the similarities in the four

21  Nepalese claims were an indicator that the applicants advanced fraudulent claims aided and

22  abetted by Jagdip.  (RT 3645-3659).

23      205.   None of these Nepalese asylum applicants, who DHS granted asylum following

24  interviews vetting their claims, testified at trial.  In fact, no Nepali testified at trial.

25      206.   Thus, with respect to the allegations against Jagdip involving the Nepalese claims,

26  the prosecution relied solely on the Case Agent's opinion as its only evidence.  (RT 3769, 3771,

27  3775, 3776).

28

26

207.    Significantly, with respect to the allegations against Jagdip and his preparation of the Nepalese claims, the prosecution's reliance on Case Agent Webster's testimony extended beyond her opinion regarding similarities carrying an indicia of fraud.

208.    In the case of the Nepalis, there was significant evidence that the applicant's persecution claim was based on information provided by the applicant.  (RT 3754-3760).

209.    Specifically, there was a statement written by the applicant in his handwriting that tracked the applicant's actual application word for word.  (RT 3754-3760).  Exhibit II, Defense Exhibit 6C and 6C1 ("Exh. II").

210.    Case Agent Webster, during her investigation, had labeled the evidence "exculpatory."  (RT 3754-3760). Exhibit JJ, Defense Exhibit 6B, ("Exh. JJ.")

211.    However, during her testimony she was permitted to opine that the applicant's handwritten statement was actually inculpatory.  (RT 3753-3754).

212.    According to Case Agent Webster's opinion, the applicant's written account was implausible.  (RT 3753-54).

213.    She based her opinion on her "firearms training."  (RT 3754).

214.    As evidenced by her testimony regarding her "firearms training" to dismiss otherwise exculpatory evidence, Case Agent Webster's opinion testimony was not limited to those expressed in the charts.  (RT 3784).

215.    The prosecution would in fact argue that the most important dimension of Case Agent Webster's testimony was her opinion that the description of an applicant going "unconscious" after a persecutory experience was an indicia of fraud.  This opinion was not set forth in Case Agent's charts.  (RT 3784, 6671, 6675, 7218, 7225)

**(c)    Case Agent Webster's testimony regarding Khera**

216.    During her expansive testimony, Case Agent Webster also addressed her handling of Khera.  (RT 3517-3521).

217.    Upon Case Agent Webster's request, "special operations" at San Francisco's DHS office transferred Khera's file to her, where she was "holding" it.  (RT 3517-3518)

27

218.    Special operations in San Francisco was in the process of investigating whether Khera's marriage to Sarbjit and his previous marriage to Diaz were a sham before Khera's file was transferred to the Case Agent.  (RT 3800-3818).

219.    As a result, according to Khera and Case Agent Webster's testimony, when Khera and Sarbjit sought to check on the status of his petition and his application, he was directed to Sacramento's DHS office, where the Case Agent met with the couple.  (RT 3517-3521).

220.    According to Khera and Case Agent Webster, the meeting occurred in 2005.  (RT 1653, 3519).

221.    The Case Agent testified that when Khera and Sarbjit visited the Sacramento DHS office to check on the status of their pending petition and Khera's accompanying adjustment application, "I spent a lot of time with he and his wife, they seemed like a normal couple, they had good interaction."  (RT 3804-3805).

222.    During the meeting, according to Case Agent Webster, she also thoroughly reviewed Khera's immigration file with the couple.  (RT 3804-3807; see also 1795-1797).

223.    Case Agent Webster, during the course of her testimony, repeatedly emphasized her meeting with Khera and Sarbjit as her basis for having no doubt regarding the *bona fides* of their marriage.  (RT 3518, 3519, 3519-3520, 3804, 3818).

224.    It was as a result of their meeting that the Case Agent was able to secure Khera's agreement to serve as a prosecution witness.  (RT 3517-3518).

225.    After the meeting, she testified that she performed a background investigation on Khera through a program available to DHS.  (RT 3804).

226.    She also thereafter studied his file, including the notes and reasoning of the DHS officer Brigido A. Villalon, who interviewed Khera and Sarbjit and determined that they failed to establish the *bona fides* of their marriage and suspected it was a "sham."  (RT 3801, 3805-3806).

227.    On that basis, Case Agent Webster testified, after the October 2006 filing of the indictment, which set forth Jagprit's filing of Khera's application as an overt act in the Count 1 conspiracy, she, in December 2006, forwarded Khera's file to DHS's Fresno adjudications unit for an adjudication of Khera's petition and application.  (RT 3519-3520).

28

228.   Notably, the Khera overt act was the only one involving a citizen and national of India that was submitted to the jury.  (RT 7249).

229.   Case Agent Webster testified that she transferred the Khera immigration file to the Fresno DHS office for adjudication because she herself did not have the authority to adjudicate the petition and application.  (RT 3519).

230.   Case Agent Webster transferred the Khera file with an accompanying memorandum stating that Khera was a "key" prosecution witness "crucial to the indictment of three attorneys in the asylum fraud ring," and requesting the adjudication of his pending petition and adjustment application.  Exh. E, p. 154.

231.   Although she received the file from San Francisco DHS's office where the investigation was pending, Case Agent Webster, nevertheless, in December 2006 chose to transfer the file to DHS's Fresno office for an adjudication.  (RT 3519).

232.   Case Agent Webster explained her reason for transferring Khera's file to the Fresno DHS office rather than returning it to the San Francisco DHS office for adjudication:

233.   It had been pending in San Francisco, but our office requested the file.  What happened was the jurisdiction for his place of residence during that time moved to Fresno.  (RT 3519).

234.   The effect of Case Agent Webster transferring the file to the Fresno DHS office over the San Francisco office is that the San Francisco office "special operations unit" never investigated its suspicions regarding the *bona fides* of Khera's marriage to Sarbjit.

235.   Instead, according to Case Agent Webster, the Fresno DHS office conducted an independent adjudication of the merits of the I-130 petition and I-485 application.  (RT 3815-3818).

236.   Case Agent Webster testified she did not "know the CIS official that adjudicated [Khera's] petition;" did not "make any recommendation to him about how he should adjudicate that petition;" and, did not "participate in any way in his decision regarding that adjudication." (RT 3521).

29

237.    In other words, according to Case Agent Webster, she transferred the file to the Fresno DHS office for a completely independent adjudication of his petition and application on the merits.  (RT 3815-3818).

238.    She explained, "[A]djudicate means to make a decision, so they would conduct whatever they need to do to make the decision on the application."  (RT 3815).

239.    According to Case Agent Webster, the resulting adjudication by Fresno DHS officer Carlos A. Guadamuz Jr. granting Khera legal permanent residency was based on the merits of Khera's petition and adjustment application.  (RT 3815-3818); Exh. E, pp. 1, 61.

240.    Case Agent Webster was unequivocal that Officer Guadamuz's granting of legal permanent residence was not as a result of his status as a "key" and "crucial" prosecution witness.  (RT 3520-3521).

241.    She testified, "Well, it was based on his marriage.  He was eligible for that benefit."  (RT 3816-3817).

242.    Case Agent Webster, in fact, assumed the position that, Khera "would have had the green card had we not requested the file to begin with.  He would have had it before we requested the file."  (RT 3817).

243.    Case Agent Webster testified that Officer Villalon's finding that there was not sufficient documentary evidence to support the *bona fides* of Khera's and Sarbjit's marriage was contrary to the evidence in their file.  (RT 3811).

244.    When Jagdip's attorney, during cross-examination, questioned Case Agent Webster as to the basis for Officer Villalon, who interviewed Khera and Sarbjit in 2002, for checking the box on the DHS form "that says joint documents do not support *bona fides*," the Case Agent responded:  "I think --- I don't know why that was checked because my review of the file did not reflect that."  (RT 3811).

245.    Similarly, according to Case Agent Webster, the findings of Officer Villalon, "a lot of these things that are listed, the fact they're from India, it doesn't really have any bearing on a marriage."  (RT 3818).

30

246.    And when Jagdip's attorney alleged that Khera secured his legal permanent residence status based on a fraudulent petition and adjustment application, Case Agent Webster responded:  "No, he didn't."  (RT 3817).

247.    Judge Damrell accepted the prosecution and Case Agent Webster's representations that DHS granted Khera adjustment of status on the merits of the petition and application, and instructed the jury accordingly.  (RT 7243).

248.    Specifically, Judge Damrell excluded Khera from the list of prosecution witnesses "who received special consideration from immigration authorities in connection with this case…"  (RT 7243).

249.    As a consequence, Judge Damrell exempted Khera from the instruction to the jury that cautioned:

> [I]n evaluating their testimony, you should consider the extent to which or whether their testimony may have been influenced by [special consideration from immigration authorities].  In addition, you should also examine their testimony with greater caution than that of other witnesses.

(RT 7243).

250.    Therefore, the prosecution's deliberate misrepresentation that Khera did not receive legal permanent residency due to serving as a prosecution witness became the law of the case.

### (d)    Case Agent Webster's testimony regarding Davinder Singh

251.    Case Agent Webster's testimony regarding the circumstances of how she met with Davinder Singh were consistent with his testimony.  (RT 3521-3522).

252.    Case Agent Webster, however, denied threatening Davinder Singh with removal if he did not cooperate with the prosecution.  (RT 3522-3523).

253.    She also denied promising him a benefit if he did cooperate.  (RT 3523-3524).

254.    As a result, as in the case of Khera, Judge Damrell excluded Davinder Singh from the cautionary jury instruction regarding prosecution witnesses who received special

consideration from the immigration authorities based on their cooperation with the prosecution. (RT 7243).

255.     Case Agent Webster listed Davinder Singh's asylum application on one of her summary charts, Government Exhibit 75.4, because in her opinion it carried an indicia of fraud based on perceived similarities with other applications filed by the firm.  (RT 3580); Exh. P.

**D.     THE PROSECUTION'S SUMMATION**

256.     During summation, the prosecution proclaimed that Case Agent Webster's investigation in the case was the "story of the trial."  (RT 6679-6680)

257.     The prosecution explicated for the jury the Case Agent's omnipresent role in the collecting and synthesizing of its evidence and supplying the theory of its case.  (RT 6679-6680, 7236).

258.     The prosecution's theory was that regardless of the client's nationality, the law firm's approach was the same:  they would be confronted with a noncitizen who did not have a persecution claim to support an asylum application;  Jagprit would fabricate a claim on his or her behalf;  the law firm staff would encourage the applicant to secure corroborating documents to support the fraudulent claim;  and, the law firm staff would rehearse the claim so that the applicant could present it convincingly at an asylum interview or hearing.  (RT 6680-6682).

259.     In the prosecution's own words, "[T]here were seven clients of Sekhon and Sekhon who testified, Alina Contis, Ranbir Khera, Radu Vlad, Stefan Kadar, Davinder Singh, Cosmin Iacob and Florin Vorobiov … They dealt with Sekhon and Sekhon at different times between 2000 and 2004, and yet they all told you basically the same thing … Jagprit Sekhon produced a narrative of supposed persecution of those seven individuals – a complete fantasy – and sent it to them."  (RT 6687, 6774-6775, 6777-6778).

260.     According to the prosecution, "They all had differing reactions to this process, the process itself was the same in case after case.  All seven of these unrelated individuals."  (RT 6690).

261.     Again, according to the prosecution, Ranbir Khera distinguished himself amongst the seven witnesses "Ranbir Khera, he wanted nothing to do with it.  Once he saw the actual

1  persecution story that his asylum claim was based on, once he actually read that, he refused to

2  come into Sekhon and Sekhon and didn't do anything further with his claim."  (RT 6690).

3        262.   Any concerns that Khera had engaged in immigration fraud by trying to secure

4  legal residency based on a fraudulent marriage, the prosecution explained, was a distraction, and

5  "a silly aside and we don't have time for that."  (RT 7203).

6        263.   In addition to arguing that Khera was above committing immigration fraud, the

7  prosecution also argued the Case Agent had no influence on DHS' adjudication of Khera's

8  petition and adjustment application; to the contrary, she was wholly removed from it.  (RT 7204,

9  7225-7226).

10        264.   Based on the testimony of Khera and the other six prosecution witnesses who

11  were former clients of the law firm, the prosecution proceeded to argue that the recording

12  involving the Romanian CI was emblematic of how the law firm processed their clients who

13  sought asylum, playing it repeatedly to support the Count 1 allegations.  (RT 6693, 6714, 6723,

14  6724, 6735, 6748, 6750); (RT 7189, 7192-7194, 7232-7333).

15        265.   According to the prosecution, Case Agent Webster's opinion and analysis

16  regarding "hundreds of Romanian and Indian claims filed by the Sekhon firm," revealed that the

17  scope of the alleged Count 1 conspiracy was not limited to the Sacramento defendants advancing

18  fraudulent Romanian asylum claims.  (RT 6679-6680).

19        266.   So casting the conspiracy through the Case Agent's opinion testimony was indeed

20  the basis for the prosecution to implicate Jagdip in the Count 1 conspiracy:  "It simply does not

21  make sense for Jagprit Sekhon to be creating scores, hundreds of phony asylum claims and then

22  passing them off to his brother, his partner of many years and concealing the fact that they were

23  false."  (RT 6721).

24        267.   In this context, the prosecution highlighted the four Nepalese claims listed on

25  Government Exhibit 75.6 to argue, based on Case Agent Webster's opinion, they evinced

26  Jagdip's involvement in the Count 1 conspiracy.  (RT 6688, 6712-6713, 6741-6742, 7219-7222).

27

28

268.     Case Agent Webster's opinion testimony was in fact the most heavily cited evidence in its summation implicating Jagdip in the Count 1 conspiracy.  (RT 6676-6677, 6694, 6704, 6711-6712, 6722, 6736, 6741, 6746, 6760, 6774-6775, 7218-7219).

269.     Case Agent Webster's opinion testimony thus proved to be the key evidence fueling the prosecution's unrelenting theme that the firm was a "fraud factory" consisting of an "assembly line of fraud" that extended to Jagdip and his San Francisco office.  (RT 6679-6680, 6682, 6789, 7198).

270.     The prosecution punctuated its summation by juxtaposing their own motivation to serve as the vanguards of a "noble thing in the best tradition of what this country stands for," and to preserve "the integrity of the process [that] is crucial to the fair and accurate and objective adjudication of these asylum claims," with that of the defendants, including Jagdip, who "made a living out of cheating that system … exploit[ing] vulnerabilities to cram through paying clients who had no entitlement to asylum."  (RT 6675).

