UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Respondent,

vs.

JAGDIP SINGH SEKHON, MANJIT KAUR RAI,

Movants.

No. 2:06-cr-0058-JAM-EFB

ORDER SETTING EVIDENTIARY HEARING

Movants Jagdip Singh Sekhon and Manjit Kaur Rai have filed motions to vacate, set aside, or correct their sentences pursuant to 28 U.S.C. § 2255.[1] ECF Nos. 622, 627. Several of the movants' claims overlap and, after review of the record and the pleadings, the court has determined that two of these overlapping claims[2] merit an evidentiary hearing. The first of these claims alleges that government witnesses Carol Webster and Ranbir Khera offered testimony

[1] These motions were assigned, for statistical purposes, the following civil case numbers: No. 2:15-cv-2491-JAM-EFB and No. 2:16-cv-00067-JAM-EFB.

[2] The court notes that both movants raise other claims which are not appropriate for a hearing at this time. Sekhon alleges that (1) the government knowingly presented false testimony by Davinder Singh and Wazhma Mojaddidi in violation of *Napue* and (2) that his trial counsel was ineffective. Rai alleges that (1) the government knowingly presented false testimony by Wazhma Mojaddidi and that (2) her trial counsel was ineffective.

which the government knew to be false in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). The second is that the government failed to disclose that it had offered Khera legal permanent residency in exchange for his testimony in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

**I. Procedural History**

On December 13, 2007, by way of a second superseding indictment, Sekhon[3] was charged with conspiring to defraud the United States in violation of 18 U.S.C. § 371 by making false statements in asylum applications. ECF No. 94 at 1-14.[4] Rai was charged with six separate counts: (1) a § 371 violation identical to Sekhon's; (2-3) two counts of aiding and abetting the advancement of false statements in violation of 18 U.S.C. § 1546; (4) one count of aiding and abetting the advancement of false statements under 18 U.S.C. § 1001; (5) one count of violating the offense clause of § 371; and (6) one count of making false statements under § 1001. ECF No. 627-1 at 42. Trial began on March 11, 2009 before the Honorable Frank C. Damrell, Jr. and on June 25, 2009, after roughly three months, a jury concluded that Sekhon was guilty of the charge against him. ECF Nos. 234, 326 at 4. The jury acquitted Rai of one count of making false statements in asylum applications under § 1546 but found her guilty on all other counts. ECF No. 325. Sekhon was sentenced to sixty months of incarceration and thirty-six months of supervised release (ECF No. 462); Rai was sentenced to thirty months of incarceration and thirty-six months of supervised release (ECF Nos. 468, 491). Both movants appealed their convictions to the United States Court of Appeals for the Ninth Circuit. ECF Nos. 476-477. The Ninth Circuit affirmed Sekhon's conviction. *See United States v. Harmath*, 580 F. App'x. 591 (9th Cir. 2014). With respect to Rai, the Circuit vacated one of the conspiracy convictions as multiplicitous and otherwise affirmed her convictions. *Id*. at 596. Sekhon filed his current motion for relief on December 1, 2015 (ECF No. 622); Rai's motion was filed on January 11, 2016 (ECF No. 627).

---

[3] The indictment also charged Sekhon's brother Jagprit in the same conspiracy and with other violations of federal law. ECF No. 94 at 6-20. The current motion is advanced only on Jagdip's behalf and, absent clear, textual indication to the contrary, all references to "Sekhon" in this order refer to him alone.

[4] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

## II. Factual Background and Relevant Claims

In its opposition to Sekhon's § 2255 motion, the government includes a brief summary of the facts of the case. The court reproduces this summary in part solely for background purposes.

> Sekhon & Sekhon was founded in 1995 by Defendant and his younger brother, Jagprit Sekhon. ECF No. 504-11 at 54–57 (RT 6215–18). The firm focused on representing clients in immigration proceedings. Id. at 54, 59 (RT 6215, 6220). The firm maintained offices in San Francisco and Sacramento. ECF No. 502-9 at 46 (RT 652). Defendant was based in the San Francisco office while Jagprit was based in the Sacramento office. *Id*. Defendant specialized in asylum work. ECF No. 504-11 at 59 (RT 6220).
>
> In 2002, a United States asylum officer, Mark Temple, became suspicious about asylum claims filed on behalf of Sekhon & Sekhon clients. ECF No. 502-7 at 50–51 (RT 455–56). The matter was referred to Immigration and Customs Enforcement (ICE) Special Agent Carol Webster for investigation. ECF No. 502-7 at 55–56 (RT 460–61). During the course of the investigation, Special Agent Webster had a confidential informant pose as a potential Sekhon & Sekhon client. ECF No. 503-10 at 79–80 (RT 2295–96). The informant recorded meetings with defendants Jagprit Sekhon, Rai, Caza, and Harmath; those recordings were later played at trial. ECF No. 504 at 23–29 (RT 3487–93).