271.     To support this juxtaposition the prosecution relied on the testimony of Wazhma Mojaddidi who claimed she confronted Jagdip regarding having learned that the Sacramento defendants were engaging in fraud and he reacted by diverting her.  According to the prosecution, Jagdip's practice of diverting allegations of fraud was indicative of his guilt and on display for the jury during his testimony.  (RT 6745-6746).

272.     Finally, the prosecution urged the jury to reject the defendants arguing that Case Agent Webster was "overzealous" and "influenced the testimony of witnesses through threats and promises."  (RT 6775).

273.     Rather the prosecution celebrated Case Agent Webster's virtues and urged the jury to embrace her as an irreproachable fraud investigator, whose efforts the jury should reward with guilty verdicts.  (RT 7226, 7235-7236).

34

1

### E.   THE VERDICT

2       274.    Jury selection began on March 10, 2009.  (RT 19).

3       275.    Following a trial spanning over three months, on June 25, 2009, the jury returned

4  the verdict convicting all the defendants of the Count 1 conspiracy, including Jagdip.   (RT 7279,

5  7290-7291).

6       276.    In addition to Count 1, Jagprit was convicted on Counts 3, 5, 6, 9, 10, 11, 12, 14,

7  and 17.  (RT 7290).

8       277.    In addition to Count 1, Manjit was convicted on Counts 5, 15, 17, and 18.

9  (RT 7282-7283, 7290-7291).

10       278.    In addition to Count 1, Caza was convicted on Counts 4, 5, 10, 11, 12, 14, and 17.

11  (RT 7291).

12       279.    In addition to Count 1, Harmath was convicted on Counts 11 and 17.  (RT 7291).

13     ### F.   SENTENCING

14       280.    Under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"),

15  Judge Damrell determined that Jagdip's criminal history category was I, and he calculated

16  Jagdip's offense level at 28.  (Transcript of Judgment and Sentence ("JST") 91).

17       281.    Judge Damrell's calculation of Jagdip's offense level was based, in part, on a two-

18  point enhancements for "abuse of a position of trust," under § 3B1.3 of the Guidelines; and, a

19  two-point enhancement for "obstruction of justice" under § 3C1.1.  (JST 40-41, 59).

20       282.    Judge Damrell applied § 3B1.3 enhancement to Jagdip's codefendants who were

21  also attorneys, Jagprit and Manjit.  Exh. BB, ¶9.

22       283.    Judge Damrell also applied the § 3C1.1 enhancement for "obstruction of justice"

23  to Manjit, who besides Jagdip was the only defendant who testified.

24       284.    Jagdip's Guideline range, based on Judge Damrell's calculation, was 78 to 87

25  months.

26       285.    On September 24, 2010, Judge Damrell sentenced Jagdip to 60 months

27  imprisonment, the statutory maximum under 18 U.S.C. § 371.  (JST 91).

28

286.    Jagprit was sentenced to 108 months imprisonment. Exh. D, pp. 8. Caza was sentenced to 90 months imprisonment. Exh. D, pp. 8.  Manjit was sentenced to 30 months imprisonment and Harmath to four. Exh. D, pp.7-8.

**G.    NINTH CIRCUIT APPEAL**

287.    On October 1, 2010, Jagdip appealed his conviction to the United States Court of Appeals for the Ninth Circuit Exhibit X, Notice of Appeal ("Exh. X").

288.    On or about June 14, 2012, this Court granted Jagdip's motion seeking bail pending appeal.  At the time, Jagdip had completed serving approximately 21 months of his 60-month sentence.  Docket #567, Order Granting Defendant's Renewed Motion for Release Pending Appeal.

289.    On June 25, 2014, the Ninth Circuit affirmed Jagdip's conviction, and remanded the case for resentencing, *inter alia*, based on the grounds that the district court erred in applying the "abuse of a position of trust" enhancement when it calculated his sentencing guideline range. Exhibit Y, Memorandum and Order of the United States Court of Appeals for the Ninth Circuit issued on June 25, 2014 ("Exh. Y").

290.    Following the Ninth Circuit's memorandum and order of the 25th of June, on July 7, 2014, Jagprit timely petitioned the panel for rehearing pursuant to Federal Rule of Appellate Procedure ("FRAP") 40, correctly alerting the Court to the fact that he, through his appellate counsel, raised the challenge to the "abuse of a position of trust" enhancement not Jagdip as the June 25th memorandum incorrectly stated;  and therefore the Ninth Circuit's memorandum and order should be amended to reflect that, upon remand, he is entitled to resentencing based on the misapplication of the "abuse of a position of trust" enhancement. Exhibit Z, Petition for Rehearing ("Exh. Z").

291.    The fact was that Jagdip's appellate counsel did not raise a challenge to his sentence based on the misapplication of the "abuse of a position of trust" enhancement even though the sentencing enhancement was applied to him.  Exhibit AA, Opening Brief filed on Behalf of Jagdip Sekhon Before Ninth Circuit ("Exh. AA"); *see also* Exhibit NN Declaration of Dennis Riordan ("Exh. NN").

36

292.    Jagdip's appellate counsel did not challenge the application of the "abuse of a position of trust" enhancement in the brief he filed on behalf of Jagdip;  nor did Jagdip's appellate counsel join in the arguments pursuant FRAP 28(i) filed by his co-appellants who raised the issue.  *See* Exh. AA; Exh. NN.

293.    Jagdip's appellate counsel in fact did not raise any challenge to his sentence based on a misapplication of enhancements of his offense level under the Guidelines.  Exh. AA.

294.    On July 31, 2014, the Ninth Circuit granted Jagprit's petition, amended its order and memorandum to clarify that Jagprit upon remand was entitled to resentencing based on the misapplication of the "abuse of a position of trust" enhancement.  Exhibit BB, Amended Order of the United States Court of Appeals for the Ninth Circuit

295.    On August 8, 2014, Jagdip filed a petition for panel rehearing pursuant to FRAP 40, requesting that the Court overlook his failure to raise a challenge to the "abuse of a position of trust" enhancement, or join in the arguments of his co-appellants that did so.  Exhibit CC, Petition for Panel Rehearing filed on Behalf of Jagdip Sekhon ("Exh. CC").

296.    The panel denied the rehearing petition without comment, and thus Jagdip was denied the benefit of resentencing.  Exh. A.

297.    On or about November 4, 2014, Jagdip surrendered to Federal Bureau of Prisons to complete his remaining term of imprisonment.

298.    On October 28, 2014, this Court, pursuant to the Ninth Circuit's remand, resentenced Jagdip's codefendant Manjit to a term of imprisonment of 9 months, reducing her sentence by 70%.  Docket # 599, Judgement and Sentencing.

299.    On February 24, 2015 this Court, pursuant to the Ninth Circuit's remand, resentenced Jagdip's codefendant Jagprit to a term of 71 months, reducing his sentence by more than 34%.  Docket #617, Jagprit Sekhon 2:06-cr-00058-JAM-2.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### H.   POST TRIAL INVESTIGATION AND EVIDENCE REGARDING SARBJIT

#### 1.   Statement of Sarbjit Kaur that her marriage to Ranbir Khera was a sham and that Sarbjit and Case Agent Webster never met.

300.   Recently, a licensed investigator working on behalf of Jagdip located and interviewed Sarbjit Kaur, Ranbir Khera's second wife. Exhibit EE, Declaration of Sarbjit Kaur ("Exh. EE").

301.   Sarbjit's statements revealed that the concerns of the DHS officer who interviewed Sarbjit and Khera in 2003 and suspected that their marriage was a sham were unquestionably legitimate.  Exh. EE, ¶¶8-17.

302.   Through reviewing her biographic information contained in the Khera immigration file, the investigator was successfully able to confirm Sarbjit's identity.

303.   As indicated in the Khera immigration file, Sarbjit was born on May 12, 1985, and is a citizen and national of the United States. Exh. E, A004428, Exh. EE, ¶¶2-3.

304.   She was raised in California's central valley in a traditional Indian household where she resided with her parents. Exh. EE, ¶4.

305.   Contrary to Khera's representations, Sarbjit explained that when she was sixteen her parents arranged for her to marry him.  Exh. EE, ¶6.

306.   The couple did not have a romantic courtship or "love marriage." Exh. EE, ¶8.

307.   They married in Reno, Nevada in 2002, which led to the filing of Sarbjit's immigrant petition on behalf of Khera.  Exh. EE, ¶9.

308.   After Sarbjit turned 17, the couple had a formal wedding ceremony, and Sarbjit began residing with Khera and his family. Exh. EE, ¶10.

309.   Her ordeal with Khera is a "year in [her] life she would like to forget."  Exh. EE, ¶23.

310.   Khera never revealed to Sarbjit he had been previously married.  She first learned of Khera's marriage to Diaz at the 2003 DHS interview regarding her immigrant petition and adjustment application.  Exh. EE, ¶16.

311.    In 2003, after the interview, Sarbjit caught Khera engaging in extramarital relations – he was "cheating" on her – at their Turlock home.  Exh. EE, ¶¶17-18.

312.    Sarbjit immediately left the Khera home.  Exh. EE, ¶19.

313.    She tried to return to her parents, but they refused to permit her to do so.  Exh. EE, ¶19.

314.    She then began living independently and eventually moved to San Diego, California.  Exh. EE, ¶¶20, 25-27.

315.    She presently resides in San Diego where she works at a blood laboratory.  Exh. EE, ¶3.

316.    Sarbjit views Khera as a "fraud," who never had any intention of being faithful or honest to her.  Exh. EE, ¶¶23, 25-26.

317.    The couple did not have any comingled assets, joint property, or joint insurance policies.  Exh. EE, ¶21.

318.    Sarbjit, of course, does not know Carol Webster.  Exh. EE, ¶30.

319.    Sarbjit has no recollection of accompanying Khera to DHS's Sacramento office, let alone having a meeting with Webster at that office in 2005.  Exh. EE, ¶29.

320.    Indeed, she only saw Khera a few times after leaving him in 2003, lost contact, and did nothing to advance her immigrant petition filed on his behalf.  Exh. EE, ¶¶22, 27.

321.    In May 2009 Khera served Sarbjit with divorce documents. Sarbjit did not know how Khera found her address. Exh. EE, ¶27.

322.    She does not know why Khera in the divorce documents indicated they legally separated in May 2006, particularly given that she left him in 2003.  Exh. EE, ¶25-26.

323.    She nonetheless executed the divorce documents leading to an uncontested dissolution of the marriage.  Exhibit FF, Dissolution Proceedings of Khera in Superior Court of King County, Washington ("Exh. FF").

324.    This entire episode had led to a long estrangement between Sarbjit and her parents.  They only have recently resumed communicating.  Exh. EE, ¶24.

39

1

2

### 2.   Khera and Sarbjit's Divorce Proceedings Confirm that their Marriage was a Sham.

3      325.   On the heels of the end of trial on June 25, 2009, Khera, on July 9, 2009, filed for

4   divorce from Sarbjit. Exh. FF.

5      326.   The proceedings were initiated and conducted in the Superior Court of King

6   County, Washington.  Exh. FF.

7      327.   Khera was preparing for the filing of divorce during the course of the trial as he

8   secured Sarbjit's joinder – "joining in the petition, a decree or judgment and order may be

9   entered in accordance with the relief requested in the petition …" – on May 12, 2009. Exh. FF,

10   pp 17, 33.

11      328.   The divorce was uncontested by Sarbjit.  Exh. FF.

12      329.   The "Decree of Dissolution" of Khera's and Sarbjit's marriage was entered on

13   October 15, 2009.  Exh. FF, p. 18.

14      330.   The divorce petition represents that the couple was legally separated since May

15   20, 2006.  Exh. FF, p. 2

16      331.   In the divorce petition, Khera represents that:

17         1)   Khera and Sarbjit have no existing joint bank accounts;

18         2)   Khera had no interest in any of Sarbjit's employment benefits, and
             Sarbjit had no interest in Khera's employment benefits;

19

20         3)   Khera and Sarbjit did not have any joint insurance policies;

21         4)   Khera and Sarbjit did not have any joint interest in personal
             property;

22

23         5)   Khera and Sarbjit did not have any joint interest in real property;

24         6)   Khera and Sarbjit did not incur any joint debts and liabilities; and,

25         7)   Khera and Sarbjit did not seek any spousal maintenance from one
             another.

26

27   Exh. FF, pp. 1-5.

28

40

1    332.    Not surprisingly, the divorce petition indicates Khera and Sarbjit did not have any

2    children.  Exh. FF, p. 2, ¶1.3.

3    333.    There was thus no indication in the divorce proceedings that Khera's marriage to

4    Sarbjit was *bona fide*, and every indication that, based on the divorce proceedings coupled with

5    DHS's suspicions following its 2003 interview of the couple, their marriage was a "sham."  Exh.

6    FF.

7    **I.    POST TRIAL EVIDENCE CONFIRMING PROSECUTION WITNESS
         WAZHMA MOJADDIDI LIED DURING HER TESTIMONY**

8

9    **1.    Mojaddidi's Suspect Trial Testimony**

10    334.    Wazhma Mojaddidi provided dubious testimony at trial that she confronted Jagdip

11    regarding a statement made by Manjit disparaging the authenticity of the law firm's Romanian

12    asylum applicants.

13    335.    At the time, Mojaddidi was an associate at the firm.  She worked in the

14    Sacramento office under Jagprit's supervision, not with Jagdip in San Francisco.  (RT 798-799).

15    336.    She was hired due to Mojaddidi's friendship with Jagdip's ex-wife, who was

16    Mojaddidi's college roommate.  (RT 799, 836).

17    337.    Sometime after she was hired at the firm, Mojaddidi was shadowing Manjit as

18    part of her training.  (RT 803, 807).

19    338.    Manjit was representing a client at an asylum interview who Mojaddidi had

20    prepared.  (RT 805-806).

21    339.    Mojaddidi could not recall the name of the client, but identified her as a young

22    Romanian woman.  (RT 806, 878-879).

23    340.    Mojaddidi perceived the interview went poorly.  (RT 808).

24    341.    In retrospect, Mojaddidi testified, the interview did not proceed as poorly as she

25    thought.  She now knows "clients freeze up during interviews."  But at the time, she was

26    disappointed.  (RT 830).

27

28

1       342.    Mojaddidi testified she shared her disappointment with Manjit, and Manjit

2    "shocked" her by the "message" of her response:  "Don't you realize these cases are not real?

3    Don't you realize that this is all made up?"  (RT 808-810).

4       343.    Mojaddidi further testified she later spoke to Jagdip, who she considered her

5    "good friend and mentor," about Manjit's statement.  (RT 810-811).