ECF No. 646 at 7-8. At trial, the government introduced testimony and evidence from various sources with the intent of proving that Sekhon & Sekhon was a "fraud factory" wherein "each defendant played a different role in the process, but each was vital to the overall scheme, the processing of fraudulent asylum claims." *Id*. at 9-13; ECF No. 504-14 (RT 6680).

### A. False Testimony

Movants argue that the government knowingly presented false testimony from Agent Webster and Ranbir Khera. ECF No. 622 at 62-72; ECF No. 627 at 49-54. As noted above, Webster was an Immigration and Customs Enforcement agent who investigated Sekhon & Sekhon for the asylum fraud relevant to this case. ECF No. 502-7 at 55-56 (RT 460–61). Khera is an Indian national who first sought immigration assistance from Sekhon & Sekhon's Sacramento office in 2000. ECF No. 503-2 at 75-79 (RT 1633-1637). Khera testified that he met with Sekhon's brother Jagprit, signed several documents, and subsequently received an asylum application from the firm by mail. *Id*. at 76-84 (RT 1634-1642). He testified that the application

contained several statements which falsely described both his involvement with a Sikh separatist movement and local police retaliation against him stemming from that affiliation. *Id*. at 85-90 (RT 1643-1648). Khera testified that he called Jagprit Sekhon and informed him that, due to the falsity of those statements, he would not attend his asylum interview. *Id*. at 92 (RT 1650). Khera would later marry a United States citizen and seek renewed adjustment to his immigration status. *Id*. at 93-94 (RT 1651-1652). Officials referred him to the Sacramento Immigration Office sometime in 2005, and he testified that he first met Webster at that time. *Id*. at 95 (RT 1653).

Both movants argue that, at trial, Khera and Webster misrepresented their interactions. They state that both witnesses falsely testified about a 2005 meeting in Sacramento between Webster, Khera, and his wife, Sarbjit Kaur, which actually never occurred. ECF No. 503-3 at 81-85 (RT 1743-1747); ECF No. 504 at 53-54 (RT 3517-3518). Webster testified that, as a result of observing the couple's interaction at this meeting, she was convinced[5] that their marriage was *bona fide*. ECF No. 506 at 47- 48 (RT 3804-3805). Webster would go on to maintain that she had not promised Khera any favorable adjudication in exchange for his testimony and state that, based on meeting the couple, she "was confident that he would have gotten his green card" on the *bona fides* of the marriage. ECF No. 504 at 54-57 (RT 3518-3521); ECF No. 506 at 61-62 (RT 3817-3818). Movants argue that Webster's testimony was perjury and have provided declarations from Kaur which state that she never met Webster or travelled to Sacramento with Khera to discuss his immigration status with anyone. ECF No. 622-10 at 298; ECF No. 627-2 at 167. Movants emphasize that Khera and Kaur *did* attend an interview with a different immigration official in San Francisco in 2003 to establish their marriage *bona fides*. After meeting with the couple, that immigration official raised numerous concerns about the legitimacy of the marriage. *See* ECF No. 622-3 at 44; *see also* ECF No. 627 at 36. Finally, movants point to a 2006 memo from Webster to the Fresno office of Customs and Immigration Services requesting that Khera's immigration status be adjudicated. ECF No. 622-3 at 29. The memo

[5] It must be noted, however, that Webster also testified that she had no authority over Khera's final immigration status adjudication. ECF No. 505 at 100 (RT 3670). Instead, she testified that the adjudication was performed independently by the Fresno office of Customs and Immigration Services. ECF No. 506 at 58-62 (RT 3814-3818).

describes Khera as a "key witness in an ongoing ICE criminal investigation regarding the preparers of his asylum application" and notes that the information he provided was "crucial to the indictment of three attorneys in an asylum fraud ring." *Id*. Movants contend that this language is indicative of Khera being provided an adjudicative benefit for his testimony. *See* ECF No. 627 at 36.

Movants state that the foregoing discrepancies are material. They argue that the discrepancies show that Khera was not, as the government presented at trial, granted permanent residency as a matter of course.[6] Rather, the movants contend that the fabrication of the 2005 meeting and the weakness of the 2003 marriage interview both indicate that Khera could only have been granted permanent residency in exchange for his trial testimony. The movants go on to conclude that the revelation of Webster's perjury in this matter would have undermined her overall credibility as a witness and the government's case against them would have weakened significantly.