6       344.    She, however, could not recall where she spoke to Jagdip about Manjit's

7    statements, or if the conversation was face to face or over the telephone.  (RT 811, 950).

8       345.    According to Mojaddidi, her recollection of Jagdip's response was "brush[ing] me

9    off."  (RT 811).

10      346.    Specifically, Jagdip's response was, "That is nothing I have to do with."  (RT

11    831).  He told Mojaddidi, "Wazhma, those cases are handled by my brother Jagprit Sekhon, who

12    runs the Sacramento office and you know the work I do."  (RT 811, 6372, 6887).

13      347.    According to Mojaddidi, Jagdip stated to her that, "If you're uncomfortable

14    working on those cases, then you don't have to do that stuff anymore.  I can have you do other

15    work in the firm."  (RT 811, 6372, 6887).

16      348.    Jagdip's response mollified Mojaddidi's concerns, in part because her experience

17    with him was inconsistent with him being involved in fraud.  (RT 829-831).

18      349.    The law firm records, however, indicate that Mojaddidi continued to work on

19    Romanian asylum cases until she left the firm in December 2003.  (RT 882-883, 819-834, 838-

20    863, 875-884).

21      350.    She left the firm in December 2003 due to a personal dispute with the law firm's

22    staff.  (RT 814, 889).

23      351.    The day she left, she stormed out of the Sacramento office, vowing, "[Y]ou guys

24    are all going down.  I'm out of here."  (RT 813-814, 889).

25      352.    Mojaddidi, however, testified it was not personal animus that led to her leaving

26    the firm, but ultimately her professional ethics.  (RT 814-815, 892).

27      353.    To this end she testified that after leaving the firm, she twice attempted to lodge

28    anonymous complaints with the State Bar of California against the law firm.  (RT 816, 892).

354.    According to Mojaddidi, her first attempt was rebuked by a State Bar representative on the basis that the state agency does not accept anonymous complaints. (RT 816, 892).

355.    She testified she then tried to lodge her complaint a second time, but was again rebuked by the State Bar representative for the same reason.  The representative stated she could not file an anonymous complaint.  (RT 816, 892).

356.    Therefore, Mojaddidi testified, she never lodged a complaint against the firm. (RT 816).

357.    Her testimony at trial was directly refuted by Cecilia Horton-Ballard, who at the time of the trial was one of two supervising trial counsel at the State Bar's Office of Intake.  (RT 4647).

358.    Horton-Ballard supervises "intakes of complaints," and testified that all complaints must be in writing, and the State Bar encourages complainants to disclose "their name and contact information."  (RT 4649-4650).

359.    However, the State Bar does take, investigates, and, if appropriate, prosecutes anonymous complaints.  (RT 4655).

360.    "[W]e never would refuse a complaint because it's anonymous."  (RT 4656).

> **2.    A Post Trial Investigation Establishes that Mojaddidi's Testimony that Jagdip Introduced his Brother to her Further Evinces her Prevarication.**

361.    A post trial investigation reveals that Mojaddidi's account of her conversation with Jagdip is implausible, and that she purposely fabricated her exchange with Jagdip.

362.    Mojaddidi testified that Jagdip responded to her confronting him with Manjit's alleged confession by stating, "Wazhma, those cases are handled by my brother Jagprit Sekhon who runs the Sacramento office and you know what work I do."  (RT 811).

363.    Thus, according to Mojaddidi's testimony, Jagdip introduced his brother to her by providing her his first and last name, "Jagprit Sekhon;" and he told her which of the two law offices he "runs" -- "the Sacramento office."  (RT 811).

364.    However, at the time of the alleged conversation, late 2003, Mojaddidi had known Jagdip and his wife for many years (RT 799, 804-805, 829-832);  Jagdip and Jagprit were brothers;  she, by the time of her alleged exchange with Jagdip had previously worked with him as a contract attorney and at the Davis School of Law (RT 807);  she had been working for a couple of months as an associate at the law firm's Sacramento office under Jagprit's supervision (RT 801);  and, during this period she worked on preparing Romanian asylum claims with Jagprit.  (RT 806-807, 817-824, 832, 839-862, 878).

365.    Mojaddidi was therefore fully acquainted with the Jagdip's brother, and knew he supervised and ran the law firm's Sacramento office.  (RT804).

366.    After all, she worked for him in the Sacramento office.  (RT 801, 806-807, 817-824, 832, 839-862, 878).

367.    Jagdip of course knew Mojaddidi worked for his brother because it was through Jagdip that Mojaddidi secured her employment at the law firm.  (RT 829).

368.    Thus, there was no need for Jagdip to introduce his brother to Mojaddidi, and absurd to allege that he would do so.

369.    A post trial investigation unsurprisingly reveals that there was no possibility that Jagdip would have done so. Exhibit UU, Declaration of Kuljinder Sekhon ("Exh. UU."); Declaration of Manisha Sista ("Exh. VV."); Declaration of Pavan Athwal ("Exh. WW."); Declaration of Ted McMillen ("Exh. XX.").

370.    Affidavits from acquaintances and friends of both Jagdip and Mojaddidi establish that Jagdip in a conversation never has referred to his brother as "my brother Jagprit Sekhon" or "Jagprit Sekhon," and, in a conversation, Mojaddidi never referred to Jagdip's brother as "Jagprit Sekhon." Exh. UU, Exh. VV, Exh. WW, Exh. XX.

371.    Mojaddidi's account of what Jagdip said to her in a response to Manjit's alleged confession was thus fabricated. Exh. UU, Exh. VV, Exh. WW, Exh. XX.

372.    The words Mojaddidi attributed to Jagdip could not be and were not his.

44

373.   Those words instead were contrived by Mojaddidi to introduce Jagdip's brother and his responsibilities to an unfamiliar jury, and is more evidence of her prevarication. Exh. UU, Exh. VV, Exh. WW, Exh. XX.

### 3.   EVIDENCE IN THE § 2255 CASE REGARDING MOJADDIDI'S REPRESENTATION OF HAMID HAYAT CONCLUSIVELY DEMONSTRATED THAT SHE COMMITTED PERJURY AT JAGDIP'S TRIAL.

#### a.   Hamid Hayat's § 2255 motion challenging his criminal conviction due to Mojaddidi's ineffective assistance.

374.   New and previously unavailable evidence supports the unmistakable import of Mojaddidi's testimony:  she was lying and her impetus for testifying at trial was the opportunity to capture the public spotlight.

375.   On or about April 30, 2014, in the United States District Court for the Eastern District of California, Hamid Hayat, Mojaddidi's former client, filed a petition seeking relief under 28 U.S.C. § 2255.  Exhibit GG, Motion for Relief Pursuant to § 2255 in CR-S-05-0240 ("Exh. GG").

376.   The basis of Hayat's petition is Mojaddidi's ineffective assistance resulted in him receiving a 288-month imprisonment in *United States of America v. Hamid Hayat*, No. CR-S-05-0240, Exh. GG, pp. 2-5.

#### b.   Mojaddidi's 2014 deposition confirms she committed perjury at Jagdip's trial.

377.   Both the prosecution and defense at Jagdip's trial suspected Mojaddidi committed perjury. This belief was confirmed in August 2014.

378.   On August 11, 2014, Mojaddidi was deposed by Hayat's attorney and S. Robert Tice-Raskin, Assistant United States Attorney for the Eastern District of California. Exhibit SS, Deposition of Wazhma Mojaddidi in *U.S. v. Hayat* Case No. 05-cr-240-GEB, ("Exh. SS").

379.   AUSA Raskin was part of the team that prosecuted Hayat and works at the same United States Attorney's office that prosecuted this case.  Exh. SS.

45

380.    AUSA Raskin was thus aware that Mojaddidi testified at the 2009 trial in this case regarding her alleged experiences at the law firm. Exh. SS.

381.    At her deposition, both Hayat's attorney and AUSA Raskin explored with Mojaddidi her educational and work experience before she began her own practice in December 2013.  Exh. SS.

382.    In response to questions posed by Hayat's counsel and AUSA Raskin, Mojaddidi's sworn testimony was that after graduating from law school in May 2002, she "wasn't working."  Exh. SS, at 11.  At the trial in this case, of course, when asked the exact same question by AUSA Wagner, she responded, "Yes, I did … ultimately worked for the Sekhon and Sekhon law firm.  I began sometime in October 2003."  (RT 798).

383.    During her 2014 deposition, Mojaddidi referenced the contract work for Jagdip.  Exh. SS, at 10-11.  She was "helping him out with various projects" and "some projects here and there, but [she] wasn't working."  Exh. SS, id.  She also referenced the position Jagdip helped her secure at the Davis law school.  Exh. SS, at 117-118.

384.    Nonetheless, Mojaddidi omitted any mention in her 2014 deposition of her "first" and only job that she testified about with extraordinary flare at this trial; so much flare that the news coverage used "dramatic" to describe her testimony.  Exhibit RR, Sacramento Bee, March 25, 2009 ("Exh. RR")[11]

385.    As the article noted, Mojaddidi's testimony regarding her experience with the law firm included episodes of:  "her ideals suffer[ing] a jarring blow when she learned that her first job out of law school was at a corrupt law firm;" "shock and dismay;" "surprise[] and disappointment[];" "righteous indignation;" betrayal at the hands of her "friend" and "mentor;" her flamboyant exit filled with threats, ending with her courageous attempt to file an anonymous complaint with the State Bar only to be thwarted on two occasions by indifferent agents.  Exh. RR.

---

[11] Denny Walsh, "Law firm corrupt, witness testifies in asylum fraud case," *The Sacramento Bee*, March 25, 2009.

386.   Mojaddidi's 2014 sworn deposition testimony squarely conflicts with her trial

testimony in this case.

387.   In light of the compelling evidence presented at trial through the testimony of

Horton-Ballard that Mojaddidi had committed perjury at the trial in this case, her false and

misleading sworn 2014 testimony confirms that Mojaddidi's "dramatic" testimony was

perjurious.

> **c.   Previously unavailable evidence regarding Mojaddidi's grave misconduct in *Hayat* makes clear that her testimony at trial was not her commitment to professional ethics, but her appetite for publicity.**

388.   Hayat alleges in his § 2255 motion that it was an act of extreme hubris, and

violation of fundamental professional ethics for Mojaddidi to represent Hayat in the case.  Exh.

GG, pp. 2-5.

389.   The stakes in Hayat's case were extraordinarily high, given the charges and

sentence he was facing.  Exh. GG, pp. 1-2.

390.   The Office of the United States Attorney had charged Hayat with one count of

violating 18 U.S.C. § 2339A, alleging Hayat provided material support of terrorists;  and three

counts of violating 18 U.S.C. § 1001, alleging Hayat made false statements to the FBI.  *See*

*United States v. Hayat*, 710 F.3d 875, 883 (9th Cir. 2013).

391.   Moreover, the case was uniquely complicated, prosecuted by a sizeable and

extremely qualified legal team armed with specialists and expert witnesses.  Exh. GG, pp. 1-3.

392.   The resources of the Central Intelligence Agency, Federal Bureau of Investigation

and the National Security Agency were all supporting the prosecution.  Exh. GG, p. 2.

393.   On the other hand, Hayat was represented solely by Mojaddidi.  Exh. GG, pp. 2-3.

394.   It was her first, and to be only, time she represented a defendant in a criminal

proceeding.  Exh. GG, pp. 11-12.

395.   Mojaddidi was so underqualified for the task that when she eventually applied to

the district court for appointment as Hayat's attorney in order to fund her representation, and the

court, in turn, referred her request to the Office of the United States Public Defender, Daniel

47

Broderick of the Public Defender's Office reported that Mojaddidi's lack of experience barred her "membership on a CJA panel." Exh. GG, pp. 11-12.

396.  Hayat's case would proceed to trial, and the outcome was tragically predictable. Exh. GG, pp. 7-9.

397.  Mojaddidi's representation of Hayat during the trial was grossly ineffective resulting in the jury finding Hayat guilty for violating 18 U.S.C. §§ 1001, 2339A. Exh. GG, p. 7.

398.  The Honorable Garland E. Burrell, United States District Court Judge, then sentenced Hayat to a term of imprisonment of 288 months. Exh. GG, p. 7.

399.  Hayat appealed and the United States Court of Appeals for the Ninth Circuit affirmed his convictions and sentence. *See United States v. Hayat*, 710 F.3d 975 (9th Cir. 2013).

400.  The Ninth Circuit noted that Mojaddidi's representation of Hayat "may well have been deficient," *Hayat*, 710 F. 3d at 895, fn. 15.

401.  Following the Ninth Circuit's decision, on April 30, 2014, through new counsel, Hayat initiated his § 2255 proceedings alleging twelve separate grounds of Mojaddidi's ineffectiveness. Exh. GG, pp. 29-107.

402.  Hayat's § 2255 petition explicates unassailable evidence of Mojaddidi's ineffectiveness that was an inevitable consequence of her being under qualified to represent him. *See* Exh. GG pp. 2-3, 29-46.

403.  Following the Ninth Circuit's affirmance of Hayat's convictions, in an interview Mojaddidi herself admitted that she was unqualified to represent Hayat, relying on and playing a subordinate role to attorney Johnny Griffin:

> "Most of the trial was jointly with Johnny Griffin," who represented Hayat's father, Umer. "I was in the case primarily because of my Muslim background, language skills and ability to analyze evidence."

Exhibit HH, Sacramento Bee, March 13, 2013 ("Exh. HH").[12]

_____

[12] Sam Stanton, Denny Walsh, and Stephan Magagnini, "Divided Appellate Panel Upholds Terrorist Conviction of Lodi's Hamid Hayat," *The Sacramento Bee*, March 14, 2013.

1    404.    As stated in the article, Griffin was the attorney for Hayat's codefendant, Hayat's

2    father, Umer.  See Exh. HH.

3    405.    Thus, if Griffin was commanding the trial strategy for both Hayat and his father –

4    the latter being Griffin's client – it left Hayat without an attorney.   Exh. GG, 3-5; 24-70.

5    406.    In other words, Mojaddidi's decision to represent Hayat as a subordinate, which

6    was necessitated by her lack of experience, left her client defenseless.  Exh. GG, pp. 2-4.

7    407.    The resulting "conflict" violated the cornerstone of a lawyer's professional ethics

8    that she must be in a position to act independently in the interests of her client.  *See Wood v.*

9    *Georgia*, 450 U.S. 261, 271, fn. 17 (1980).

10    408.    Mojaddidi's motive for unjustifiably undertaking Hayat's representation in clear

11    violation of her professional ethics is evidenced by her conduct during the course of her

12    representation of him.  Exh. ZZ, News articles regarding Mojaddidi's Representation of Hayat

13    ("Exh. ZZ").