**B. Failure to Disclose**

Movants also argue that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to inform the defense that Khera had been granted lawful permanent residency in exchange for his testimony. ECF No. 622 at 81; ECF No. 627 at 56-57.

/////

[6] At trial, Judge Damrell noted his own concerns about the investigation into Khera's marriage. He referenced the 2003 meeting with the San Francisco immigration official where concerns were raised about the legitimacy of Khera's marriage and stated:

> All the documents seem to point to a problem. The interview points to questions that the hearing officer had that apparently were not resolved at the hearing.
>
> …
>
> My concern is it is left on the cliff anticipating something beyond that, and the next thing that we know, the witness has got a permanent status.

ECF No. 503-3 at 102 (RT 1764). Government counsel agreed to look into the matter (*Id*. at 103 (RT 1765)) but stated that "to [his] understanding" Webster had no influence on Khera's adjudication. Webster confirmed that understanding in her testimony the next day. ECF No. 504 at 53-57 (RT 3517-3521).

The government maintains that Khera was not given anything in exchange for his testimony. ECF No. 646 at 35; ECF No. 658 at 28-29.

**III. Applicable Law**

**A. Motions Brought Pursuant to 28 U.S.C. § 2255**

A federal prisoner making a collateral attack against the validity of his or her conviction or sentence must do so by way of a motion to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255, filed in the court which imposed sentence. *Tripati v. Henman*, 843 F.2d 1160, 1162 (9th Cir. 1988). Under § 2255, the federal sentencing court may grant relief if it concludes that a prisoner in custody was sentenced in violation of the Constitution or laws of the United States. *United States v. Barron*, 172 F.3d 1153, 1157 (9th Cir. 1999). To warrant relief, a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Relief is warranted only where a petitioner has shown "a fundamental defect which inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346 (1974).

**B. *Napue* Claim**

The Supreme Court's decision in *Napue v. Illinois* holds that "a conviction obtained through use of false evidence, known to be such by representatives of the State" violates a defendant's rights under the Fourteenth Amendment. 360 U.S. 264 at 269 (1959). *Napue* is also violated where "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id*. *Napue* draws no distinction between false testimony that goes directly to a defendant's guilt and testimony that bears only on the credibility of a witness. *Id*. To prevail on a *Napue* claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). "In assessing materiality under *Napue*, we determine whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; if so, then the conviction must be set aside." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (internal quotations and

citations omitted). "Under this materiality standard, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. It must be noted, however, that mere inconsistencies in testimony are insufficient to establish either that the testimony was false or that the prosecutor knowingly used false testimony. *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997).

**C. *Brady* Claim**

*Brady v. Maryland*, 373 U.S. 83 (1962) and its successors require the prosecution to disclose evidence that is favorable to the accused, "either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). There is no violation under *Brady*, however, unless the evidence the prosecution failed to disclose prejudiced the accused – that is, that there is a reasonable probability the suppressed evidence would have produced a different verdict. *Id*. at 281.

**D. Evidentiary Hearings**

In reviewing a motion brought pursuant to § 2255, a federal court shall hold an evidentiary hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). *See also United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003); *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (citing 28 U.S.C. § 2255(b)). Evidentiary hearings are particularly appropriate when "claims raise facts which occurred out of the courtroom and off the record." *United States v. Burrows*, 872 F.2d 915, 917 (9th Cir. 1989); *accord Frazer v. United States*, 18 F.3d 778, 781 (9th Cir. 1994); *Doganiere v. United States*, 914 F.2d 165, 168 (9th Cir. 1990).

In deciding whether a § 2255 movant is entitled to an evidentiary hearing, the district court should determine whether, accepting the truth of movant's factual allegations, he could prevail on his claim. *Blaylock*, 20 F.3d at 1465. However, to be entitled to an evidentiary hearing the movant must provide specific factual allegations which, if true, state a claim on which relief under § 2255 could be granted. *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003); *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984). The court may deny a request

for evidentiary hearing on a § 2255 motion "if the petitioner's allegations, viewed against the record, fail to state a claim or are 'so palpably incredible or patently frivolous as to warrant summary dismissal.'" *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996) (citations omitted).