14    409.    Prior to Hayat's trial, Mojaddidi engaged in a promotional tour to publicize her

15    representation of Hayat at the expense, of course, of her client and her ethical duties to him.

16    Exhibit AAA, News articles displaying Mojaddidi's affinity for publicity ("Exh. AAA").

17    410.    In this case, the prosecution presented her purported commitment to professional

18    ethics as her motivation for leaving the firm and acting as a reluctant witness at trial.  (RT 7205-

19    7208).

20    411.    As a result, as a climax of her testimony, the prosecution elicited testimony from

21    Mojaddidi that upon her leaving the firm she attempted to lodge a complaint with the State Bar

22    but was stonewalled.  (RT 814-816).

23    412.    "[T]he righteous indignation she ascribed to herself upon learning of the asylum

24    fraud [was] consistent with her reaction to Hayat's fate."  Exh. HH.

25    413.    Mojaddidi's testimony including her pronouncement of her "righteous

26    indignation," was a clear, indefensible lie exposed by the testimony of Horton-Ballard.  (RT

27    4647-4656).

28

1    414.    And the new, previously unavailable evidence regarding her egregious

2    malfeasance in the *Hayat* trial crystallizes Mojaddidi's motives for falsely testifying in this

3    highly publicized case in the Sacramento area. Exhibit BBB, Sekhon & Sekhon case highly

4    publicized in the news ("Exh. BBB"). As in the case of her disastrous representation of *Hayat*,

5    when she has an opportunity for publicity, she will seize it regardless of any professional ethical

6    implications or the devastating impact of her actions on others.  Exh. GG, Exh. ZZ, Exh. AAA,

7    and Exh. RR.

8    415.    Mojaddidi's thirst for publicity explains both her misconduct in the *Hayat* case

9    and her false testimony in this case, and not "the righteous indignation she ascribed to herself."

10    Exh. HH.

11    **J.    JAGDIP SEKHON'S CURRENT STATUS**

12    416.    Jagdip is currently in the custody of the Federal Bureau of Prisons at Lompoc,

13    California.

14    417.    He has thus far served approximately 33 months of his sixty-month term of

15    imprisonment, and has accumulated approximately 6 months of "good time."

16    418.    His current release date is June 2016 based on "good time" credits, and his

17    participation in the Residential Drug Abuse Program pursuant to 18 U.S.C. § 3621 (e).

18    419.    His community release date is December 28, 2015.

19    **IV.    CLAIM #1: THE PROSECUTION KNOWINGLY PRESENTED PERJURED**

20    **AND FALSE TESTIMONY, AND THEREFORE VIOLATED JAGDIP'S RIGHTS**
**UNDER NAPUE, WARRANTING DISMISSAL OF THE INDICTMENT OR**

21    **ALTERNATIVELY A NEW TRIAL.**

22    420.    Movant realleges and incorporates in this paragraph each and every of the

23    foregoing allegations.

24    **A.    *NAPUE***

25    421.    *Napue v. Illinois*, 360 U.S. 264 (1959), prohibits the government from the

26    knowing use of "false evidence, including false testimony, to obtain a tainted conviction."

27    *Napue*, 360 U.S. at 269.

28

422.    The government's knowing use of false evidence or testimony to obtain a

conviction violates a defendant's constitutional right to due process.  *Napue*, 360 U.S. at 269;

*Mooney v. Holohan*, 294 U.S. 103 (1935).

423.    "The same result obtains where the [government], although not soliciting false

evidence, allows it to go uncorrected when it appears."  *Napue*, id. at 269.

424.     "A claim under *Napue* will succeed when '(1) the testimony (or evidence) was

actually false, (2) the prosecution knew or should have known that the testimony was false, and

(3) the false testimony was material."'  *Jackson v. Brown*, 513 F.3d 1057, 1071-72 (9th Cir.

2008), *quoting Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (*en banc*).

**B.      THE PROSECUTION VIOLATED *NAPUE* BY KNOWINGLY
          PRESENTING CASE AGENT WEBSTER'S FALSE TESTIMONY.**

**1.      Case Agent Webster was a Core Member of the Prosecution Team
          and Provided Opinion Testimony Resulting in Jagdip's Conviction.**

425.    The prosecution aptly portrayed Case Agent Webster as its catalyst.  (RT 6679-

6680, 7224, 7226).

426.    Her investigation provided both the evidence and the theory of the prosecution's

case.  (RT 6679-6680).

427.    In addition, she secured and managed the prosecution's witnesses, including

working on their behalf to obtain their immigration benefits in exchange for their cooperation.

(RT 3516-3531).

428.    Based on her role on the prosecution team, she was permitted to sit at its table

throughout the trial as the prosecution's designated representative.  *See* Fed. R. Evid. 615(2)

(RT 3483).

429.    The jury was in fact so familiar with the Case Agent prior to her assuming the

witness stand, when she eventually did, the AUSA quipped at the outset of her examination that

she needed no introduction.  (RT 3420).

430.    Case Agent Webster then, over the defense's vigorous objection, proceeded to

provide the prosecution's most significant evidence of Jagdip's involvement in the conspiracy.

She opined that based on similarities she perceived in the supporting asylum narratives, over 100

51

1  asylum applications filed by the law firm on behalf of Romanians as well as noncitizens of

2  various backgrounds contained an indicia of fraud.  (RT 3350-3665).

3     431.   The purpose of her testimony was to establish that the conspiracy was not limited

4  to the Sacramento defendants and the law firm's Romanian clients, but was so widespread

5  amongst all the applicants the firm represented that it extended to the firm's San Francisco office

6  and Jagdip.  (RT 3480).

7     432.   The purpose of Case Agent Webster's testimony was made clear by its heavy

8  focus on Jagdip, and was exploited by the prosecution's summation, which depended on

9  Webster's testimony to implicate Jagdip in the conspiracy.  (RT 6676-6677, 6694, 6704, 6711-

10  6712, 6722, 6736, 6741, 6746, 6760, 6674-6675, 7218-7219).

11  **2.     Case Agent Webster Testified Falsely, and the Prosecution Knew her**
12  **Testimony was False.**

13  **a.     Case Agent Webster falsely testified that she determined**
**Khera and Sarbjit had a *bona fide* marriage after meeting the**
14  **couple; DHS granted Sarbjit's I-130 and Khera's I-485 based**
**on the merits, not based on Khera's status as a prosecution**
15  **witness; and, the Khera immigration file contained an**
**evidentiary basis for DHS's approval.**
16

17     433.   There were numerous instances of Case Agent Webster knowingly providing false

18  testimony.

19     434.   First, Case Agent Webster repeatedly provided false testimony that she met Khera

20  and Sarbjit (RT 3517-3520, 3804-3805, 3818); and based on her meeting with the couple and

21  review of the Khera immigration file, she determined the couple's marriage was *bona fide*.

22  (RT 3517-3521, 3800-3818).

23     435.   Case Agent Webster in fact never met with Khera and Sarbjit, and thus did not

24  make an assessment of the *bona fides* of their marriage based on such a meeting and the Khera

25  immigration file.

26     436.   Her testimony that she had done so was knowingly false.

27     437.   Second, Case Agent Webster also knowingly provided false testimony that DHS's

28  Fresno office approved Sarbjit's immigrant petition filed on Form I-130 and Khera's

52

accompanying adjustment of status application on Form I-485 based on a meritorious and evidentiary basis in February 2007, as opposed to doing so based on Khera's status as a prosecution witness.  (RT 3517-3521, 3814-3818).

438.   In 2004, DHS's San Francisco office transferred the Khera immigration file to Case Agent Webster.  The transfer resulted in the interruption of the San Francisco DHS adjudicating officer's efforts to investigate whether Khera's marriage to Sarbjit, as well Khera's marriage to Diaz, was a sham.  The San Francisco DHS officer concluded that evidence submitted by Sarbjit and Khera, including their testimonial evidence, was insufficient to establish the *bona fides* of their marriage and warranted an investigation into whether it was a sham.

439.   At some point Khera and Webster met, and Webster thereafter maintained telephonic contact with Khera.  (RT 1747-1748, 3520).

440.   During this period, Khera urged Webster to assist him to secure a favorable adjudication of the I-130 and I-485.  (RT 3519-3520, 3814-3815).

441.   In December 2006, after the prosecution's filing of the indictment that set forth the submission of Khera's asylum application as a Count 1 overt act, Case Agent Webster transferred the Khera immigration file to the Fresno DHS office requesting an adjudication, and identifying Khera as a "key witness" who was "crucial" to the prosecution's indictment against Jagdip.

442.   By December 2006, when Case Agent Webster transferred the Khera immigration file to DHS's Fresno office for adjudication of Sarbjit's I-130 and Khera's I-485, according to Sarbjit's and to Khera's divorce petition, the couple had long been separated.  As a result, they never appeared before the Fresno DHS office for an adjudication of their I-130 and I-485, or submitted any evidence to Fresno DHS's office to support the *bona fides* of their marriage.

443.   DHS Fresno's office, nonetheless, in 2007 approved the I-130 and I-485, resulting in granting legal permanent residency to Khera.

444.   DHS's Fresno office then returned the Khera immigration file to Case

445.   Agent Webster with no indication of the Fresno DHS office approving the I-130 and I-485 based on an evidentiary basis.

446.    Nevertheless, at trial, after reviewing the Khera immigration file, Case

447.    Agent Webster falsely testified that Fresno DHS's office conducted an adjudication independent of her request accompanying the transfer of the file, and approved the I-130 and I-485 based on its merits.  (RT 3814-3819).

448.    Her testimony was knowingly false, as was her testimony that the file contained evidence supporting the *bona fides* of Khera's marriage to Sarbjit.  (see RT 3811).

> **b.    The prosecution knew Case Agent Webster's testimony was false.**

449.    Case Agent Webster was a member of the prosecution team and therefore, unmistakably, "the prosecution knew or should have known" Case Agent Webster's testimony "was actually false." *See United States v. Basham*, 789 F.3d 358, 376 (4th Cir. 2015) ("Testimony by a law enforcement officer that is knowingly false or misleading is 'imputed to the prosecution.'"), *quoting Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998) (*citing Giglio v. United States*, 405 U.S. 150, 153 (1972)); *Jackson*, 513 F 3d at 1075 (same).

450.    Moreover, with respect to Case Agent Webster's false testimony regarding the basis of DHS granting legal residency, the Case Agent so testified after Judge Damrell directed the prosecution to confirm whether, as Khera had testified, DHS granted him legal residency based on the merits of the I-130 and I-485, not his status as a prosecution witness.  (RT 1761-1765).

451.    Judge Damrell so directed the prosecution because Khera's testimony was implausible and suggested he may have committed perjury.  (RT 1761-1765).

452.    Judge Damrell thus reinforced the prosecution's pre-existing duty to ensure that the prosecution truthfully represented to the court, the jury, and defendants, the accurate basis for the Fresno DHS office granting Khera legal permanent residency.  *Morris v. Ylst*, 447 F.3d 735, 743-744 (9th Cir. 2006).

453.    AUSA Wagner's immediate reply was to assure Judge Damrell that the *bona fides* of Khera's marriage to Sarbjit had been "fully investigated by ICE."  (RT 1763).

454.    The prosecution thereafter knowingly presented Case Agent Webster's false testimony that:

    1)    she met Khera and Sarbjit, and after reviewing their immigration file with them, she determined that their marriage was *bona fide* – she never did;

    2)    the Fresno DHS office granted Khera legal permanent residency based on the merits of the I-130 and I-485, not his status as a prosecution witness – she knew DHS did not; and,

    3)    the Khera immigration file contained an evidentiary basis for the approval of the I-130 and I-485 – it did not.

455.    The prosecution cemented its deceit when in response to Judge Damrell's directive to confirm the basis of DHS granting Khera legal residency, the prosecution cloaked rather than corrected Khera's and the Case Agent's perjury.  (RT 1763-1765).

### 3.    Case Agent Webster's False Testimony was Material.

**a.    The *Napue* violation involving Case Agent Webster's perjury was material because if her perjury was revealed to the jury, it would have irreparably damaged the prosecution's overall credibility and wholly undermined its most important evidence with respect to Jagdip – her opinion that over 100 asylum applications filed by the law firm were fraudulent.**

456.    Case Agent Webster's perjury is material under *Napue* if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (*en banc*), (*quoting Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir. 2003)).

457.    The materiality analysis requires the determination "whether there was any reasonable likelihood that the presentation of false testimony or failure to correct the record once the false evidence was presented 'could have affected the judgement of the jury.'"  *Hayes*, 399 F.3d at 988 (*quoting Belmontes*, 350 F.3d at 881).

458.    As the parties agreed during the trial, the materiality of Case Agent

459.    Webster's perjury cannot be overstated.

55

460.    If the record was corrected and Case Agent Webster's perjury was thereby exposed to the jury, it would have destroyed her credibility, and the prosecution's case, at least with respect to Jagdip, would have unraveled.  *See Jackson*, 513 F.3d at 1077.

461.    It was principally her opinion testimony that the prosecution argued established that the alleged criminal conspiracy was not limited to the Sacramento defendants advancing fraudulent Romanian asylum claims, but extended to Jagdip in San Francisco and the law firm's non-Romanian asylum claims.

462.    The exposure of Case Agent Webster's perjury would have discredited her testimony and thereby wholly undermined her opinion so vital to the prosecution:  the criminal conspiracy included the law firm's non-Romanian asylum applicants and implicated Jagdip.  *See Jackson*, id.

463.    In fact, it would have been impossible for the prosecution to extricate

464.    Case Agent Webster's perjury from her opinion testimony, because her perjury surrounding Khera involved her purported grounds for forming an opinion regarding whether or not a noncitizen, in this instance Khera, was engaged in immigration fraud.

465.    Exposed, her perjury reveals that Case Agent Webster did not genuinely assess the truthfulness, or lack thereof, of a noncitizen's application for immigration relief.

466.    Case Agent Webster instead readily lied to the jury to advance her "opinion" as to whether or not a noncitizen engaged in fraud.

467.    She, moreover, advanced immigration fraud on behalf of a noncitizen to secure him as a prosecution witness, and proceeded to cover-up her misdeeds through a conspiracy to falsely testify that the underlying application was actually *bona fide*.

468.    The fact is that it is unfathomable that if Case Agent Webster's perjury was exposed, Judge Damrell would have favorably exercised his discretion to admit her opinion testimony and the associated summary charts.

469.    The revelation of Case Agent Webster's perjury would have thus disarmed the prosecution of its most significant evidence to support its theory of its case against Jagdip, and

56

1    was therefore material.  *See Hayes*, 399 F. 3d at 988 (*Napue* violation is material where the

2    correcting record would have a "devastating effect" on the prosecution).

3              **b.      The *Napue* violation involving Case Agent Webster's perjury is**
              **material because, if her perjury was revealed to the jury, both**
4             **Count 1 overt acts related to non-Romanian applicants would**
              **have imploded.**
5

6        470.    Of course, if Case Agent Webster's perjury was exposed, it would have also

7    devastated Khera's testimony just as it would have devastated her own.

8        471.    Khera, like Case Agent Webster, would have been evinced as a perjurer, mired in

9    immigration fraud and engaged in a conspiracy with the prosecution to conceal it.

10       472.    Yet by virtue of its deception, the prosecution succeeded in convincing Judge

11   Damrell to instruct the jury that Khera did not receive an immigration benefit as a result of his

12   status as a prosecution witness.

13       473.    Thus the shockingly perverse theme the prosecution both expressly and implicitly

14   conveyed to the jury that Khera was the most trustworthy of all its witnesses – aside from the

15   Case Agent of course – was sealed by jury instruction.  (RT 7203-7204).

16       474.    The reason why the prosecution went to such pernicious lengths to deceive the

17   court and the jury was because Khera was, indeed, "key" and "crucial."

18       475.    Khera was so "key" and "crucial" when Judge Damrell suspected that Khera's

19   testimony was untruthful, he *sua sponte* required that Khera shall be made available to be

20   recalled.  (RT 1761).

21       476.    Khera was, in fact, the only non-Romanian former client of the law firm who was

22   the subject of a Count 1 overt act serving as a prosecution witness.

23       477.    Khera was thus a "key" and "crucial" witness for extending the Count 1

24   conspiracy to non-Romanians, particularly to Indian nationals from Punjab, so the prosecution

25   could argue that the conspiracy was firm-wide involving applicants from all nationalities, *inter*

26   *alia*, Nepalis and Fijians.

27

28

478.    The revelation of Case Agent Webster's perjury also exposed Khera as a perjurer, and thus undercut the credibility of the only non-Romanian witness who was the subject of a Count 1 overt act.

479.    Additionally, the remaining Count 1 overt act involving a non-Romanian – the filing of M.S.'s asylum application by Jagprit – would also have been undercut by the revelation of Case Agent Webster's testimony.  Exh. B, p. 12, ¶32.

480.    The allegations that Jagprit's filing of M.S.'s asylum application was in furtherance of a criminal conspiracy solely rested on Case Agent Webster's opinion that similarities in his asylum claim compared with others filed by the law firm indicated it was fraudulent.  (RT 3583-3585); (RT 3590-3593); (RT 3569-3665).

481.    Case Agent Webster's opinion testimony, of course, is annihilated by the revealing of her perjury to the jury.

482.    Therefore, like in the instance of the overt act involving the filing of Khera's asylum application, the revelation of Case Agent Webster's perjury destroys the evidentiary basis for the alleging that the filing of M.S.'s asylum application was in furtherance of the Count 1 conspiracy.

483.    In other words, the two Count 1 overt acts involving non-Romanians do not survive the Case Agent's perjury.

484.    As a result, the *Napue* violation involving Case Agent Webster's perjury establishes that the Count 1 conspiracy was limited to the Sacramento defendants' advancing fraudulent Romanian asylum applications, and did not involve Jagdip.

485.    If Case Agent Webster's perjury was revealed to the jury, "an entirely different trial would have occurred," as the Count 1 allegation would have been stripped of its allegations supporting its theory of its case against Jagdip.  *Hayes*, 399 F.3d at 987-988.

486.    Accordingly the *Napue* violation was material.  *Hayes*, id.

58

        c.    **The domino effect of the revelation of Case Agent Webster's testimony would adversely impact every dimension of the prosecution theory of its case against Jagdip, including its reliance on the testimony of Davinder Singh.**

487.　By virtue of Khera's testimony, coupled of course with Case Agent Webster's opinion testimony, the prosecution was perfectly positioned to argue that conduct that was consistent with Jagdip's professional duties as an attorney was actually in furtherance of a criminal conspiracy.  (RT 7187).

488.　For example, Davinder Singh, an Indian national from Punjab, testified that:  his fear of persecution in India was genuine but Jagprit fabricated elements of his asylum claim to strengthen it, and then filed it on his behalf; he later met Jagdip at the law firm's San Francisco office prior to his scheduled asylum interview before DHS, but he never told Jagdip that his asylum claim was partly fraudulent; and, Jagdip, fulfilling his professional duties to Davinder Singh, prepared him for his asylum interview where he was represented by Manjit.

489.　Due to Khera's testimony, and Case Agent Webster listing Davinder Singh on a chart based on her opinion that his asylum application carried an indicia of fraud (RT 3580), the prosecution was able to argue that Jagdip's apparent performance of his professional duties was actually motivated by fraudulent intent.  (RT 7187).

490.　The nullification of Case Agent Webster's and Khera's testimony due to their perjury eliminates the prosecution's predicate to argue that Jagdip's advocacy on the part of Davinder Singh was criminally motivated.

491.　Additionally, the revelation that Case Agent Webster was untruthful regarding her managing of the prosecution witnesses and what benefits were provided to them to secure them as prosecution witnesses would have further upended the prosecution, particularly with respect to its case against Jagdip.

492.　Again, in the instance of Davinder Singh, he testified that he agreed to testify for the prosecution only after Case Agent Webster threatened that if he did not so cooperate, DHS would remove him to India, his fear of persecution notwithstanding; but, if he did cooperate with the prosecution, DHS would grant him legal residency.  (RT 2262-2263, 2276-2277).

493.    Case Agent Webster denied Davinder Singh's account.  (RT 3521-3524).

494.    However, the revelation that Case Agent Webster committed perjury regarding her handling of prosecution witnesses such as Khera would support the conclusion that Davinder Singh was truthful and Case Agent Webster was untruthful regarding how she secured him as a prosecution witness; he agreed to testify for the prosecution so that he may remain in the United States and avoid future persecution in India; and, therefore, because he was testifying under a threat of removal to the country where he feared torture, his testimony was not reliable.

495.    Like Khera's, Davinder Singh's testimony does not survive Case Agent Webster's perjury.

496.    Inescapably, both the major and minor pieces of the evidence supporting the prosecution's theory of its case against Jagdip that the conspiracy was not limited to the Sacramento defendants advancing fraudulent Romanian asylum claims are wholly undermined by Case Agent Webster's perjury.

497.    As a result, the theory of the prosecution's case with respect to Jagdip – that the criminal conspiracy was not just limited to the Sacramento defendants advancing fraudulent asylum claims on behalf of Romanians, but was firm-wide involving non-Romanian claims as well – in light of Case Agent Webster's perjury, is without any support.

498.    Accordingly, it is beyond dispute that the *Napue* violation involving Case Agent Webster's perjury was material, because if she was discredited based on her perjury, it undoubtedly "could have affected the judgment of the jury."  *Hayes*, 399 F.3d at 988.

499.    This Court should thus vacate the judgement and sentence in this case.  *Hayes,* id. at 988.

**C.    THE PROSECUTION VIOLATED NAPUE BY KNOWINGLY PRESENTING RANBIR KHERA'S FALSE TESTIMONY.**

**1.    The Prosecution Suborned Ranbir Khera's Perjury**

500.    Ranbir Khera falsely testified and the prosecution knew he had done so.

501.    Ranbir Khera falsely testified that:

1            1)      he and his wife Sarbjit together met with Case Agent Webster – no such meeting ever occurred (RT 1703-1705, 3517-3521); and,

2)      he received no benefit as a result of his status as a prosecution witness (RT 1747-1749) – Khera was, of course, aware that the Fresno DHS summarily granted him legal permanent residency in February 2007 at a time when he and his wife had long been separated.

502.    The prosecution was aware that Khera's testimony was false in these respects.

503.    The prosecution, in fact, conspired with Khera not only to present the false testimony, but also to conceal the truth from the court, the jury, and Jagdip.

504.    In fact, at the instruction of the prosecution, Khera waited until after the end of the trial and Jagdip's conviction in June 2009, to file his divorce petition dissolving his marriage with Sarbjit, even though Sarbjit left Khera in 2003 and the couple had not seen one another since.

505.    It was ultimately the discovery of the divorce petition that led to the investigation and ultimate discovery of the *Napue* violation.

## 2.    Ranbir Khera's False Testimony Was Material.

506.    As discussed in the context of the *Napue* violation related to Case Agent Webster's false testimony, the exposing of her testimony as false also exposes the falsity of Khera's testimony.

507.    And the exposure of Khera's testimony as false would have affected the judgment of the jury, given the benefit he received in exchange for his testimony; and, his willingness to commit perjury to conceal it.

508.    His "key" and "crucial" testimony would have been discredited.

509.    Similarly, the exposure of Khera's testimony as false operates to expose the falsities in Case Agent Webster's testimony.

510.    As a result, the materiality of Khera's false testimony is not based solely on weighing the undermining of his testimony by virtue of his perjury, but also weighing the related undermining of Case Agent Webster's testimony by virtue of her perjury.

61

1    511.    Accordingly, the *Napue* violation involving Khera's false testimony was material,

2    and entitles Jagdip to relief under § 2255(a).  *See Hayes*, 399 F. 3d at 988.

3    **D.    THE PROSECUTION VIOLATED NAPUE BY KNOWINGLY**
     **PRESENTING FALSE EVIDENCE AND TESTIMONY THROUGH**

4    **DAVINDER SINGH.**

5    **1.    The Prosecution Knowingly Presented False Evidence and Testimony**
     **through Davinder Singh.**

6

7    **a.    The Prosecution knowingly presented false evidence that**
     **Government Exhibit 61.4.4 was presented to Davinder Singh**

8    **during his preparation.**

9    512.    During Davinder Singh's direct examination, when AUSA Wagner sought to ask

10   Davinder questions regarding Government Exhibit 61.4.4, the law firm's copy of his asylum

11   application, the defendants objected.

12   513.    The objection prompted Judge Damrell to seek clarification from AUSA Wagner

13   whether 61.4.4 had been presented to Davinder during his preparation with Jagdip and Manjit at

14   the law firm's San Francisco office.  (RT 2160).

15   514.    AUSA Wagner falsely responded "yes."  (RT 2160).

16   515.    AUSA Wagner's false response constitutes evidence, and that evidence secured

17   the admission of 61.4.4.

18   516.    Moreover, AUSA Wagner knew or should have known that his proffer was false

19   because:

20   1)    he knew Government Exhibit 7.3 was the copy of the asylum narrative in
           Davinder's possession, not 61.4.4.  (RT 2140-2150, 2158).
21

22   2)    Davinder clarified on cross-examination he never had a copy of 61.4.4 with him;
           it was not his copy; and he could not recall ever seeing it before.  (RT 2149-
23         2150).

24   3)    he had no independent basis for believing Davinder ever saw 61.4.4 before he
25         himself presented it to Davinder.

26   517.    Nevertheless, AUSA Wagner never corrected his misrepresentation that resulted

27   in the admission of 61.4.4.

28

1

2

               **b.**     **The prosecution knowingly presented false testimony that the dates written in Exhibit 61.4 .4 were in Jagdip's handwriting.**

3        518.    During Davinder Singh's direct examination, AUSA Wagner elicited false

4 testimony that Jagdip wrote three dates on 61.4.4, and therefore Jagdip supplied those dates.  (RT

5 2161-2162).

6        519.    The handwriting was not Jagdip's, but Manjit Rai's.

7        520.    The prosecution team was readily able to distinguish Jagdip's handwriting from

8 Manjit's; throughout the trial they correctly identified and distinguished the handwriting of the

9 two defendants; and, had identified Manjit's on 61.4.4 and distinguished it from Jagdip's

10 scribbles.  (RT 4004-4008).

11       521.    The discernibility of the defendants' handwriting was, in fact, a cornerstone of the

12 prosecution's case.  (RT 3874, 4004-4008).

13       522.    Moreover, the falsity of Davinder Singh's testimony was crystallized on cross-

14 examination when he himself testified he was merely speculating whose handwriting was on

15 61.4.4 (RT 2249-2250), he could not recognize Jagdip's handwriting (RT 2249-2250), and he

16 had no recollection of any conversation regarding a date.  (RT 2253).

17       523.    Accordingly, the prosecution was aware, or should have been aware, that the

18 handwriting at issue was Manjit's and not Jagdip's.

19           **2.**     **Davinder Singh's False Testimony was Material.**

20       524.    In addressing Jagdip's challenge to the sufficiency of the evidence, the United

21 States Court of Appeals for the Ninth Circuit singled out Davinder's false testimony that the

22 handwriting on 61.4.4 was Jagdip's and hence he supplied the dates at issue.  *See United States v.*

23 *Harmath*, 2014 WL 3766994, ¶5 (9th Cir. 2014).

24       525.    Based on an argument presented by the prosecution in its brief to the Ninth

25 Circuit, the Court of Appeals relied on Davinder Singh's false testimony to reject Jagdip's

26 argument regarding the insufficiency of the evidence to support his conviction.  *Harmath*, id.

27       526.    Thus, the prosecution has argued and the Ninth Circuit has found that Davinder

28 Singh's false testimony regarding 61.4.4 could have affected the judgment of the jury and

therefore was material.  *See Harmath*, id.; *See also United States v. Bagley*, 473 U.S. 667, 679-680 (1985) (*Napue* violation "is considered material unless failure to disclose it would be harmless beyond a reasonable doubt.")

527.    As a result, the judgement and sentence in this case must be vacated.  *See Hayes*, 399 F. 3d at 988.

**E.    THE PROSECUTION VIOLATED *NAPUE* BY FAILING TO INVESTIGATE AND CORRECT THE FALSE TESTIMONY IT ELICITED FROM MOJADDIDI.**

**1.    The Prosecution Failed to Investigate Mojaddidi's testimony that it Suspected was False.**

**a.    Wazhma Mojaddidi provided testimony that the defendants alleged was perjurious, and the prosecution knew was false.**

528.    The parties at trial agreed that Mojaddidi testified falsely as to a material aspect of her claimed experiences with the law firm.

529.    Horton-Ballard's explanation of the State Bar's intake policy and procedures evidenced that Mojaddidi testified falsely regarding calling the State Bar to file any anonymous complaint on two separate occasions, and on both those occasions a State Bar agent refused to accept her complaint on the ground that Mojaddidi sought to file it anonymously.

530.    The defense's position was that Mojaddidi's testimony was clearly perjurious. Given that the State Bar accepts and duly acts on anonymous complaints, and "never" refuses to accept such complaints, Mojaddidi deliberately fabricated her testimony that:

1)    she sought to report the fraud she uncovered at the law firm by filing an anonymous complaint but when she attempted to do so, she was thwarted by a State Bar agent on the erroneous grounds that the State Bar does not accept anonymous complaints;

2)    she thought the agent may have been misinformed about the State Bar's policy; so,

3)    she called the State Bar a second time to attempt to file her complaint and another misinformed agent prevented her from doing so.

64

531.    The prosecution apparently took the position that Mojaddidi's testimony was false, but was not perjurious.

532.    The prosecution articulated its position during summation, conceding that the State Bar agents did not tell her that she cannot file an anonymous complaint, and thus her testimony to the contrary was false.  (RT 7207).

533.    The prosecution, however, explained to the jury that after the State Bar advised Mojaddidi she cou1d file a complaint, she chose not to.  She chose not to, according to the prosecution, because of the difficulties associated with filing an anonymous complaint.  (RT 7207).

534.    Although the parties disagreed whether her testimony was deliberately false, the parties agreed it was false.  (RT 7207).

> **b.    The prosecution violated *Napue* by failing to investigate whether Mojaddidi's false testimony was perjurious.**

535.    Horton-Ballard's testimony created a ready inference that Mojaddidi committed perjury.

536.    To counter this facile inference, the prosecution reconstructed Mojaddidi's testimony by claiming that she testified that she chose to forego filing a complaint, when, in fact Mojaddidi testified she was determined to do so but the State Bar agents prevented her from filing her complaint anonymously.

537.    The prosecution's attempt to reconstitute Mojaddidi's testimony was born from a concern that she may have committed perjury and was unlawful.

538.    "When a prosecutor suspects perjury, the prosecutor must at least investigate." *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006).

539.    "This principle is supported by *Mooney*, *Napue*, and their progeny… In *Napue*, the Court elaborated on the prosecutor's role noting that 'the district attorney has the responsibility and the duty to correct what he knows to be false and elicit the truth.'"  *Morris*, 447 F.3d at 745 (*quoting Napue v. Illinois*, 360 U.S. 264, 270 (1959)); *see also*, *United States v. Price*, 566 F.3d 900, 910, fn. 11 (9th Cir. 2009).

65

540.    *Napue's* imperative stems from a criminal defendant's due process rights under the Constitution.  *Napue*, 360 U.S. at 269-270.

541.    The prosecution here failed to investigate its suspicion that Mojaddidi committed perjury and rather tried to "finesse the problem" by patently misleading the jury regarding her testimony.  *Morris*, 447 F.3d 744.

542.    Mojaddidi's August 2014 deposition establishes that if the prosecution would have pursued the "diligent and good faith" investigation the Constitution required of it, *see Morris*, id., such an investigation would have confirmed the defense's allegation that Mojaddidi committed perjury.

543.    Mojaddidi provided her sworn testimony in a deposition conducted in connection with the § 2255 proceedings in case 05-cr-240 prosecuted by the Office of the United States Attorney for the Eastern District before Judge Burrell.

544.    The gravamen of the § 2255 motion is that Mojaddidi's representation of the defendant Hamid Hayat was ineffective, in large part due to her inexperience.

545.    As a consequence, one of the areas explored in Mojaddidi's deposition was her experience or lack thereof prior to her undertaking Hayat's representation.

546.    In a question posed directly by Hayat's counsel regarding her work experience in May 2002 until her opening her own solo practice in December 2003, she made no mention of her employment with the law firm, asserting, "I wasn't working."

547.    When asked the same questions at the trial in this case that was posed by Hayat's counsel at her deposition – "Did you seek employment after graduating from McGeorge Law School?" – she responded, "Yes, I did…ultimately worked for the Sekhon and Sekhon law firm. I began in October of 2003."  (RT 798).

548.    At her 2014 deposition, she failed to mention her employment with the law firm even though she mentioned other, less significant employment she secured through her relationship with Jagdip, her "attorney friend," "some projects here and there;" and, working under his supervision at the Davis law school.

66

549.    In other words, Mojaddidi effectively denied working at the law firm even though in the very same building where her deposition was conducted, she had "dramatically" testified at Jagdip's trial that her employment at the law firm was her "first job," which turned out to be an "emotional," life "jarring" experience due to the fraud she had uncovered and attempted to heroically combat.  Exh. HH.

550.    Mojaddidi's 2014 deposition squarely conflicts with her trial testimony, and evinces a readiness on the part of Mojaddidi in both instances to prevaricate under oath.

551.    Horton-Ballard's testimony provided irreproachable evidence that Mojaddidi testified falsely at the trial in this case and forcefully indicated that she committed perjury.

552.    When confronted with a serious concern of whether Mojaddidi had committed perjury during the trial in this case, the prosecution violated *Napue* by failing to conduct a "diligent and good faith" investigation into those concerns.  *Morris* 447 F.3d at 744, (*quoting Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001)).

553.    Mojaddidi's 2014 deposition validated those concerns by confirming that Mojaddidi, in light of Horton-Ballard's testimony, committed perjury at Jagdip's trial.

>          **2.    The *Napue* Violation involving the Prosecution's Failure to Investigate
>                  and Correct Wazhma Mojaddidi's Suspect Perjury was Material.**

554.    The prosecution devoted substantial portions of its summation to argue that Mojaddidi's testimony supported the allegation that Jagdip was guilty of criminal conspiracy. (RT 6745, 7204-7207).

555.    Specifically, the prosecution argued that Mojaddidi's testimony regarding her experiences with the law firm, including her discussion with Jagdip, provided direct evidence of his knowledge of the Sacramento conspiracy.  (RT 6745, 7204-7207).

556.    To this end, the prosecution miscast Mojaddidi's testimony and provided pages of elaborate explanations to deflect the defense's allegations that she committed perjury. (RT 7204-7207).

557.    Mojaddidi was thus uniquely important amongst the prosecution witnesses with respect to Jagdip, because she provided the only "direct" evidence of Jagdip's alleged

67

1   criminality. See Exhibit D, Amended Answering Brief of the United States in *United States v.*

2   *Harmath*, ("Exh. D"), pp. 40-41

3        558.   As the prosecution explained, "The jury need not have relied on this

4   circumstantial evidence of Jagdip Sekhon knowing participation in the fraud scheme.  However,

5   Wazhma Mojaddidi, an associate at the firm, described to the jury confronting him regarding the

6   fraudulent asylum applications presented by the firm and his response that if she was

7   uncomfortable doing those applications, she should find other work in the firm to do."  Exh. D,

8   pp. 40-41.

9        559.   If the prosecution complied with its Constitutional obligations and investigated

10  and reported Mojaddidi's perjury to the jury, it "would surely have called into question the truth

11  of all [her] testimony."  *Jackson*, 513 F.3d at 1077.

12       560.   The resulting void would have left the prosecution without any direct evidence of

13  Jagdip's involvement in the Sacramento conspiracy to advance fraudulent asylum applications.

14  *See Hayes*, 398 F .3d at 985 (In cases where "[n]early all of the other evidence against" a

15  defendant is "circumstantial," *Napue* violation involving prosecution witness who provides

16  "direct" evidence is material).

17       561.   Because of the unique position Mojaddidi's testimony occupied in the

18  prosecution's theory of its case against Jagdip, there is certainly a "reasonable likelihood" that

19  the complete undermining of her credibility could have affected the judgment of the jury.'"  See

20  *Hayes*, 399 at 984; see also, *Jackson*, 513 F.3d at 1078 (Unique position of witnesses' testimony

21  in prosecution's theory of its case makes *Napue* violation material).

22       **F.    THE CUMULATIVE EFFECT OF THE NAPUE VIOLATIONS**
             **COMPELS DISMISSAL OF THE INDICTMENT.**
23

24       562.   There is a reasonable likelihood that each of the *Napue* violations could have

25  affected the judgment of the jury.  Resultantly, even if each of the *Napue* violations were

26  considered and weighed independently of one another, Jagdip would be entitled to habeas relief.

27       563.   Case Agent Webster was the embodiment of the prosecution, integral to all its

28  phases.  Moreover, her opinion testimony was the most important piece of prosecution evidence

                                          68

1    pertaining to Jagdip. Her credibility, thus, was indispensable with respect to the prosecution's

2    case, particularly against Jagdip.  And if her credibility is undermined, so is the prosecution's

3    case against him.  Therefore, the *Napue* violation involving Case Agent Webster was material.

4         564.    Ranbir Khera's testimony was also undeniably material as evidenced by Judge

5    Damrell's express attempt to ensure the prosecution truthfully disclosed the basis for DHS

6    granting him legal permanent residency, and the prosecution's calculus not to do so and decision

7    to mislead the court, Jagdip, and ultimately the jury that Khera was granted legal residency based

8    on the merits of the I-130 and I-485.  The fact that the prosecution engaged in an elaborate

9    scheme of deception with respect to Khera is conclusive proof of the materiality of his

10   credibility, which was due to him being:  the only non-Romanian asylum applicant who was the

11   subject of a Count 1 overt act testifying as a prosecution witness; the only Indian national who

12   was the subject of a Count 1 overt act; and, the only non-Romanian who testified that the law

13   firm applied for asylum on his behalf although he did not have a genuine fear of persecution.

14        565.    The *Napue* violation resulting from the prosecution's failure to investigate

15   Mojaddidi's perjury was also material because her testimony was the only direct evidence the

16   prosecution identified that linked Jagdip to the Sacramento conspiracy.

17        566.    Thus, Khera's testimony was necessary to extend the Count 1 conspiracy beyond

18   the Sacramento defendants and the Romanian asylum applicants, and thereby implicate Jagdip.

19   Accordingly, the *Napue* violation involving Khera was material.

20        567.    Finally, as set forth, based on the Ninth Circuit's finding, the *Napue* violation with

21   respect to Davinder Singh is also material.

22        568.    Because of the materiality of each of the *Napue* violations, Jagdip's conviction

23   should be set aside.  *See United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011).

24        569.    Although independently material, the *Napue* violations and their effect on the

25   fairness of the trial must be weighed collectively to determine the appropriate remedy.  *Jackson*,

26   513 F.3d at 1071.

27

28

570.     Examining the *Napue* violations collectively and the underlying prosecutorial misconduct, in addition to setting aside Jagdip's conviction, the Court should dismiss the indictment.  *See United States v. Barrera-Moreno,* 951 F.2d 1089 (9th Cir. 1991).

571.     In this case the false testimony was not merely the prosecution concealing the extension of a benefit to a witness.  The false testimony involved a conspiracy between a "key" and "crucial" witness and the prosecution to fabricate a meeting to further the concealment of the fact that DHS granted legal permanent residency to Khera based on his status as a prosecution witness, notwithstanding his ineligibility.

572.     The prosecution audaciously continued to advance its elaborate scheme even ***after*** Judge Damrell advised the prosecution at side bar and in open court that Khera's testimony did not appear credible and he wanted the prosecution to investigate the basis of DHS granting Khera legal residency.  Thereafter, the prosecution presented Case Agent Webster's false testimony corroborating Khera's false testimony and ultimately convinced Judge Damrell that Khera and the Case Agent testified truthfully.

573.     The end result was that Judge Damrell instructed the jury to embrace the prosecution's deception regarding Khera.  Specifically, he did not include Khera on the list submitted to the jury of prosecution witnesses who received an immigration benefit as a result of their willingness to testify, and whose testimony Judge Damrell advised the jury to view with caution.

574.     "A court may dismiss an indictment under its supervisory powers only when the defendant suffers 'substantial prejudice,' and where no lesser remedial action is available." *United States v. Chapman,* 524 F.3d 1073, 1087 (9th Cir. 2008) (internal citations omitted).

575.     The prosecution's *Napue* violations substantially prejudiced Jagdip by violating his constitutional due process right to a fair trial.  *See, e.g. Chapman*, 524 F. 3d at 1086 (Due process violation, such as a *Brady* violation, may support a dismissal of an indictment).

576.     And, in light of the fact that he will have served his underlying sentence by the time this Court resolves this motion, no lesser remedial action other than dismissal is available.

70

577.    Finally, the prosecution's *Napue* violations were flagrant and epitomized bad faith litigation tactics with reckless disregard for the justice system.

578.    Thus dismissal of the indictment is warranted "to implement a remedy for the violation of a statutory or constitutional right; to preserve judicial integrity by ensuring a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Simpson,* 927 F.2d 1088, 1090 (9th Cir. 1991), *abrogated on other grounds by United States v. W.R. Grace,* 526 F.3d 499, 511 fn.9 (9th Cir. 2008).

**V.    CLAIM #2: THE PROSECUTION FAILED TO REVEAL ITS CONSPIRACY TO CONCEAL THAT DHS GRANTED KHERA LEGAL PERMANENT RESIDENCY BECAUSE HE WAS A PROSECUTION WITNESS, AND CONSEQUENTLY VIOLATED JAGDIP'S DUE PROCESS RIGHTS UNDER BRADY AND GIGLIO, WARRANTING DISMISSAL OF THE INDICTMENT OR ALTERNATIVELY A NEW TRIAL.**

579.    Movant realleges and incorporates in this paragraph each and every of the foregoing allegations.

**A.    *BRADY***

580.    *Brady v. Maryland,* 373 U.S. 83 (1963), obliges the government to provide exculpatory evidence to a criminal defendant.

581.    Impeachment evidence is exculpatory evidence.  *Giglio* 405 U.S. at 154 (1963); *United States v. Bagley,* 473 U.S. 667, 676 (1985); *United States v. Brumel-Alvarez,* 991 F.2d 1452, 1461 (9th Cir. 1993) (Under *Brady* and *Giglio* "material … that bears on the credibility of a significant witness in the case" is exculpatory).

582.    "[S]pecial immigration treatment" accorded by the United States immigration authorities to a prosecution witness is "highly relevant impeachment material."  *United States v. Blanco,* 392 F.3d 382, 392 (9th Cir. 1994).

583.    "Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned."  *Garringer v. Stewart,* 132 F.3d 463, 480 (9th Cir. 1997) *(en banc)*.

584.    The government violates *Brady* if:  1) the evidence at issue is favorable to the criminal defendant because it is either exculpatory or "bears on the credibility of a significant

71

1   witness in the case," *United States v. Brumel-Alvarez,* 991 F.2d 1452, 1461 (9th Cir. 1993); 2)

2   the government willfully or inadvertently suppressed the evidence; and 3) the suppressed

3   evidence was material, or failure to disclose the evidence prejudiced the defendant.  *Benn v.*

4   *Lambert,* 283 F.3d 1040, 1052-53 (9th Cir. 2002).

5       **B.      THE PROSECUTION VIOLATED BRADY BY FAILING TO DISCLOSE
                  ITS CONSPIRACY TO CONCEAL THAT DHS GRANTED KHERA**
6                 **LEGAL PERMANENT RESIDENCY BASED ON HIS STATUS AS A**
7                 **"KEY" AND "CRUCIAL" GOVERNMENT WITNESS.**

8           **1.      The Fact that the Prosecution Conspired to Conceal that DHS
                      Granted Khera Legal Permanent Residency Based on his Status as a**
9                     **Prosecution Witness was Invaluable Evidence for Impeaching Khera**
                      **and Case Agent Webster.**
10

11      585.    The fact that DHS, due to his status as a prosecution witness, granted

12      586.    Khera legal permanent residency based on his marriage to Sarbjit, even though

13   the agency suspected their marriage was fraudulent, was invaluable evidence for Jagdip to

14   impeach two significant prosecution witnesses:  Ranbir Khera and Case Agent Carol Webster.

15      587.    "Special immigration treatment" is "highly relevant impeachment material."

16   *Blanco,* 392 F.3d at 392.

17      588.    DHS's granting of legal permanent residency to Khera was especially relevant

18   because the agency unlawfully did so based on a fraudulent petition and application that would

19   have resulted in his removal to India.

20      589.    Consequently, Khera's incentive to lie in order to secure the most favorable of all

21   immigration treatment was overwhelming.

22      590.    And, unsurprisingly, he enthusiastically did commit perjury for the prosecution,

23   something Jagdip could have established if the prosecution would have complied with its *Brady*

24   obligations and revealed that DHS granted Khera legal permanent residency based on his status

25   as a prosecution witness.

26      591.    Moreover, the evidence would have proved invaluable for impeaching

27      592.    Case Agent Webster.

28

593.    Case Agent Webster not only deliberately falsely testified that Khera was granted legal permanent residency based on the merits of the underlying I-130 and I-485, not his status as a prosecution witness.  She also engaged in a conspiracy with Khera to present false testimony to cover-up the fraud.

594.    If the prosecution would have revealed to Jagdip that the prosecution conspired to conceal that DHS granted Khera legal permanent residency based not on the merits of the I-130 and I-485 but on his status as a prosecution witness, it would have evidenced that she, like Khera, committed perjury.

595.    DHS unlawfully granting Khera legal permanent residency and the prosecution's conspiracy to conceal that it had done so was invaluable impeachment evidence for Jagdip.  *Cf. Jackson*, 513 F. 3d at 1076-1077 (Evidence of perjury operates to thoroughly impeach a witness); *see also Blanco*, 392 F. 3d at 392-395 (Deliberate failure to disclose immigration benefit to a witness is material and may warrant dismissal of indictment).

**2.      The Prosecution Conspired to Suppress that DHS Granted Khera Legal Permanent Residency Due to His Status as a Prosecution Witness.**

596.    The prosecution knowingly suborned Khera's and Case Agent Webster's perjurious testimony in order to deliberately misrepresent that Khera's marriage to Sarbjit was *bona fide;* and, DHS granted Khera legal permanent residency based on the merits of the I-130 and I-485.

597.    The prosecution deliberately misrepresented the basis of DHS granting Khera legal permanent residency as part of its conspiracy to suppress that DHS actually granted Khera legal permanent residency based on his status as a prosecution witness.

598.    Additionally, the prosecution suborned perjury from Khera and Case Agent Webster to further its conspiracy to cover-up the fact that DHS unlawfully granted Khera legal permanent residency.  Specifically, Khera and Case Agent Webster both falsely testified that Khera and Sarbjit met Case Agent Webster; Webster reviewed the Khera immigration file during that meeting with Khera and Sarbjit; and based on the meeting, the Case Agent was satisfied that their marriage was *bona fide.*  No such meeting occurred.

73

599.     The prosecution, in fact, advanced its conspiracy to suppress DHS's unlawful grant of legal permanent residency to Khera, even though Judge Damrell directed the prosecution to confirm whether or not it was doing so.

600.     The prosecution's response to Judge Damrell was to eventually falsely report to that it was not suppressing the fact that DHS did not grant Khera legal permanent residency based on his status as a prosecution witness.

601.     The prosecution thus engaged in outrageous conspiratorial misconduct to suppress the unlawful basis for DHS granting Khera legal permanent residency. *See Chapman*, 524 F. 3d at 1085-1088 (Discussing flagrant prosecutorial misconduct in context of *Brady* violation).

### 3.     The Prosecution's Conspiracy to Deliberately Suppress the Unlawful Basis for DHS Granting Khera Legal Permanent Residency was Material.

602.     A *Brady* violation is material when "there is a reasonable probability the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985).

603.     Case Agent Webster permeated every dimension of the prosecution and was designated as its representative.

604.     Consequently, the prosecution unequivocally represented on summation that the "result of the proceeding" turned on Case Agent Webster's credibility.

605.     If the fact was exposed that DHS granted legal permanent residency to Khera based on his status as a prosecution witness and not on the merits of the I-130 and I-485, the impeachment evidence would have proven Case Agent Webster perjured herself and conspired with a witness to cover it up with more perjurious testimony.

606.     The impeachment evidence would have thus destroyed Case Agent Webster's credibility, with immeasurable destructive ripple effects for the prosecution, and consequently destroyed the prosecution's case against Jagdip.

607.     The impeachment evidence would have destroyed Khera's credibility as well, whose testimony was a necessary component of extending the Count 1 conspiracy beyond the Sacramento defendants filing fraudulent Romanian asylum claims in order to implicate Jagdip.

608.    Considered cumulatively, it is certain that the result of the proceedings would have been different if the prosecution would have complied with its *Brady* obligations and informed Jagdip that the prosecution conspired to conceal that DHS granted legal permanent residency to Khera based on his status as a prosecution witness.  *See Kyles v. Whitley,* 514 U.S. 419, 436 (1995). ("Suppressed evidence is considered 'collectively, not item by item.'").

609.    The fact that the prosecution deliberately violated *Brady* operates to affirm that violation was material; the prosecution's conscious decision to violate *Brady* evidences its awareness of the crucial significance of Khera and Case Agent Webster's credibility to its case. *See Napue*, 360 U.S. at 270; *see also United v. Sedaghaty*, 728 F. 3d 885, 902-093 (9th Cir. 2013); *Silva v. Brown*, 416 F. 3d 980, 987 (9th Cir. 2005).

610.    The deliberateness of the *Brady* violation also establishes that in addition to vacating Jagdip's conviction, the appropriate remedy is dismissal of the indictment.  *See Blanco,* 392 F.3d at 395.

**VI.    CLAIM #3:  PETITIONER JAGDIP SEKHON'S SIXTH AMENDMENT RIGHT WAS VIOLATED BY HIS TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE DUE TO COUNSEL'S FAILURE TO INVESTIGATE SARBJIT KAUR.**

611.    Movant realleges and incorporates in this paragraph each and every of the foregoing allegations.

**A.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS**

612.    The Sixth Amendment of the Constitution entitles a criminal defendant to effective assistance of counsel.  *Strickland v. Washington,* 466 U.S. 668, 685 (1984).

613.    Effective assistance of counsel is necessary to ensure that a criminal defendant's trial is fair.  *Strickland,* 466 U.S. at 685.

614.    A criminal defendant's constitutional right to effective assistance includes the right to counsel of reasonable competence.  *Strickland,* id. at 696.

615.    A criminal defendant is denied effective assistance based on his counsel's incompetent performance if:  1) counsel's performance fell below an objective standard of reasonableness, and 2) had counsel performed competently, there is a reasonable probability that the result of the proceeding would have been different.  *Id.*

75

616.     A "reasonable probability" of a different result had counsel acted competently is less than a preponderance of the evidence, but instead is simply a probability to undermine confidence in the outcome. *Kyles v. Whitley,* 514 U.S. 419, 434-35 (1995); *Strickland,* 466 U.S. at 693, 695.

**B.     THE FAILURE OF JAGDIP'S COUNSEL TO INVESTIGATE SARBJIT KAUR FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS.**

617.     Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. "Tactical choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation." *Strickland,* id at 1109-1110.

618.     "[A] lawyer who fails adequately to investigate, and to introduce evidence that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Avila v. Galaza,* 297 F.3d 911, 919 (9th Cir. 2002).

619.     Jagdip's trial counsel made the obvious and correct tactical decision to attack the prosecution's evidence presented for the purpose of proving that the criminal conspiracy was not limited to the law firm's Romanian asylum applicants and the Sacramento defendants.

620.     Jagdip's trial counsel, as a result, vigorously cross-examined Case Agent Webster regarding: her opinion testimony, specifically challenging it as it related to non-Romanians she included on her summary charts (RT 3749-3760, 3767-3776, 3782-3787, 3841-3848); and, her managing of Khera and Davinder Singh and what benefits were extended to them as a result of their status as prosecution witnesses.  (RT 3796-3799, 3800-3819, 3820-3840).

621.     Jagdip's counsel also subjected Khera and Davinder Singh to rigorous cross-examination. (RT 1706-1765, 2249-2266).

622.     Moreover, he also presented four witnesses who were Indian asylum applicants. All four notably testified they had feared persecution in India, and the law firm genuinely and successfully presented their persecution claims to the immigration authorities.  (RT 4711, 4723-4738, 4803, 4808-4825, 4930, 4933-4948, 4975, 4984-4996, 6810, 6922-6923).

623.    However, despite his otherwise sound strategy, Jagdip's counsel failed to reasonably investigate potential witnesses who would have seriously, if not completely undermined the prosecution's case against his client.

624.    Namely, Jagdip's attorney did not attempt to speak to Sarbjit Kaur, even though the evidence at trial was clear that DHS Officer Villalon did not believe her marriage to Khera was *bona fide* but DHS nevertheless granted Khera legal permanent residency based on the marriage; and both Khera and Case Agent Webster testified that the couple's marriage was *bona fide* and that was the basis for DHS granting Khera legal permanent residency, not his status as a prosecution witness.

625.    A competent criminal defense attorney would have sought out and attempted to interview Sarbjit through an investigator to determine the veracity of Khera and Webster's seemingly facially implausible testimony.

626.    The failure of Jagdip's counsel to do so fell below an objective standard of reasonableness for a criminal defense attorney.

**C.    IF JAGDIP'S COUSEL WOULD HAVE INVESTIGATED SARBJIT KAUR IN ALL LIKELIHOOD THE RESULT OF THE PROCEEDING WOULD BE DIFFERENT.**

627.    If Jagdip had the benefit of competent counsel, his attorney would have interviewed Sarbjit Kaur.

628.    Sarbjit would have revealed, as she has, that her marriage to Khera was a "sham"; consequently she left Khera in 2003; she did not advance the immigrant petition she filed on her behalf after DHS interviewed her and Khera in July 2003; and, she never met Case Agent Webster.

629.    As a result, interviewing Sarbjit, and presenting her as a witness, would have exposed that Khera and Case Agent Webster perjured themselves to conceal the fact that the basis of DHS granting Khera legal permanent residency was not the *bona fides* of his marriage to Sarbjit, but Khera's status as a prosecution witness.

630.    Their perjury exposed, Khera and Case Agent Webster would have been discredited, and the prosecution's case against Jagdip would have been irreparably damaged.

77

631.    Therefore, if trial counsel would have performed competently, there is a reasonable possibility that the jury would not have found Jagdip guilty as alleged in Count 1. *See Kyles*, 514 U.S. at 434-435.

632.    As a result, Jagdip is entitled to the vacating of his conviction based on the ineffective assistance of his trial counsel.  *See Strickland*, U.S. at 693-695.

**VII.    CLAIM #4: PETITIONER JAGDIP SEKHON'S SIXTH AMENDMENT RIGHT WAS VIOLATED BY HIS TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE DUE TO COUNSEL'S FAILURE TO INVESTIGATE THE ALLEGED STATEMENT JAGDIP MADE TO MOJADDIDI.**

633.    Movant realleges and incorporates in this paragraph each and every of the foregoing allegations.

634.    According to Mojaddidi, after Manjit Rai had told her all the Romanian asylum claims filed by the law firm were not true, Mojaddidi confronted Jagdip with Manjit's statement. (RT 809-811).

635.    Mojaddidi quoted Jagdip replying, "Wazhma, those cases are handled by my brother *Jagprit Sekhon who runs the Sacramento office,* and you know what work I do." (RT 811) (emphasis added).

636.    Mojaddidi, at the time, had known Jagdip and his ex-wife for many years  (RT 799, 811, 835,-837); she had known Jagprit for some time and she knew he was Jagdip's brother (RT 805); she worked for Jagprit for a couple of months on Romanian asylum claims (RT 799, 801, 805, 817-824, 832-834, 838-863, 878); and, she knew that Jagprit exclusively managed and ran the Sacramento office (RT 799, 805-807, 904, 946-947), while Jagdip managed and ran the San Francisco office.  (RT 798-799, 801, 817, 947).

637.    Jagprit was Wazhma's boss.  (RT 798-799, 801, 817, 947).

638.    Therefore Wazhma's testimony that Jagdip said to her "those cases are handled by my brother *Jagprit Sekhon who runs the Sacramento office*" is flatly not credible because obviously Mojaddidi knew: where she worked; who she worked for, her boss's name – "Jagprit Sekhon;" and, that Jagprit was Jagdip's brother.

78

639.    The absurdity of Mojaddidi's account of Jagdip's response is made more evident by the fact that their exchange was allegedly initiated by her confronting him about Jagprit's mishandling of Romanian asylum applications in the Sacramento office:

> I told him that [Manjit] told me that these asylum applications were fraudulent and that Jagprit was the person who was basically giving these stories to these people who come back and recant [sic] them.

(RT 998).

640.    Jagdip's trial counsel could have conclusively exposed Mojaddidi's testimony as a lie if he would have conducted a modest investigation and presented witnesses who would have testified that Jagdip, in a conversation with a friend or acquaintance, never referred to his brother as "my brother Jagprit Sekhon" or "Jagprit Sekhon."

641.    Mojaddidi's testimony was shaky.  She did not know when or how she allegedly spoke to Jagdip regarding Manjit's "confession," or the name of the Romanian asylum applicant that triggered the sequence of events that was the subject of her testimony.

642.    All she remembered, according to Mojaddidi, are the words constituting Jagdip's alleged response.

643.    However, if Jagdip's trial counsel could have evidenced that Mojaddidi's account of what Jagdip said was wholly implausible – he never referred to his brother as "my brother Jagprit Sekhon" or "Jagprit Sekhon" in a conversation with a friend or acquaintance – it would have erased any evidentiary value Mojaddidi's testimony may have had.

644.    This is particularly so because Mojaddidi had already been caught in a lie at trial when she testified she twice attempted to file anonymous complaints with the State Bar against the law firm, but the Bar refused to accept them.

645.    Counsel's failure to investigate and present easily available witnesses whose testimony would have exposed Mojaddidi's account of her conversation as a lie fell below an "objective standard of reasonableness."

646.    If Jagdip's counsel would have performed competently, he would have established that Mojaddidi's testimony regarding Jagdip's response was fabricated and purposely packaged to inform the unfamiliar jury with the full name of Jagdip's brother and where he worked.

647.    Moreover, there is a "reasonable probability that, but for counsel's unprofessional errors, the result would have been different."

648.    No client of the firm testified that during the period of the alleged conspiracy he or she advised Jagdip that Jagprit had fabricated his or her persecution claim.

649.    Mojaddidi is the only employee of the firm who testified that she informed Jagdip of Jagprit's criminal wrongdoings.

650.    If her already severely impeached testimony was wholly undermined by evidence that she fabricated the conversation she alleged she had with Jagdip, there would be no evidence that during the course of the criminal conspiracy someone had informed Jagdip that Jagprit was fabricating fraudulent Romanian asylum applications.

651.    Consequently, trial counsel's failure to conduct an investigation and present witnesses to establish that Jagdip never referred to his brother as "my brother Jagprit Sekhon" or "Jagprit Sekhon," and Mojaddidi's testimony that he had done so was fabricated, constitutes ineffective assistance of counsel warranting the vacating of his conviction. *See Avila*, 297 F. 3d at 919.

652.    The materiality of Jagdip's counsel's failure to investigate the words Mojaddidi attributed to Jagdip is affirmed by new and previously unavailable evidence regarding Mojaddidi's disposition to commit outrageous acts of professional wrongdoing if it will garner her publicity.

653.    On March 13, 2013, Wazhma Mojaddidi made a statement in a Sacramento Bee news report that confirmed that her testimony that she left the law firm due to her professional ethics was implausible.

654.    The news report dealt with the criminal trial of Hamid Hayat.

655.    During the trial, Mojaddidi acted as Hayat's sole defense attorney.

656.    However, in the news report Mojaddidi explained that she represented Hayat "jointly with Johnny Griffin," and her role was limited and subservient.

657.    According to Mojaddidi, "I was in the case primarily because of my Muslim background, language skills and ability to analyze the evidence."

80

658.    The necessity for Mojaddidi to assume such a limited and subservient role was a natural consequence of the fact that she had no criminal trial experience, and Hayat's case was an exceedingly complex one made more difficult by a very formidable prosecution team.

659.    The problem with Mojaddidi assuming a limited and subservient role was that while she was Hayat's attorney, Griffin was representing Hayat's codefendant, Hayat's father, Umer.

660.    The end result was, as Hayat's pending § 2255 motion explicates, due to Mojaddidi's actions, which unassailably constitute ineffective counsel, Hayat was left defenseless without a competent attorney, and following a jury trial he was convicted.

661.    As a consequence, he is now serving a 288-month sentence.

662.    Mojaddidi's conduct was inexcusable under any circumstances, but was alarmingly so given that Hayat's life hung in the balance of his case.

663.    Mojaddidi's representation reflected an utter disregard for an attorney's professional ethics, and further undermines her already incredulous testimony that it was her professional ethics that led her to leave the law firm in December 2003.

664.    What the new evidence establishes is that Mojaddidi's myopic concern is publicity, which is the only explanation for her assuming Hayat's representation; and, provides the only explanation for her testimony at Jagdip's highly publicized trial.

665.    As a result, the new and previously unavailable evidence regarding her misconduct during the *Hayat* trial confirms she lied at Jagdip's trial that she had a conversation with Jagdip regarding Manjit's alleged admission that the firm was engaged in aiding and abetting the fraudulent advancement of Romanian asylum applications.

666.    Finally by fully exposing the degree and extent of Mojaddidi's lies, Jagdip's trial counsel would have been positioned to accurately cast the prosecution's entire case against Jagdip, in light of his failure to discover the *Napue* and *Brady* violations, as one replete with false testimony and prosecutional misconduct.  *See Harris v. Wood*, 64 F. 3d 1432, 1438 (9th Cir. 1995) (The cumulative deficiencies may generate prejudice).

81

667.    However, due to his trial counsel's failings Jagdip did not have the benefit of this proper portrait of the prosecution's fraudulent case against him.

668.    As a consequence, Jagdip suffered prejudice due to his trial counsel's ineffective assistance.  *Cf. Hayes*, 399 F. 3d at 988 (Denial of evidence that would have completely discredited prosecution's case constitutes material prejudice).

**VIII.    CLAIM #5: PETITIONER JAGDIP SEKHON'S RIGHT TO DUE PROCESS WAS VIOLATED BY HIS COUNSEL'S INEFFECTIVE REPRESENTATION BEFORE THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.**

669.    Movant realleges and incorporates in this paragraph each and every of the foregoing allegations.

**A.    INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIMS**

670.    The Sixth Amendment of the Constitution entitled Jagdip to effective assistance of an attorney during the course of his appeal.

671.    "A criminal defendant challenging the effectiveness of his appellate counsel must satisfy both prongs of the *Strickland* test in order to prevail on his claim."  *Smith v. Robbins,* 528 U.S. 258, 289 (2000); *see also, Moormann v. Ryan,* 628 F.3d 1102, 1106 (9th Cir. 2010).

672.    Consequently, he must show that:  1) appellate counsel's performance was objectively unreasonable by demonstrating that counsel failed to advance a meritorious issue, and 2) there is a reasonable probability that, but for appellate counsel's failure to raise the issue, he would have prevailed in his appeal.  *Moormann,* 628 F.3d at 1106.

**B.    JAGDIP'S APPELLATE COUNSEL'S REPRESENTATION WAS PROFESSIONALLY UNREASONABLE**

**1.    Appellate Counsel's Failure to Challenge the Application of the "Abuse of a Position of Trust" Enhancement Constituted Ineffective Assistance of Counsel.**

673.    Jagdip's appellate counsel failed to raise in his briefing to the Ninth Circuit that the district court miscalculated his sentencing guidelines under the Guidelines by wrongly applying the two-point enhancement for "abuse of a position of trust" under § 3B1.3.

82

674.    The meritoriousness of the issue is demonstrated by the fact that the Ninth Circuit remanded Jagdip's co-appellant's case for resentencing minus the § 3B1.3 enhancement because, unlike Jagdip, he did raise the issue.  Harmath, 2014 WL 3766994 at ¶9.

675.    The incompetency of Jagdip's appellate counsel is notably exacerbated by his failure to file a joinder pursuant to FRAP 28 (i) adopting the sentencing arguments raised by Jagprit.

676.    Competent appellate counsel for a criminal defendant routinely joins in all the arguments briefed by his client's co-appellants pursuant to FRAP 28(i), which permits an appellant to join and have the benefit of advancing the pertinent arguments presented by his or her co-appellants through noticing the Ninth Circuit he or she is opting to do so.

677.    The purpose of the routine practice of filing a "joinder" is that, with minimal effort, appellate counsel can ensure that his client has the benefit of all the various arguments raised by his co-appellants, and, as a consequence, significantly reduces the chance that he will fail to advance a meritorious issue on behalf of his client.

678.    Filing a joinder is objectively reasonable for competent appellate counsel; failure to file a joinder is objectively unreasonable and is not competent appellate advocacy.

679.    Jagdip's appellate counsel failed to file a joinder, which resulted in him failing to raise an issue that the Ninth Circuit panel deemed meritorious:  the misapplication of the "abuse of a position of trust" sentencing enhancement to the three defendants who were attorneys.

680.    Jagdip's appellate counsel's representation was professionally unreasonable because he failed to raise the meritorious issue of the misapplication of the "abuse of a position of trust" enhancement either in his briefing or through a FRAP 28(i) joinder.

681.    Accordingly, his representation was ineffective.

> **2.    Appellate Counsel's Failure to Challenge the Application of the "Obstruction of Justice" Enhancement Constituted Ineffective Assistance of Counsel.**

682.    Jagdip's appellate counsel also failed to raise a challenge to Judge Damrell's application of the "obstruction of justice" enhancement under § 3C1.1 of the Guidelines.

83

683.    Appellate counsel failed to do so because he failed to examine any and hence overlooked all the issues related to Jagdip's sentence.

684.    As a result, appellate counsel denied Jagdip his right to an appeal of his conviction, and consequently his representation of Jagdip was professionally unreasonable.  *See Moormann*, 628 F. 3d at 1106 (Appellate counsel's acts "unreasonably in failing 'to discover and brief merit-worthy issue,'" unless his or her oversight is justified).  *see also*, *Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (Counsel's decision not to pursue an avenue of defense is only reasonable to the extent it is an "informed choice").

685.    A challenge to the "obstruction of justice" enhancement would have been meritorious.

686.    The § 3C1.1 enhancement was applied to Jagdip because he testified in his defense nevertheless the jury found him guilty. (JST 52-54).

687.    The Ninth Circuit in *United States v. Castro-Ponce*, 770 F.3d 819 (9th Cir. 2014), held that the fact that a defendant testified and in the process contradicted the prosecution's allegations that the jury ultimately found supported a guilty verdict, does not standing alone support the application of the "obstruction of justice" enhancement.  *Castro-Ponce*, 770 F. 3d at 822-823.

688.    The application of the § 3C1.1 enhancement instead must be based on a finding "'(1) the defendant gave false testimony, (2) on a material matter, (3) with willful intent.'"  *Castro-Ponce*, id. at 822 (*quoting United States v. Garro*, 517 F 3d 1163, 1171 (9th Cir. 2008)).

689.    Moreover, the application of the enhancement must rest on "express findings on all three prongs." *Id*.

690.    "To enhance a guidelines sentencing range based on obstruction of justice, which often results in more time served in prison, a district court must make explicit findings that not only did the defendant give false testimony, but also that the falsehoods were willful and material to the criminal charges." *Id*. at 823.

691.    In this case, the application of the § 3C1.1 enhancement is not supported by such explicit findings, and was thus unlawful.

84

692.   As a result, a challenge to its application on appeal would have been meritorious.

693.   Because Jagdip's appellate counsel's failure to raise a challenge to the "obstruction of justice" enhancement was professionally unreasonable and such a challenge would have been meritorious, his representation was ineffective. *See Moormann*, 628 F. 3d at 1106.

## C.   JAGDIP WAS PREJUDICED BY HIS APPELLATE COUNSEL'S INEFFECTIVENESS.

694.   Appellate counsel's ineffectiveness prejudiced Jagdip because there is a reasonable possibility that, but for appellate counsel's failure to raise the challenges to the § 3B1.3 and § 3C1.1 enhancements, he would have prevailed on appeal. *See Moormann*, 628 F. 3d at 1106.

695.   He would have prevailed on the issue of the misapplication of the "abuse of a position of trust" enhancement. *See Harmath*, 2014 WL 376994 at ¶9 (Remanding this case for Jagdip's codefendant based on misapplication of § 3B1.3 enhancement). He would have also prevailed on the issue of the misapplication of the "obstruction of justice" enhancement. *Castro-Ponce*, 770 F. 3d at 823.

696.   The prejudice is further confirmed by the reduction in sentences the court granted Jagdip's similarly situated codefendants who were attorneys.

697.   Jagprit and Manjit's case were both remanded by the Ninth Circuit for resentencing.

698.   And this Court proceeded to resentence them based on a Guidelines range minus the misapplied "abuse of a position of trust" enhancement.

699.   This Court reduced Jagprit's sentence from 108 months to 71 months, a more than 34% reduction of his original sentence.

700.   This Court reduced Manjit's sentence from 30 months to 9 months, a more than 70% reduction of her original sentence.

701.   A similar reduction in Jagdip's sentencing would result in his immediate release.

702.    Thus, Jagdip unquestionably suffered prejudice due to his counsel's incompetent representation that would have accorded him the benefit of resentencing.  *See Moormann*, 628 F. 3d at 1106.

703.    Accordingly, he is entitled to the vacating of his sentence.

**IX.    CONCLUSION**

WHEREFORE, based on the foregoing, Jagdip Sekhon prays that this court:

1)    Issue an order to have him brought before it to the end that he might be discharged from his unconstitutional confinement and restraint;

2)    Grant his immediate release from custody pending resolution of this motion;

3)    Order the government to answer why Jagdip is not entitled to the relief sought;

4)    Grant Jagdip the authority to obtain subpoenas for witnesses and documents which are not obtainable by other means;

5)    Order an evidentiary hearing at which Jagdip will offer this and further proof in support of the allegations herein;

6)    After full consideration of the issues raised issue an order:

   a)    vacating the judgement and sentence imposed on Jagdip in the Eastern District of California, case number CR-06-00058;

   b)    dismiss the underlying indictment or alternatively order a new trial.

DATED: November 30, 2015
Marysville, CA

Respectfully submitted,

/s/RAJDEP S. CHIMA_____
RAJDEP S. CHIMA (SBN 269677)
The Law Offices of Raj S. Chima
500 Olive Street, Suite 10 and 11
Marysville, CA 95901
Telephone: (530) 749-0749
Facsimile: (530) 749-0748
Attorney for Defendant
JAGDIP SEKHON

86

1

**CERTIFICATE OF SERVICE**

2

I, Rajdep Chima, hereby declare as follows:

3

I certify that on the 30th of November 2015, I filed the foregoing NOTICE OF MOTION

4

AND MOTION TO VACATE JUDGEMENT AND SENTENCE [28 U.S.C. SECTION 2255]

5

with the Clerk of the Court for the United States District Court for the Eastern District of

6

California, Sacramento Division, by using the CM/ECF system.

7

I further certify that all participants in the case are registered CM/ECF users and that

8

service will be accomplished by the CM/ECF system.

9

Executed on November 30, 2015, in Marysville, California.

10

11

/s/RAJDEP S. CHIMA_____
RAJDEP S. CHIMA (SBN 269677)

12

The Law Offices of Raj S. Chima
500 Olive Street, Suite 10 and 11

13

Marysville, CA 95901
Telephone: (530) 749-0749

14

Facsimile: (530) 749-0748

15

16

17

18

19

20

21

22

23

24

25

26

27

28

87