**IV. Analysis**

**A. Napue Claims**

The record before the court contains conflicting evidence as to whether: (1) Webster, Khera, and Kaur met in Sacramento in 2005; and (2) Khera was offered a favorable immigration adjudication in exchange for his testimony. With respect to this *Napue* claim, the government argues that the movants have failed to carry their burden of showing that the testimony in question was "actually false." ECF No. 646 at 20-21; ECF No. 658 at 21. Rather, it contends that the movants' evidence merely "raise[s] a question" as to Webster and Khera's credibility and argues that Kaur's contradictory account "at most point[s] to evidence creating an inference of falsity." ECF No. 646 at 21; ECF No. 658 at 21.

The government relies, in part, on *United States v. Houston*, 648 F.3d 806 (9th Cir. 2011) wherein the Ninth Circuit rejected a prosecutorial misconduct claim after finding that there was insufficient evidence to demonstrate that the testimony in question was false or that the government knew it to be false at the time it was presented. *Id.* at 814. In *Houston*, one of the inmate defendants (Houston) was convicted of various offenses arising out of a conspiracy to murder black inmates. *Id.* at 810-811. At trial, a jailhouse informant testified that Houston had told him that, if he were not sentenced to death, he would continue to kill black inmates. *Id.* at 812. At trial, defense counsel questioned the informant about his appearance in other, related proceedings in which he did not mention Houston's statement. *Id.* Their line of inquiry suggested that the informant had invented this statement after his deal to testify against another inmate involved in the conspiracy fell through because of that inmate's death. *Id.* On cross-examination, the informant testified that he had told a Pennsylvania Assistant United States Attorney (AUSA) about Houston's statement several years before. *Id.* The prosecuting AUSA was surprised by this testimony and reached out to Pennsylvania for the interview notes and

turned them over to the defense. *Id*. Those notes provided no indication that such a statement was made during the interview and the Pennsylvania AUSA stated that he could not recall whether the informant mentioned Houston, but noted that it was "fairly unlikely" that he would not have recorded such a statement. *Id*. On appeal, Houston argued that the government had violated *Napue* by knowingly presenting the informant's false testimony. *Id*. at 813. The Ninth Circuit disagreed and held that Houston had, at most, pointed to "evidence creating an inference of falsity." *Id*. at 814. In so doing, it stated that the informant's previous omissions of the statement amounted to nothing more than inconsistent statements and it emphasized that these inconsistencies "were fully explored and argued to the jury." *Id*.

*Houston* is distinguishable from the present case insofar as Kaur's affidavit presents more than an "inference of falsity"; it is a direct refutation of Webster and Khera's testimony regarding the 2005 meeting. Moreover, the inconsistency between the two narratives was not explored at trial. Additionally, given the import of Webster's testimony to the government's case, the court cannot simply dismiss her allegedly false testimony as immaterial. *See Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005) ("Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case.")[7]; *see also Hayes*, 399 F.3d at 986 ("[I]t is of no consequence that the falsehood bore upon the witness's credibility rather than directly upon the [movant's] guilt . . . [t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . ." (internal citations and quotations omitted)).

Based on the foregoing, the court finds that the movants have presented colorable *Napue* claims. The clear contradiction between Webster and Khera's recounting of their 2005 meeting and Kaur's claim that the same meeting never occurred militates in favor of an evidentiary hearing to resolve this factual issue. The consequent question of whether Khera was offered any inducement for his testimony must also be addressed at this hearing.

---

[7] In *Silva*, the Ninth Circuit evaluated materiality in the context of a claim that the government failed to disclose material evidence. 416 F.3d 980, 986-987 (9th Cir. 2005). It noted, however, that the same materiality analysis applies to claims regarding the use of and failure to correct false evidence. *Id*. at 986 n.1.

**B. *Brady* Claims**

The movants' *Brady* claims arise from the same factual nexus as their *Napue* claims against Agent Webster and Ranbir Khera. Indeed, Sekhon's memorandum of points and authorities explicitly states "[t]he *Napue* violations involving Case Agent Webster and Khera also double as *Brady* violations." ECF No. 622-1 at 53. As noted above, movants allege that the government failed to disclose the evidence that Khera had been granted permanent residency in exchange for his testimony. The government has repeatedly denied that Khera was given anything in exchange for his testimony and argues that this claim should be dismissed as "pure speculation." *See* ECF No. 646 at 35. The court has already determined that an evidentiary hearing on the analogous *Napue* claims is appropriate and, as such, the parties should address this claim at that hearing as well.

**V. Conclusion**

Accordingly, good cause appearing, IT IS HEREBY ORDERED that:

1. This matter is set for evidentiary hearing on December 5, 2016 at 9:30 a.m. in Courtroom No. 8.

2. The parties shall appear at the evidentiary hearing by counsel and shall be prepared to present witnesses and provide factual development on the matters discussed above.

DATED: November 17, 2016.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE